# **Exhibit A**

FILED

1   ANDRÉ BIROTTE JR.
    United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    STEVEN R. WELK
4   Assistant United States Attorney
    Chief, Asset Forfeiture Section
5   P. GREG PARHAM
6   Assistant United States Attorney
    Asset Forfeiture Section
7   California Bar No. 140310
       Federal Courthouse, 14th Floor
8      312 North Spring Street
9      Los Angeles, California 90012
       Telephone:  (213) 894-6528
10     Facsimile:  (213) 894-7177
11     E-mail: greg.parham@usdoj.gov

12  Attorneys for Plaintiff
    United States of America
13
                    UNITED STATES DISTRICT COURT
14
               FOR THE CENTRAL DISTRICT OF CALIFORNIA
15
                        WESTERN DIVISION
16
17  UNITED STATES OF AMERICA,     )  NO. CV12-7651 -ODW
                                   )       (JEM)
18         Plaintiff,             )
                                   )     VERIFIED
19      vs.                        )  COMPLAINT FOR FORFEITURE
                                   )
20                                 )
21  ONE 2006 MERCEDES-BENZ R350,   )  [18 U.S.C. § 981(a)(1)(A)&(C)]
                                   )
22         Defendant.             )
                                   )     [I.R.S.]
23                                 )
                                   )
24                                 )
                                   )
25                                 )
                                   )
26                                 )
                                   )
27
28

1

EXHIBIT A
Page 28

1    The United States of America brings this claim against the

2  defendant one 2006 Mercedes-Benz R350 ("the defendant"), and

3  alleges as follows:

4                    **JURISDICTION AND VENUE**

5    1.   This is a civil forfeiture action brought pursuant to

6  18 U.S.C. § 981(a)(1)(A) and (C).

7    2.   This court has jurisdiction over the matter under 28

8  U.S.C. §§ 1345 and 1355.

9    3.   Venue lies in this district pursuant to 28 U.S.C.

10 § 1395(b).

11                   **PERSONS AND ENTITIES**

12   4.   The plaintiff is the United States of America.

13   5.   The defendant is one 2006 Mercedes-Benz R350 with

14 vehicle identification number 4JGCB65EX6A026288.

15   6.   The interests of Rocco Cuccia ("Cuccia"), Laura

16 Adriana Moreno ("Moreno") and Lionsgate Entertainment may be

17 adversely affected by these proceedings.

18   7.   Plaintiff alleges that the defendant constitutes or

19 was derived from proceeds traceable to violations of 18 U.S.C.

20 § 1343 (wire fraud).  As such, the defendant is subject to

21 forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  In addition,

22 plaintiff alleges that the defendant was purchased with

23 criminally derived funds over $10,000.00, in violation of 18

24 U.S.C. § 1957 (money laundering-engaging in a monetary

25 transaction with criminally derived funds), thus providing a

26 separate basis for forfeiture under 18 U.S.C. § 981(a)(1)(A).

27   8.   The defendant was seized pursuant to a federal seizure

28 warrant (hereinafter "IRS") and is currently in the custody of

EXHIBIT A
  Page 29

1   the Internal Revenue Service ("IRS"), where it shall remain

2   subject to this court's jurisdiction during the pendency of this

3   action.

### EVIDENCE SUPPORTING FORFEITURE

5       9.   On or about January 2006 and continuing into 2011,

6   Cuccia embezzled substantial sums of money from his former

7   employer, Lionsgate Entertainment ("Lionsgate"), in a kickback

8   scheme he orchestrated with Larry Collins ("Collins"), a third

9   party vendor.

10      10.   Lionsgate is a theatrical and television production

11  and distribution entertainment company.  Lionsgate produces

12  television shows and acquires pictures and shows for release in

13  theatres and for home video (DVD).  The DVDs are released

14  through Lionsgate's Home Entertainment Department and operated

15  by their Home Entertainment Operations Team.  When DVDs are

16  released for sale, the DVDs are generally displayed on

17  "corrugates."  Corrugates are cardboard display cases that have

18  graphic designs of the particular show or movie on the DVD.

19

20  *Cuccia and Collins Devised A Scheme To Embezzle Thousands Of
    Dollars From 2006-2010 From Lionsgate*

21

22      11.   In 2006, Cuccia was hired by Lionsgate's Home

23  Entertainment Department as the Buyer and Manager of Material

24  Business Systems.  Cuccia's job duties included the distribution

25  of DVDs, finding a vendor who sold corrugate cardboard designs,

26  and making corrugate purchases through the selected vendor.

27  ///

28  ///

3

12.   Prior to working for Lionsgate, Cuccia worked in the Procurement Department at MGM where he and his department made corrugate purchases from Versagraphic Design Group ("Versagraphic"), a corrugate supply company owned by Collins.

13.   In 2006, Cuccia left MGM to work for Lionsgate.  It is alleged that Cuccia and Collins embezzled hundreds of thousands of dollars from MGM by increasing the quantities of corrugates on pre-approved purchase orders and thereby doubled the amount made payable to Collins and his companies.

14.   Versagraphic supplies entertainment companies with corrugate cardboard designs.  In 2009, Collins changed the name of his company to Versagrafx.  Collins also owns a company called Versastack Merchandising ("Versastack").  Both of these companies purport to be engaged in supplying corrugate designs and supplies.  Collins operated his companies from his residence in Porter Ranch, California.

15.   From 2006 through 2010, while employed at Lionsgate, Cuccia used his knowledge of the procurement system and his authority to access the procurement computer program to increase the quantity of ordered corrugates on approved purchase orders, thus doubling the amount to be paid to Versagraphic.

16.   Cuccia "padded" already approved purchase orders and created completely fabricated purchase orders of corrugates by manipulating the "unlimited" toggle function in the procurement computer system.

17.   In order to facilitate the fraudulent transactions and ensure the payment of embezzled funds from Lionsgate to Versagraphic, Cuccia and Collins contracted with Jefferson

EXHIBIT A
Page 31

Factors, Inc. ("Jefferson"), a factor company located in West Palm Beach, Florida, to facilitate the payment of invoices to Versagraphic.

18.   Collins sold his Lionsgate accounts receivables to Jefferson at a discount and Jefferson paid Versagraphic upfront the total amount less the discount.

19.   From 2006 through 2011, Jefferson paid Collins' companies $11 million for services allegedly provided to Lionsgate.

20.   Lionsgate confirmed that Cuccia was not authorized to make any such contracts on behalf of Lionsgate.  Contracts obtained during the investigation show Cuccia's signature on the contracts authorizing the business transactions among Lionsgate, Collins and Jefferson.

21.   In January 2011, Lionsgate conducted an internal merchandise audit and discovered Cuccia's and Collins' scheme. Cuccia resigned immediately when he learned of the audit.

*Cuccia Conspired With Collins To Commit Wire Fraud, A Specified Unlawful Activity ("SUA"), For The Purpose Of Receiving Illegally Derived Funds From Lionsgate*

22.   On December 22, 2011, IRS Special Agents interviewed Collins at his residence.  Based on their interview with Collins, they learned the following:

a.   Collins was shown several wire transfers sent from his companies, Versastack and Versagrafx, to Cuccia from January 1, 2006 to October 25, 2010, totaling over $500,000.00.

b.   Collins admitted sending the money to Cuccia, stating the money was for personal loans and consulting fees, to

1  help Cuccia establish his own corrugate design company, and to

2  pay other vendors who provided services to Lionsgate.

3      23.  On December 22, 2011, FBI Special Agents interviewed

4  Cuccia at his residence.  Based on their interview with Cuccia,

5  they learned the following:

6          a.   Cuccia admitted increasing the tolerance level in

7  the procurement computer system by using the toggle function in

8  the program.

9          b.   Cuccia was able to increase the tolerance level

10  without supervisor approval due to a default in the procurement

11  computer system.

12         c.   Cuccia was shown purchase order 6006990 with an

13  original quantity order of 5,000 corrugates.  Cuccia was also

14  shown a screen shot printout from Lionsgate which showed the

15  change in the quantity of corrugates from 5,000 to 11,000.  The

16  printout shows the changes were made by user, "RCUCCIA."  Cuccia

17  acknowledged that he made the changes in the procurement

18  computer system.  Cuccia stated that he does not know why he

19  changed the tolerance level from 10 to 0.

20         d.   Cuccia was shown the contract between Jefferson,

21  Versagraphic and Lionsgate.  Cuccia identified his signature on

22  the contract, which authorized payments of Lionsgate purchase

23  orders to Versagraphic.

24         e.   Cuccia admitted that he received approximately

25  over $500,000.00 from Collins' companies via wire transfers for

26  work he had performed for Collins.

27     24.  During the investigation, IRS Special Agents obtained

28  and reviewed IRS transcripts and reports for Cuccia which

1  detailed all Forms 1099s and Forms W-2 issued from 2006 through

2  2010.  Based on the review of these records, no Forms W-2 or

3  Forms 1099 were issued to Cuccia by Versastack, Versagrafx or

4  any other company owned by or affiliated with Collins.

6  ### *The Illegally Derived Funds Were Traced From Collins' To Cuccia's Personal Bank Account*

7      25.  During the course of the investigation, IRS Special

8  Agents received and reviewed bank documents, Lionsgate Purchase

9  Orders, Invoices submitted to Lionsgate by Collins, emails

10  between Cuccia and Collins, Jefferson contracts (DBA as 21st

11  Financial Solutions), and a spreadsheet provided by Lionsgate

12  which identifies Cuccia as the individual who altered and

13  manufactured fraudulent purchase orders.  Agents reviewed and

14  analyzed these documents and learned the following.

15      26.  On or about October 29, 2009, Jefferson wired

16  $80,096.90 to Collins into his Versagrafx Citibusiness Checking

17  Account ending in 2106 ("Versagrafx Account 2106") for Lionsgate

18  Purchase Orders 60005303, 4687367 and 4687368.

19          a.   On or about November 2, 2009, Collins wired

20  $2,500.00 from his Versagrafx Account 2106 into his Versastack

21  Citibusiness Checking Account ending in 1664 ("Versastack

22  Account 1664").

23          b.   On or about November 2, 2009, Collins wired

24  $2,000.00 from his Versastack Account 1664 into Cuccia's

25  Citibank Regular Checking Account ending in 2604 ("Citibank

26  Account 2604").

27  ///

28  ///

EXHIBIT A
Page 34

27. On or about March 22, 2010, Jefferson wired $56,897.76 to Collins into his Versagrafx Account 2106 for Lionsgate Purchase Order 4700607.

a. On or about March 22, 2010, Collins wired $10,000.00 from his Versagrafx Account 2106 into his Versastack Account 1664.

b. On or about March 22, 2010, Collins wired $10,000.00 from his Versastack Account 1664 into Cuccia's Citibank Account 2604.

28. On or about April 19, 2010, Jefferson wired $43,959.65 to Collins into his Versagrafx Account 2106 for Lionsgate Purchase Order 4701855.

a. On or about April 20, 2010, Collins wired $20,000.00 from his Versagrafx Account 2106 into his Versastack Account 1664.

b. On or about April 20, 2010, Collins wired $20,000.00 from his Versastack Account 1664 into Cuccia's Citibank Account 2604.

29. On or about August 13, 2010, Jefferson wired $43,967.40 to Collins into his Versagrafx Account 2106 for Lionsgate Purchase Order 60006690.

a. On or about August 13, 2010, Collins wired $21,500.00 from his Versagrafx Account 2106 into his Versastack Account 1664.

b. On or about August 13, 2010, Collins wired $21,500.00 from his Versastack Account 1664 into Cuccia's Citibank Account 2604.

///

1       30.   On or about August 31, 2010, Jefferson wired

2  $96,901.38 to Collins into his Versagrafx Account 2106 for

3  Lionsgate Purchase Order 4713319.

4         a.   On or about September 3, 2010, Collins wired

5  $24,000.00 from his Versagrafx Account 2106 into his Versastack

6  Account 1664.

7         b.   On or about September 3, 2010, Collins wired

8  $24,000.00 from his Versastack Account 1664 into Cuccia's

9  Citibank Account 2604.

10     31.   On or about September 13, 2010, Jefferson wired

11  $43,983.24 to Collins into his Versagrafx Account 2106 for

12  Lionsgate Purchase Order 60006808.

13         a.   On or about September 14, 2010, Collins wired

14  $10,000.00 from his Versagrafx Account 2106 into his Versastack

15  Account 1664.

16         b.   On or about September 14, 2010, Collins wired

17  $10,000.00 from his Versastack Account 1664 into Cuccia's

18  Citibank Account 2604.

19     32.   On or about September 16, 2010, Jefferson wired

20  $87,210.60 to Collins into his Versagrafx Account 2106 for

21  Lionsgate Purchase Orders 60006824 and 60006825.

22         a.   On or about September 17, 2010, Collins wired

23  $55,500.00 from his Versagrafx Account 2106 into his Versastack

24  Account 1664.

25         b.   On or about September 17, 2010, Collins wired

26  $55,500.00 from his Versastack Account 1664 into Cuccia's

27  Citibank Account 2604.

28  ///

EXHIBIT A
Page 36

33.  On or about October 22, 2010, Jefferson wired $149,909.28 to Collins into his Versagrafx Account 2106 for Lionsgate Purchase Order 60006990.

    a.  On or about October 25, 2010, Collins wired $63,000.00 from his Versagrafx Account 2106 into his Versastack Account 1664.

    b.  On or about October 25, 2010, Collins wired $63,000.00 from his Versastack Account 1664 into Cuccia's Citibank Account 2604.

34.  On or about December 14, 2010, Jefferson wired $72,605.92 to Collins into his Versagrafx Account 2106 for Lionsgate Purchase Order 4720892.

    a.  On or about December 20, 2010, Collins wired $69,500.00 from his Versagrafx Account 2106 into his Versastack Account 1664.

    b.  On or about December 20, 2010, Collins wired $69,500.00 from his Versastack Account 1664 into Cuccia's Citibusiness Checking Account ending in 9500 ("Citibank Account 9500").

35.  Agents reviewed the deposits into Cuccia's Citibank personal and business checking accounts ending in 2604 and 9500, from January 20, 2009 through December 31, 2010.  Based on the review of these records, they learned the following:

    a.  Cuccia has signature authority on Citibank Accounts 2604 and 9500.

    b.  Citibank Account 2604 was opened on February 12, 2004.

///

EXHIBIT A
Page 37

   c.   Citibank Account 9500, in the name of Media Fulfillment Solutions ("Media Fulfillment") was opened on December 20, 2010.

   d.   From January 20, 2004 through October 25, 2010, Cuccia received 43 wire transfers from Collins, or companies controlled by Collins, totaling $502,435.00, which was deposited into Citibank Account 2604.

   e.   From December 20, 2010 to December 31, 2010, Cuccia received 2 wire transfers from Collins' company, Versastack, totaling $91,250.00, which was deposited into Citibank Account 9500.

   f.   From January 31, 2006 through December 31, 2010, Cuccia received an estimated total of $593,685.00 from Collins, or companies controlled by Collins.

*Cuccia Used Illegally Derived Funds To Purchase The Defendant*

   36.   IRS Special Agents received and reviewed documents from Mercedes-Benz of Long Beach, and the California Department of Motor Vehicles.   Based on the review of these records, they have learned the following.

   37.   On or about September 15, 2010, a 2006 Mercedes-Benz R350, California license plate number 6MRE609, was purchased from Mercedes-Benz of Long Beach for $29,595.00, with check number 201, drawn on Citibank Account 2604.

   a.   As of August 9, 2010, Cuccia's Citibank Account 2604 had a balance of $9,118.72.

///

///

///

11

1         b.   From August 10, 2010 through September 17, 2010,

2 Cuccia received four wire transfers into Citibank Account 2604,

3 from Versastack, totaling $111,000.00.

4         c.   On September 15, 2010, Cuccia received two wire

5 transfers into Citibank Account 2604, from Versastack, in the

6 amount of $10,000.00 and $55,500.00.

7         d.   On September 15, 2010, Cuccia wrote check number

8 201 to Mercedes-Benz of Long Beach from Citibank Account 2604

9 for $29,595.00, the total purchase price of the 2006 Mercedes-

10 Benz R350.

11         e.   The Mercedes-Benz R350 was purchased in Cuccia's

12 name.

13         f.   On or about September 15, 2010, the title to the

14 Mercedes-Benz R350 was transferred from Cuccia to Moreno.

15     38.  As mentioned previously in this complaint, Citibank

16 provided records pertaining to bank accounts owned and

17 controlled by Cuccia and Collins.  Based on review of these

18 records, from January 2006 through October 25, 2010, Collins

19 sent wire transfers to Cuccia's Citibank Accounts 2604 and 9500

20 approximately 1-6 days after receiving payments from Jefferson.

21     39.  On December 22, 2011, Special Agents interviewed

22 Cuccia at his residence.  During the interview Cuccia was shown

23 check number 201, dated September 15, 2010, for $29,595.00, made

24 payable to Mercedes-Benz of Long Beach.  Cuccia wrote the check

25 from Citibank Account 2604.  Cuccia admitted writing and signing

26 the check for the purpose of purchasing the Mercedes-Benz.

27     40.  On December 29, 2011, IRS Special Agents interviewed

28 Joanne Kanemaki ("Kanemaki"), Fleet Manager at Mercedes-Benz of

1   Long Beach.  Kanemaki and her Finance Manager sold Cuccia a 2006

2   Mercedes-Benz R350. Kanemaki was shown a color California

3   Department of Motor Vehicle photo of Cuccia.  Kanemaki reviewed

4   the photo and identified Cuccia as the person purchasing the

5   2006 Mercedes-Benz R350.  Kanemaki recalled seeing a woman with

6   Cuccia at the time of the purchase.  Kanemaki recalled Cuccia

7   stating that he was purchasing the Mercedes-Benz for the woman

8   who was with him.

9        41.  On or about December 22, 2011, FBI Special Agents

10  interviewed Moreno.  Agents learned the following:

11            a.   Moreno is Cuccia's ex-girlfriend.  Cuccia and

12  Moreno currently live together in Downey, California.

13            b.   Cuccia purchased the 2006 Mercedes-Benz R350 for

14  Moreno.  Moreno is the registered owner of the 2006 Mercedes-

15  Benz R350.

16       42.  On or about March 22, 2012, the Honorable U.S.

17  Magistrate Judge Jacqueline Chooljian issued a seizure warrant

18  for the 2006 Mercedes-Benz R350.  Agents executed the seizure

19  warrant on March 23, 2012 and took possession of the vehicle.

20       43.  On or about March 22, 2012, Cuccia was indicted in the

21  U.S. District Court for the Central District of California for

22  wire fraud and money laundering offenses (See United States v.

23  Rocco Cuccia, et al., 12-CR-00259 ABC).  That matter is pending.

24       44.  Based on the above, plaintiff alleges that the

25  defendant constitutes or was derived from proceeds traceable to

26  violations of 18 U.S.C. § 1343 (wire fraud).  The defendant is

27  therefore subject to forfeiture pursuant to 18 U.S.C.

28  § 981(a)(1)(C).  Plaintiff also alleges that the defendant was

1  purchased with criminally derived funds over $10,000.00, in

2  violation of 18 U.S.C. § 1957 (Money Laundering-engaging in a

3  monetary transaction with criminally derived funds), thus

4  providing a separate basis for forfeiture under 18 U.S.C.

5  § 981(a)(1)(A).

6      WHEREFORE, the United States prays that due process issue

7  to enforce the forfeiture of the defendant, due notice be given

8  to all interested parties to appear and show cause why

9  forfeiture should be not be decreed, that this court decree

10  forfeiture of the defendant currency to the United States of

11  America for disposition according to law, and for such other and

12  further relief as this court may deem just and proper, together

13  with the costs and disbursements of this action.

14  DATED: September ⨏, 2012    ANDRÉ BIROTTE JR.
                                United States Attorney
15                              ROBERT E. DUGDALE
16                              Assistant United States Attorney
                                Chief, Criminal Division
17                              STEVEN R. WELK
18                              Assistant United States Attorney
                                Chief, Asset Forfeiture Section

19

20

                                P. Greg Parham
21                              P. GREG PARHAM
                                Assistant United States Attorney
22                              Asset Forfeiture Section

23                              Attorneys for Plaintiff
24                              United States of America

25

26

27

28

                                14

## VERIFICATION

I, Adrian M. Yepez hereby declare that:

1.    I am a Special Agent with the Internal Revenue Service Criminal Investigation and am the case agent for the forfeiture matter entitled United States v. One 2006 Mercedes-Benz R350.

2.    I have read the above Verified Complaint for Forfeiture and know its contents.  It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3.    Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 7, 2012 in Los Angeles, California.


_____
ADRIAN M. YEPEZ

15

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is John E. McDermott.

The case number on all documents filed with the Court should read as follows:

## CV12- 7651 ODW (JEMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

EXHIBIT A
Page 43

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | ONE 2006 MERCEDES-BENZ R350 |

| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only) |
|---|---|
| Los Angeles | Los Angeles |

| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| ANDRE BIROTTE JR., United States Attorney <br> P. GREG PARHAM, Assistant United States Attorney <br> United States Attorney's Office, California Bar No. 140310 <br> U.S. Courthouse, 14th Floor, 312 N. Spring Street, Los Angeles, CA 90012, Telephone: (213) 894-6528, Facsimile: (213) 894-7177 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. Section 981

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | **BANKRUPTCY** | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 810 Selective Service | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 850 Securities/Commodities /Exchange | | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 891 Agricultural Act | ☐ 160 Stockholders' Suits | | ☐ 441 Voting | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 892 Economic Stabilization Act | ☐ 190 Other Contract | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | | **SOCIAL SECURITY** |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | ☐ 861 HIA (1395ff) |
| ☐ 894 Energy Allocation Act | **REAL PROPERTY** | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 895 Freedom of Information Act | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 220 Foreclosure | | | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| | ☐ 230 Rent Lease & Ejectment | | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | ☒ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:** Case Number: **CV12-7651**

CV-71 (01/03)  **CIVIL COVER SHEET**  Page 1 of 2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM JS-44C, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b). RELATED CASES: Have any cases been previously filed that are related to the present case? ☒ No    ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.  Appear to arise from the same or substantially identical transactions, happenings, or events;

☐ B.  Involve the same or substantially the same parties or property;

☐ C.  Involve the same patent, trademark or copyright;

☐ D.  Call for determination of the same or substantially identical questions of law; or

☐ E.  Likely for other reasons  may entail unnecessary duplication of labor if heard by different judges.

IX. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☒ Check here if the U.S. government, its agencies or employees is a named plaintiff.
   Los Angeles

List the California County, or State if other than California, in which EACH named defendant resides.  (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
   Los Angeles

List the California County, or  State if other than California, in which EACH claim arose.  (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.
   Los Angeles

X. SIGNATURE OF ATTORNEY (OR PRO PER): _P. Greg Parham_____   Date ___September 6, 2012___

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

EXHIBIT A
Page 45

# **Exhibit B**

JENNIFER SHASKY CALVERY
Chief, Asset Forfeiture and
Money Laundering Section (AFMLS)
LINDA M. SAMUEL, Deputy Chief
DANIEL H. CLAMAN, Assistant Deputy Chief
WOO S. LEE, Trial Attorney
STEPHEN GIBBONS, Trial Attorney
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone:  (202) 514-1263
Woo.Lee@usdoj.gov

ANDRÉ BIROTTE, JR.
United States Attorney
STEVEN R. WELK (Cal. Bar No. 149883)
Assistant United States Attorney
312 North Spring Street, 14th Floor
Los Angeles, California 90012
Telephone:  (213) 894-6166
Steven.welk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT

JUN | 1 2012

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CV 2: 11-3582-GW-SS |
| Plaintiff, | Hon. George H. Wu |
| vs. | SECOND AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| ONE WHITE CRYSTAL-COVERED "BAD TOUR" GLOVE AND OTHER MICHAEL JACKSON MEMORABILIA; REAL PROPERTY LOCATED ON SWEETWATER MESA ROAD IN MALIBU, CALIFORNIA; ONE 2011 FERRARI 599 GTO, | |
| Defendants. | |

1

Plaintiff United States of America, by and through its undersigned attorneys, in a case of forfeiture in rem, alleges that:

## I.

## NATURE OF THE ACTION

1.    This is an action *in rem* to forfeit approximately $32 million in real and personal property held for the benefit of Teodoro Nguema Obiang Mangue ("Nguema"), the Second Vice President of Equatorial Guinea for National Defense and State Security, and the son of the President of Equatorial Guinea. This action seeks forfeiture of property that was derived from violations of U.S. and foreign law pursuant to 18 U.S.C. § 981(a)(1)(C), and property involved in a money laundering offense in violation of 18 U.S.C. §§ 1956 and 1957 pursuant to 18 U.S.C. § 981(a)(1)(A).  The defendants *in rem*, obtained through the abuse of public office and illegally laundered through financial institutions and businesses in the United States, are believed to be currently located, or were previously located at the time this action was originally filed, within the Central District of California.

///

///

///

EXHIBIT B
Page 48

II.

## THE DEFENDANTS IN REM

A. **One White Crystal-Covered "Bad Tour" Glove and Other Michael Jackson Memorabilia**

2.   The defendant White Crystal-Covered "Bad Tour" Glove and miscellaneous other Michael Jackson memorabilia (hereinafter "defendant memorabilia" or "defendant Michael Jackson memorabilia") are listed in Attachments A-1, A-2, and A-3 hereto.   These items are believed to have been located at the defendant real property located on Sweetwater Mesa Road, Malibu, California, described below and in Attachment B hereto, at the time this action was originally filed.

B. **Real Property Located on Sweetwater Mesa Road, Malibu, California**

3.   The defendant real property, as more fully described in Attachment B hereto, is titled in the name of Sweetwater Malibu, LLC; is located on Sweetwater Mesa Road, Malibu, California, and includes all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom (hereinafter "Sweetwater property" or "defendant real property").[1]

///

///

_____

[1] Pursuant to Local Rule 79-5.4(e), home addresses have been omitted from this complaint.

3

C. 2011 Ferrari

4.  The defendant 2011 Ferrari is described as follows:
One 2011 Ferrari 599 GTO, VIN ZFF70RCA6B0176109, its tools and
appurtenances (hereinafter "defendant 2011 Ferrari").

5.  The defendant 2011 Ferrari is titled in the name of
Teodoro Nguema Obiang and was located at the Sweetwater property
at the time this action was originally filed.  At present, it is
in the possession of the United States.

6.  The following may have interests in the defendants *in
rem*: Teodoro Nguema Obiang Mangue.

7.  The defendant Michael Jackson memorabilia, Sweetwater
property, and 2011 Ferrari are collectively referred to as "the
defendant assets."

III.

JURISDICTION AND VENUE

8.  The United States brings this action *in rem* in its own
right to forfeit and condemn the defendant assets.  This Court
has jurisdiction over an action commenced by the United States
under 28 U.S.C. § 1345, and over an action for forfeiture under
28 U.S.C. § 1355(a).

9.  This Court has *in rem* jurisdiction over the defendant
assets under 28 U.S.C. § 1355(b).
///

4

10.   Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 because the defendant assets are or were located in this district at the time this action was originally filed.  For assets removed from this district to a location outside of the United States, venue is also appropriate pursuant to 28 U.S.C. § 1355(b)(2).

11.   The defendant real property has not been seized but is located within this district and within the jurisdiction of this Court.  The United States does not request authority from the Court to seize the defendant real property at this time.  The United States will, as provided by 18 U.S.C. §§ 985(b)(1) and (c)(1):

- Post notice of this action and a copy of the Second Amended Complaint on the defendant real property;

- Serve notice of this action on the defendant real property's owner, and send such a notice to any other person or entity who has claimed an interest in the defendant real property, along with a copy of this Second Amended Complaint;

- If necessary, request and execute a writ of entry for purposes of conducting an inspection and inventory of

EXHIBIT B
Page 51

the defendant real property.

## IV.

### BASIS FOR FORFEITURE

12.   The defendant assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because they are property constituting or derived from proceeds traceable to an offense constituting a "specified unlawful activity."  Specified unlawful activities are defined in 18 U.S.C. § 1956(c)(7) and include:  (i) foreign offenses involving "extortion"; (ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (iii) foreign offenses involving bribery of a public official; and (iv) domestic bank fraud in violation of 18 U.S.C. § 1344.  *See* 18 U.S.C. §§ 1956(c)(7)(B)(ii), 1956(c)(7)(B)(iv), and 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

13.   The defendant assets are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or an attempted transaction in violation of 18 U.S.C. § 1957, or are property traceable to such assets.  Section 1957 prohibits the conducting of a monetary transaction with property known to be the proceeds of unlawful activity with a value greater than $10,000, *i.e.*, the

EXHIBIT B
Page 52

proceeds of (i) a foreign offense involving extortion, (ii) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, (iii) a foreign offense involving bribery of a public official, and (iv) domestic bank fraud in violation of 18 U.S.C. § 1344. *See* 18 U.S.C. §§ 1956(c)(7)(B)(ii), 1956(c)(7)(B)(iv), and 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

14.  The defendant real property and memorabilia are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or an attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B), or are property traceable to such assets.  Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to conceal the nature, location, source, ownership, or control of proceeds of a specified unlawful activity, *i.e.*, (i) a foreign offense involving extortion, (ii) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, (iii) a foreign offense involving bribery of a public official, and (iv) domestic bank fraud in violation of 18 U.S.C. § 1344. *See* 18 U.S.C. §§ 1956(c)(7)(B)(ii), 1956(c)(7)(B)(iv), and

7

1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

15.   The defendant real property is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or an attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(A)(i), or is property traceable to such assets.  Section 1956(a)(1)(A)(i) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to promote the carrying on of specified unlawful activity, *i.e.*, bank fraud.  *See* 18 U.S.C. § 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

16.   The foreign offenses listed above are criminalized under the law of Equatorial Guinea ("E.G.") by the following provisions of the Spanish Penal Code in force in 1968, which is the current body of criminal law in E.G.:  Article 131 (abuse of public office);  Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession or involve oneself in a business directly related to scope of official duties); Articles 200 & 202 (collection of illegal taxes); Article 385 (prohibiting public officials from demanding or accepting bribes

EXHIBIT B
Page 54

to perform a crime); Article 386 (prohibiting public officials

from demanding or accepting bribes to perform an unjust act);

Article 387 (prohibiting public officials from soliciting

improper gifts); Article 390 (prohibiting public officials from

receiving improper gifts); Article 394 (prohibiting public

officials from stealing public funds); Article 396 (prohibiting

public officials from embezzling funds under his care); Article

400 (prohibiting public officials from defrauding the state);

Article 401 (criminal conflict of interest by a public

official); Article 404 (prohibiting public officials from taking

part in for-profit transactions within the limits of their

jurisdiction); Article 493 (criminal threats); Article 496

(unlawful compulsion); Article 503 (forcibly requiring someone

to sign, grant or quit claim a public instrument or document);

Article 514 (theft); and Articles 528 and 533 (fraud).  English

translations of these provisions are set forth in Attachment C.

V.

FACTS

17.   On information and belief, the United States alleges

the following facts.

**A.   Relevant Names, Entities, and Terms**

18.   The following individuals, entities, and terms are

relevant to this Complaint.

9

EXHIBIT B
Page 55

*Teodoro Nguema Obiang Mangue ("Nguema")* is the beneficial owner of the defendant assets, son of the President of E.G., and the Second Vice President of E.G.  From 1998 to May 20, 2012, Nguema was E.G.'s (1) Minister of Forestry and Agriculture and (2) Minister of Forestry and Infrastructure. On May 21, 2012, Nguema was appointed by his father to be E.G.'s Second Vice President.

*Teodoro Nguema Obiang Mbasogo* is the President of E.G.

*Inner Circle*:  A small number of individuals who hold critical positions of political and economic power in E.G.

*Senate Permanent Subcommittee on Investigations Report ("PSI Report")*: Report issued in July 2004 by the United States Senate Permanent Subcommittee on Investigations ("PSI") on money laundering and foreign corruption, which focused in part on money brought to Riggs National Bank in the United States that was suspected of being proceeds of corruption in E.G.

*Riggs National Bank* was the financial institution in Washington, D.C., where the government of E.G. and members of the Inner Circle maintained depository accounts from 1995 to 2004. Riggs was convicted in 2004 of violations of 31 U.S.C. §§ 5322 and 5318(g) and agreed to pay a $16 million criminal fine and a $25 million civil penalty for failure to report suspicious transactions by high-risk customers, including the E.G. and other accounts.

*Michael J. Berger* is a California lawyer who assisted Nguema in opening and utilizing bank accounts at Bank of America, Union Bank of California, Commercial Capital Bank and Citibank in the names of various California corporations, including Beautiful Vision, Inc. and Unlimited Horizon, Inc., between 2004 and 2008.  Berger assisted Nguema in forming both of these shell corporations.

EXHIBIT B
Page 56

*George Nagler* is a California lawyer who represented Nguema in purchasing the Sweetwater property. Nagler assisted Nguema gain access to the U.S. banking system by opening bank accounts at Union Bank of California, California National Bank and Pacific Mercantile Bank in the name of various California corporations, including Sweetwater Management, Inc. and Sweet Pink, Inc. In addition, Nagler assisted Nguema in forming both of these shell corporations, as well as Sweetwater Malibu, LLC, in which the Sweetwater property is titled.

*Somagui Forestal (Societe Madeira Guinea)* is a subsidiary of Grupo Sofona. Both entities are E.G. companies owned by Nguema through which Nguema has siphoned money from the E.G. Government and received illegal payments and bribes. Nguema used accounts in various E.G. banks in the name of Somagui Forestal to purchase and maintain assets all over the world, including some of the defendant assets.

B.  Background

19. Equatorial Guinea is a West African country. The population in 2009 was approximately 680,000.

20. The country was colonized by the Portuguese in the late 1600s and ceded to Spain in 1778; it gained independence in 1968. The first President was Francisco Macías Nguema.

21. In 1979, Macías Nguema was overthrown in a coup d'état by his nephew, Teodoro Obiang Nguema Mbasogo, the military governor of Bioko Island and Vice-Minister of the Armed Forces. President Macias was killed soon thereafter and Teodoro Obiang became President of Equatorial Guinea (hereinafter "President Obiang").

EXHIBIT B
Page 57

22.   More than three decades after seizing control from his uncle, President Obiang is still in power.

23.   President Obiang exercises plenary control over the Government of Equatorial Guinea.  Nearly all positions of political and economic power in E.G. are held by the Inner Circle, many of whom are relatives of the President.

24.   One member of the Inner Circle is Teodoro Nguema Obiang Mangue, President Obiang's eldest son, who has been appointed by his father to various positions within the government, including Second Vice President for National Defense and State Security (May 21, 2012 to Present) and Minister of Forestry and Agriculture (1998-2012) (at times, this position was entitled Minister of Forestry and Infrastructure).  Nguema is the beneficial owner of the defendant assets.

25.   During President Obiang's more than 30-year rule, members of the Inner Circle, including Nguema, have amassed extraordinary wealth through a variety of corrupt schemes.  The U.S. Department of State in May 2012 issued a public report concluding that, for the year 2011:

> Laws [in E.G.] provide severe criminal penalties for official corruption; however, the government did not implement these laws effectively, and officials frequently engaged in corrupt practices with impunity.  Corruption continued to be a severe problem.  The presidency and prime minister's office were the lead agencies for anticorruption efforts.  The president and members of his inner circle

12

continued to amass personal profits from the oil windfall.

26.   Under E.G. law, the nation's mineral resources and hydrocarbons belong to the public, not to individuals.  *See* Ley No 8/2006, de fecha 3 de noviembre de Hidrocarburos de la Republica de Guinea Ecuatorial.  Similarly, Equatoguinean law provides that the National Forestry Reserve is permanent, inalienable, and part of the public domain, and that the National Forests are reserved for exclusive economic extraction and development by the State.  *See* Ley No 1/1997, Sobre El Uso Y Manejo De Los Bosques ("Forestry Law").

27.   Since the commencement of large-scale extraction of its oil reserves beginning in the mid-1990s, E.G. has become a major oil and gas producer.  By 2004, it was the third-largest oil and gas producer in Sub-Saharan Africa.  Over the last several years, oil and gas exports have resulted in billions of dollars in annual revenue.

28.   Equatorial Guinea also derives income from natural resources other than oil and gas, primarily timber, its second major export commodity.

29.   As of 2006, the Equatoguinean economy had grown 20 times larger than it was in the mid-1990s, reflecting the massive revenues derived primarily from oil and gas production.

30.  Despite E.G. laws regarding public ownership of its natural resources, and despite an extraordinary expansion in the E.G. economy, living standards of the general population remain at a subsistence level.

31.  At the same time, over the last several years, Nguema and other members of the Inner Circle have gained enormous wealth through violations of E.G. law, including extortion, bribery and the misappropriation, theft, and embezzlement of public funds.  Details concerning these illegal, corrupt acts are set forth below at paragraphs 48-93.

32.  In order to maintain the defendant assets, Nguema, Michael J. Berger ("Berger"), and George Nagler ("Nagler"), and others engaged in a conspiracy to commit bank fraud against financial institutions in the United States.  Millions of dollars in bank fraud proceeds, as detailed in paragraphs 102-209, were used in connection with the maintenance and upkeep of the defendant assets.

C.   **Riggs National Bank**

33.  Public corruption in E.G. first received significant public scrutiny in the United States in the mid-2000s, following an investigation conducted by the U.S. Senate's Permanent Subcommittee on Investigations ("PSI").  The 2004 PSI Report revealed that, from at least 1995 to 2004, the Government of

14

E.G. directed that payments from oil companies be made into accounts at Riggs National Bank ("Riggs Bank") in Washington, D.C.  According to the PSI Report, aggregate deposits to E.G. government accounts totaled hundreds of millions of dollars at a time and were so large that by 2003, the E.G. portfolio had become the bank's largest single customer relationship, with balances and outstanding loans that together approached $700 million.  The PSI Report concluded that Riggs Bank "turned a blind eye to evidence suggesting the bank was handling the proceeds of foreign corruption."

34.  Beginning in 1995, the Government of E.G., as well as members of the Inner Circle, held personal bank accounts at Riggs Bank.  Members of the Inner Circle who held personal bank accounts at Riggs Bank included:  Nguema, Constancia Mangue (Nguema's mother), President Obiang (Nguema's father), Melchor Esono Edjo (E.G.'s treasurer and Nguema's cousin), Teodoro Biyogo Nsue (E.G.'s ambassador to the United States and Nguema's uncle), Elena Mensa (Nguema's aunt), Armengol Ondo Nguema (a senior E.G. national security official and Nguema's uncle), Sylvia Nchama Ondo (Nguema's cousin), Pastor Micha Ondo Bile (E.G.'s foreign minister), Baltasar Edjo (E.G.'s minister of economic affairs and finance), Miguel Buiteo Boriko (E.G.'s

EXHIBIT B
Page 61

minister of economy), Juan Olo Mba Nseng (E.G.'s minister of mining), and Maria Ondo Mangue (Nguema's cousin).

35. One such account, in the name of the Republic of Equatorial Guinea General Treasury, was known as the E.G. Oil Account because virtually all of the deposits into this account were payments from foreign oil companies doing business in E.G.

36. A withdrawal of funds from the E.G. Oil Account, according to Riggs Bank records, required the signature of President Obiang.

37. Riggs Bank records show that nearly $500,000 was sent from the Oil Account to the personal bank account of Melchor Edjo, Nguema's cousin. The records also show that President Obiang approved the wire transfer of nearly $35 million from the E.G. Oil Account to two companies, Apexside and Kalunga, that appeared to be connected to President Obiang, were unknown to the bank, and had accounts in jurisdictions with stringent bank secrecy laws. When Riggs Bank tried to obtain information about the beneficial owners of these two companies from President Obiang and Edjo at a meeting in Washington, D.C. on February 23, 2004, neither would provide Riggs Bank with further information about these entities. That same day, Riggs Bank determined that the E.G. accounts should be closed.

EXHIBIT B
Page 62

38.   In addition to direct transfers of money from the E.G. Oil Account, Riggs Bank records show deposits of large amounts of cash into accounts controlled by E.G. public officials and their families.   In 1999, President Obiang opened a money-market account at Riggs Bank in the name of a Bahamas-registered corporation.   From 2000 to 2002, $11.5 million in cash was deposited into this account.   Nguema's mother also maintained personal accounts at Riggs Bank, into which over $1.4 million in cash was deposited from 2000 to 2002.

39.   Riggs Bank closed the E.G. accounts in 2004, and subsequently pleaded guilty to failure to report suspicious monetary transactions by high-risk customers, in violation of 31 U.S.C. §§ 5322 and 5318(g).   Riggs Bank agreed to pay a $16 million criminal fine and a $25 million civil penalty, for its handling of the E.G. and other accounts.

40.   In July 2004, after the PSI Report was issued and Riggs Bank closed the E.G. accounts, much of the money held by the Government of E.G. and members of the Inner Circle was removed from the United States.   One significant exception was money brought to the United States by Nguema, including tens of millions of dollars ultimately used to purchase and maintain the defendant assets.

///

EXHIBIT B
Page 63

**D.   Nguema's Acquisition of Political and Economic Power and Influence in E.G.**

41.   In 1991, at the age of 23, Nguema came to the United States to study English as a Second Language at Pepperdine University in Malibu, California.  He did not live on campus; instead, he shuttled between rooms at the Beverly Wilshire Hotel and a house he rented in Malibu.  After five months, Nguema dropped out of the program.  His tuition and living expenses (including his hotel bill and the rental of the house in Malibu) were paid by Walter Oil and Gas Corporation, an American oil company operating in E.G.

42.   On January 8, 1993, less than two years after he left the Pepperdine program, and despite his youth and inexperience, Nguema was awarded a 20-year concession[2] to harvest timber from 25,000 hectares (approximately 61,000 acres) of rainforest in E.G. by his father, President Obiang.  Nguema was 24 years old.

43.   In 1994, Nguema formed a company in E.G. called Grupo Sofona ("Sofona"), which was purportedly a timber company.  Four years later in 1998, Nguema informed Riggs Bank that he had

---

[2] A concession is the exclusive right to engage in logging in certain defined areas, for a certain period of time. Forestry concessions in E.G. are awarded by either the President or the Minister of Forestry without competitive bidding. Companies or individuals awarded a concession are permitted to harvest timber in the concession.  They are obliged, however, to pay the E.G. government for any timber actually extracted from the concession.

18

formed a second timber company called Somagui Forestal ("Somagui"), a Sofona subsidiary.

44.   In or around May 5, 1994, Nguema's father granted Sofona a five-year concession to harvest timber from an additional 11,000 hectares (approximately 27,000 acres).

45.   Having granted his son Nguema the right to cut timber on 88,000 acres of national forest lands, President Obiang then put Nguema in charge of regulating E.G.'s forestry industry.   In approximately 1998, at the age of 30, Nguema was appointed by his father to the newly created position of "Minister of Forestry and Environment," later changed to "Minister of Forestry and Agriculture" (hereinafter "Minister of Forestry"). Nguema used his status as Minister of Forestry (and President Obiang's son) to enrich himself through corrupt schemes, as described below.

46.   In the 2000s, the rapid growth of the oil and gas sector in E.G. led to a boom in construction and other infrastructure-related activities.   In or around 2003, President Obiang added "infrastructure" to Nguema's cabinet portfolio, appointing Nguema to be E.G.'s first "Minister of Forests and Infrastructure."

///

///

EXHIBIT B
Page 65

47.   As an E.G. cabinet minister, Nguema's official salary was approximately $6,799 per month, or less than $100,000 per year, according to official E.G. sources.

**E. Nguema's Utilization of Corrupt Schemes to Enrich Himself**

48.   Nguema engaged in various corrupt schemes to enrich himself and supplement his official government salary.  These schemes are illegal under the laws of E.G., but the applicable anti-corruption laws are not enforced against the Inner Circle, including Nguema; instead, members of the Inner Circle, including Nguema, are allowed to keep funds obtained through corruption and to take the proceeds of their corruption abroad. A description of these schemes, and the E.G. penal code provisions that prohibit them, are set forth below.

   **a.  Extortion and Bribery Schemes**

49.   Beginning in the 1990s, after he dropped out of Pepperdine and returned to E.G., Nguema began demanding that businesses in E.G. -- especially those located in or around the City of Bata, the largest city and port in Rio Muni (E.G.'s mainland), where Nguema resided -- pay him personal fees to be able to operate.  Nguema abused his authority and influence within the E.G. Government both as a member of the cabinet and President Obiang's eldest son to make these demands and to retaliate against those who refused to acquiesce.

EXHIBIT B
Page 66

1. **Nguema Required Timber Companies in E.G. to Pay Him a Personal Fee to Obtain Timber Export Licenses**

50.    Timber was E.G.'s second largest export commodity. The forestry sector was supervised and regulated by Nguema's Forestry Ministry.

51.    In order to export timber from E.G., timber companies were required to, among other things, apply for and obtain timber export licenses from the Forestry Ministry.

52.    At least as early as 1998, these licenses required Nguema's personal signature.  Nguema demanded that timber companies, such as Tromad Forestal, an E.G. company, pay him personally in or around ten percent of the value of the wood harvested for export.  Nguema refused to sign timber export licenses unless applicants first paid him these personal fees.

53.    Between in or around 1998 and 2003, German Pedro Tomo, the owner of Tromad Forestal and an E.G. national, paid Nguema his personal fees regularly either in suitcases of cash or with personal checks that Tomo deposited directly into a bank account in the name of Somagui at Caisse Commune d'Epargne et d'Investissement ("CCEI Bank").  Tromad Forestal paid Nguema in or around the equivalent of $700,000 in CFA Francs ("CFAs") per year between 1998 and 2003 in order to export its products.

21

EXHIBIT B
Page 67

54.   Nguema required other timber companies in E.G. to pay him personally in or around 15,000 CFAs (approximately $27) per log a company wished to export from E.G.

55.   These personal fees were calculated by technicians on the staff of Nguema's Forestry Ministry.

56.   Companies that refused to pay Nguema were prevented from exporting their timber from the Port of Bata, where nearly all of E.G.'s timber originated, and incurred additional operational expenses of up to $5,000 per day for any delays.

2.   **Nguema Required Timber Companies in E.G. to Pay Him Personally to Gain Access to E.G.'s National Forests**

57.   Nguema also required timber companies to pay him a personal fee in order to gain access to E.G.'s forests.   To harvest timber, companies were required to receive from Nguema's Forestry Ministry either a logging concession or a special permit.   To be granted such a permit or concession, Nguema demanded and collected personal fees from companies, such as Isoroy (a French company), ABM (a Spanish company), and Agroforestal (an Italian company).   All of these companies' E.G. operations were based in or around Bata.

58.   In 1993, Nguema demanded that Isoroy pay him personally 15 million CFAs (approximately $21,000) to engage in

logging in E.G.  Isoroy obtained a concession to harvest timber from 57,053 hectares of wilderness in E.G. on September 3, 1995.

59.  Similarly, between in or around 1998 and 2003, Shimmer International Guinea Equatorial Ltd. ("Shimmer"), the E.G. subsidiary of a Malaysian company, was permitted by Nguema to harvest timber anywhere it wished in E.G.'s mainland forests, including national forest reserves protected under E.G.'s Forestry Law from industrial logging.  Nguema demanded, and Shimmer's E.G. general manager agreed, that in exchange for paying Nguema 30,000 CFAs (approx. $50) per cubic meter of timber harvested by Shimmer in E.G., Shimmer would be provided unfettered access to E.G.'s forests, including protected national forests, and would not be required to adhere to E.G.'s Forestry Law and its environmental and forest management regulations.

60.  In exchange for paying these personal fees, timber companies, like Shimmer, were permitted to harvest timber from E.G.'s forests with little or no regulatory oversight by Nguema's Forestry Ministry.  E.G.'s Forestry Law places strict controls on the manner in which timber is harvested.  Among other things, E.G.'s forestry laws regulate the quantity of timber that a company may extract from the forest; restricts timber companies from cutting down certain types of trees; and

EXHIBIT B
Page 69

even requires loggers to replant areas that have been cut down. As Forestry Minister, Nguema did not require timber companies, like Shimmer, who had paid him the personal fees to adhere to these rules.

61.   Similarly, individuals and entities, that possess timber concessions in E.G., are required under E.G. law to provide for forest regeneration; ensure that raw timber is processed in E.G.; and invest in the local community by building health facilities, churches, and schools.   (*See* Forestry Law, Art. 35).   Nguema did not require concessionaires, including himself, his company Sofona, or his mother, all of whom have substantial forestry concessions in E.G., to comply with these rules.

3.   **Nguema Required Companies in E.G. to Pay Him Personally on an On-Going Basis to Continue to Operate in E.G.**

62.   Nguema further demanded that timber companies make regular payments to him personally while they maintained active operations in E.G.   These companies included Isoroy, ABM, Agroforestal, and a company operated by Filipino nationals ("Company A").   Isoroy, for instance, paid Nguema in or around the equivalent of $104,000 every one or two months in order to be able to continue to operate in E.G. from 1993 to 1996.   This

24

fee was calculated based upon the weight of the timber harvested by Isoroy during that time period.

63.   Similarly, in or around May 1996, Nguema demanded that all foreign timber companies then-operating in E.G. pay him a retroactive fee that he called a "tax." This was an illegal tax that Nguema levied personally without authorization from E.G.'s Parliament (*La Camara de Los Representantes*) or Inter-Ministerial Council (*el Consejo Interministerial*), as required under E.G. law. This new so-called "tax" required all foreign timber companies to pay Nguema personally a one-time retroactive fee of 6,400 CFAs (approximately $10) per cubic meter of timber that had ever been harvested by that entity in E.G.

64.   For instance, Nguema demanded that ABM, which began active logging operations in E.G. in the 1970s, pay him the equivalent of approximately $1,560,000 within four days of this new so-called "tax" being levied.

65.   Nguema required foreign timber companies who refused to pay these so-called "taxes," including Isoroy and ABM, to leave E.G. Other timber companies, including Company A and a Moroccan firm, were permitted to continue to operate in E.G. after they paid Nguema his so-called retroactive "taxes."

66.   Nguema threatened and retaliated against timber companies, including Isoroy and ABM, who refused to submit to

EXHIBIT B
Page 71

his demands for payment.  In or around May 1996, Isoroy refused

to make any further payments to Nguema.  As a result, Nguema

prevented Isoroy from harvesting further timber from E.G.'s

forests and seized control of Isoroy's assets in E.G., including

its heavy machinery, two Caterpillar D7G bulldozers, two

Mercedes Benz 1622 construction trucks, a Mercedes Benz 1922/28

construction truck, a Mercedes Benz 1522 dump truck, three

Toyota utility vehicles, two Mitsubishi L200 vans, a Suzuki

vehicle, an Opel Corsa mini, and a Pajero vehicle.

67.  Only after Isoroy paid Nguema a monetary ransom did

Nguema return this hardware to Isoroy's logistics personnel in

Gabon.  Nguema charged Isoroy the equivalent of the value of the

hard assets.

68.  Similarly, in or around May 1996 when ABM refused to

pay Nguema his so-called retroactive "tax," E.G. authorities

entered ABM's offices near Bata and forcibly removed ABM

personnel from their premises and expelled them from E.G.

Nguema required ABM's owner, a Spanish national, to transfer

ownership of ABM to Nguema for in or around a third of its

actual fair market value in a transaction that Nguema called a

"sale."  After acquiring ABM, Nguema had ABM's owner arrested in

Bata and charged with fraud for charging him an inflated price

for the company.  ABM's owner was convicted and released only

after paying Nguema the equivalent of $3 million in so-called civil penalties.  ABM's assets, including its heavy machinery and timber logging equipment, were also expropriated by Nguema without further compensation.  Nguema required that Shimmer purchase ABM's logging equipment from him at significantly inflated prices.

69.   Nguema also threatened companies and their personnel who refused to acquiesce to his demands for money.  In the summer of 1996, Nguema threatened one senior Isoroy employee ("John Doe A") in Bata, promising that he would make him "suffer" because of Isoroy's refusal to pay Nguema money.  Soon thereafter, John Doe A was arrested and detained in jail.  After being released, Jane Doe A, an E.G. national familiar with Nguema, advised John Doe A to leave E.G. immediately if he did not want his children in Europe to become orphans.

70.   Even outside of the forestry sector, Nguema demanded that companies operating in E.G. pay him money and provide him with gifts of cash and other luxury products.  For instance, in or around 2003 when "infrastructure" was first added to Nguema's cabinet portfolio, Nguema demanded that Tromad SA Constructions Y Obras ("Tromad"), an E.G. company retained by the E.G. Government to build roads, pay him personally fifteen percent of the value of its government contract.  When Tromad refused to

pay Nguema, the E.G. Government stopped making payments to the

company and its contract with the E.G. Government was

terminated.

71.   Between 2004 and 2007, Nguema's Forestry Ministry

demanded that Global Santa Fe Corp. ("GSF"), a U.S.-based oil

and gas services company, provide Nguema with gifts and free

money.  Nguema's ministry staff made these types of requests of

GSF personnel one or two times per year.  When a manager at

GSF's Malabo office refused to make payments, he was threatened

by Nguema's staff and shown a document detailing numerous gifts

and payments other foreign companies had made to Nguema.

72.   Similarly, between 2004 and 2007, when Nguema held the

"infrastructure" portfolio in E.G.'s cabinet, Bouygues, a major

French civil engineering firm in E.G. that had obtained several

substantial infrastructure contracts from the E.G. Government,

built a mansion for Nguema in Malabo, E.G.'s capital, at

Nguema's request and direction.  Upon completion of that

project, Nguema refused to pay Bouygues for its work.

73.   Nguema also has demanded that companies operating in

E.G. contribute money to what are described as public service

campaigns but which, in fact, were vehicles for Nguema to

misappropriate funds for his personal benefit.  For example, as

recently as July 2011, Nguema operated a program to generate

EXHIBIT B
Page 74

funds purportedly to improve the housing conditions of the poor by changing palm roofs to ones consisting of zinc tiles.  Nguema possesses a substantial financial interest in the company that is responsible for distributing and supplying these zinc tiles in E.G.  Although advertisements promoting this campaign claim that contributions to these programs are voluntary, companies that do not contribute to these campaigns face retaliation. Companies that have not contributed to the current campaign, for instance, are identified publicly as not having contributed on televised advertisements in E.G.  Furthermore, donor contributions are not used for their alleged purpose, but instead are largely misappropriated by Nguema for his personal benefit.

74.  Extortion and bribery are illegal under E.G. law.  The 1968 Criminal Code of Spain, currently in effect in E.G., contains the following provisions, among others, that prohibit extortion and bribery:  Article 131 (abuse of public office); Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession directly related to scope of official duties); Article 200 (collection of illegal taxes); Article 202 (demanding payment of unauthorized taxes); Article 385 (prohibiting public officials from demanding or accepting bribes

29

to perform a crime); Article 386 (prohibiting public officials from demanding or accepting bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 503 (forcibly requiring someone to sign, grant or quit claim a public instrument or document); and Article 514 (theft).  *See* Attachment C.

75.   The above-described corrupt schemes violate E.G. law as referenced above.

b.   Schemes to Obtain Government Funds Through Misappropriation, Embezzlement and Theft

76.   Nguema has misappropriated, embezzled and stolen government funds and resources in violation of E.G. law.  This was accomplished either through direct diversion of funds from the E.G. Government or through schemes such as submitting fraudulently inflated "bids" and invoices for government contracts, in which corruption payments were built directly into the contract.

///

///

///

///

### 1.   Nguema Misappropriated E.G. Public Funds By Receiving Payment for Fraudulently Inflated Public Construction Contracts

77.   Nguema has misappropriated funds from the E.G. Government by receiving tens of millions of dollars in payments from fraudulently inflated construction contracts in E.G.

78.   Because government contracts are awarded to companies owned by or associated with members of the Inner Circle without true competition, those companies are able to charge the E.G. Government fees that bear little, if any, rational relationship to the actual economic value of the services or products tendered to the E.G. Government.   The bids from such companies include built-in mark-ups of 50 to 500 percent or more, so that members of the Inner Circle can obtain the difference.

79.   Nguema has admitted that, as a cabinet minister, he takes for himself a "sizeable part" of government contracts.   In 2004, for instance, Nguema claimed that he purchased real estate in Cape Town, South Africa, worth approximately $8 million with money obtained through government construction contracts awarded to SOCAGE, a highway construction company he owns in E.G. Specifically, in a sworn affidavit filed by Nguema with a court in South Africa, Nguema explained:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to owe [sic] companies that, in consortium with a foreign company, can bid for government contracts and should the company be

successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.  But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.

This is how, according to Nguema, he acquired in or around $8 million to purchase his properties in South Africa.  Contrary to Nguema's recitation of the law, such self-dealing by a public official is illegal in E.G.  These fraudulently inflated contracts are another means by which he, and other members of the Inner Circle, misappropriate funds from the public treasury for their own enrichment.

80.  Between 2003 and 2007, for instance, Nguema demanded that executives at Company B, one of the largest construction companies in E.G., submit fraudulently inflated construction bids and contracts to G.E. Proyectos, an agency of the E.G. Government in charge of awarding public construction contracts. A portion of these fraudulently inflated contracts was then paid to Nguema.  Nguema would ask that Company B executives inflate contract bids by as much as 500 percent.  The inflated amount would then be paid by Company B to Nguema.  Executives at Company B believed that if they had not acquiesced to Nguema's demands, their company would have been expelled from E.G.

EXHIBIT B
Page 78

81.   Specifically, Company B fraudulently inflated certain line items in several different construction bids tendered by the company to G.E. Proyectos.  After G.E. Proyectos awarded the contract to Company B, the Banque des Etats de l'Afrique Centrale ("BEAC"), E.G.'s central bank, wired the contract amount to Company B's account in E.G.  Company B, in turn, paid Nguema or one of his companies.

82.   Nguema asked that his companies, Somagui and Socage, either (i) be listed as a subcontractor on Company B's bids, so that G.E. Proyectos would know that Nguema was associated with the bid, or (ii) sign a sub-contract with Company B.  These sub-contracting claims were fraudulent, as Nguema's companies were paper companies with no significant commercial operations or operational personnel of any kind.  In fact, the work and services described in these subcontracts were performed by, and paid for by, Company B, not Somagui, Sofona or SOCAGE.  Nguema's companies were merely vehicles through which he could execute fraudulent contracts and receive payments from companies, such as Company B.  Company B made hundreds of these types of payments to Nguema between 2003-2007.

83.   On one occasion, for instance, Nguema asked that Company B submit a bid to build a public construction project to G.E. Proyectos for the equivalent of $10 million when a bid more

33

consistent with business and market norms would have been in or around $2 million.  After this $10 million contract was awarded to Company B, the company paid Nguema a kickback of $8 million.

### 2.   Nguema Stated Publicly to Third Parties That He Intended to Misappropriate Hundreds of Millions of Dollars in State Funds

84.  Nguema has represented to U.S.-based companies that he possessed both the ability and the intent to divert millions of dollars in E.G. public funds to acquire and pay for personal assets.

85.  In or around February 2004, Nguema contacted an executive at Ocean Energy, a U.S.-based energy company, and requested that Ocean Energy purchase a C-130 Hercules military transport aircraft from Lockheed Martin, a U.S. defense contractor, for his personal use.  A C-130 Hercules transport can cost up to $65 million.  Nguema proposed that Ocean Energy purchase the aircraft on his behalf, and that Ocean Energy, in turn, would be paid by the E.G. Government.  Specifically, Nguema advised Ocean Energy that GE Petrol, E.G.'s state-owned oil company, would compensate Ocean Energy for this transaction. Ocean Energy refused to go along with Nguema's scheme.

86.  In 2005, Nguema advised an executive at Gulfstream Aerospace Corporation, a U.S.-based aircraft manufacturer, that he could and would have Ocean Energy assume responsibility for

making the payments on a $40 million personal jet aircraft that Ocean Energy would acquire on his behalf.  These funds would then be credited against balances owed by Ocean Energy to the Government of E.G.  In this roundabout manner, Nguema again represented that he intended to misappropriate E.G. Government funds to acquire a $40 million personal asset.  Gulfstream refused to go along with Nguema's scheme to use state resources to acquire personal assets.

### 3.   Nguema Directly Diverted Public Funds to Bank Accounts Under His Direct Control

87.   Nguema diverted E.G. public resources and monies for his personal use.  Since at least as early as 2005, Nguema has maintained public funds and revenue collected by his Forestry Ministry in a separate account (the "Forestry Account") at a private commercial bank in E.G.  This is in contrast with the management of other E.G. Government funds, which are maintained by E.G.'s Treasurer at BEAC.  No E.G. public official or agency, including E.G.'s Parliament, its Ministry of Finance, and its Treasury, possesses the authority or ability to supervise, regulate or inspect how the funds in the Forestry Account are used.

88.   Other than Nguema's Forestry Ministry, no other E.G. state agency or institution maintains an account like this one.

35

89.   This Forestry Account is used by Nguema to maintain millions of dollars worth of CFAs collected as state revenue by E.G.'s Forestry Ministry from timber companies operating in E.G. The funds in this account include surface taxes paid by all persons who hold forestry concessions in E.G., fees charged to timber companies who harvested logs from such concessions, and official timber export duties collected by the Forestry Ministry.   Instead of depositing this revenue into BEAC like other public agencies, Nguema diverted and maintained these public funds in his Forestry Account.

90.   As the sole signatory on this Forestry Account, Nguema possesses exclusive authority and control over how the funds in the Forestry Account are used and disbursed.

91.   In 2006, economists and auditors from a United Nations ("U.N.") financial agency were permitted to access and review E.G.'s economic policies and data, including information and records relating to the E.G. Government's financial and fiscal management policies.   When U.N. personnel requested that they be permitted to also review and access data and records relating to the Forestry Account, their requests were denied.

92.   E.G.'s Criminal Code prohibits misappropriation, theft, and embezzlement of government funds by government officials.   *See, e.g.,* Article 131 (abuse of public office);

EXHIBIT B
Page 82

Article 196 (expropriation of assets by a public official);

Article 198 (taking advantage of official position to exercise a profession directly related to scope of official duties);

Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-profit transactions within the limits of their jurisdiction); Article 514 (theft); and Articles 528 and 533 (fraud).  *See* Attachment C.

93.   The above-described corrupt schemes violate E.G.'s law as referenced above.

F. **Nguema Uses Shell Companies in E.G. to Conceal His Criminal Conduct and to Mask the True Source of His Illicitly Acquired Wealth**

94.   Having acquired millions of dollars in criminal proceeds from the corrupt schemes described in paragraphs 48-91, Nguema formed shell companies in E.G. to disguise his criminal conduct, conceal the source of his income, and to claim falsely to overseas financial institutions and foreign governments that his income was derived from legitimate commercial activity in E.G.  Beginning in the 1990s, Nguema claimed falsely to numerous

37

American and European financial institutions (at which he opened bank accounts to funnel and shelter his criminal proceeds) that his companies Sofona and Somagui generated hundreds of millions of dollars in commercial profits.  These companies, according to Nguema, exported and marketed hundreds of thousands of cubic meters of timber every year on international markets; were singlehandedly responsible for 69 percent of E.G.'s gross domestic timber production in 2001; and were singlehandedly responsible for 73 percent of E.G.'s construction-related gross domestic product in 2004, building and paving more than 200 kilometers of highway in E.G.  In fact, as discussed below, these representations are false and Sofona, Somagui, and SOCAGE exist only on paper.

95.   Neither Sofona nor Somagui engaged in any significant business operations in E.G.  They employed few, if any, construction or logging employees and earned no legitimate revenue, let alone on the exceptional scale Nguema has claimed.

96.   Despite efforts to verify the existence of Sofona and Somagui, financial institutions and public agencies in multiple jurisdictions could not confirm Nguema's claims that his companies existed as companies with actual operations and legitimate sources of revenue.  For instance:

(i)   In 2002, J. P. Morgan, where Nguema maintained a bank account, sought to obtain more information about Sofona

EXHIBIT B
Page 84

and Somagui.  Despite researching local trade directories and reference books, and making numerous inquiries about both companies in E.G., including with the local chamber of commerce, businesses, banks, and authorities, J. P. Morgan personnel in both the United States and the United Kingdom could not confirm that Sofona or Somagui existed, let alone engaged in commercial operations of any kind. Although J. P. Morgan identified a phone number in E.G. associated with Sofona, J. P. Morgan reported that its calls were never answered.  In contrast with Nguema's contention that by 2001 these companies singlehandedly controlled nearly 70 percent of E.G.'s timber industry, E.G.'s second most important export, J. P. Morgan personnel concluded that both Sofona and Somagui were "unknown in the local market."

(ii)  Similarly, in 2004, at a time in which Nguema claimed that Sofona and Somagui were even larger and more dominant in the E.G. economy, Riggs Bank, where Nguema, his parents, and the E.G. Government opened several bank accounts, sought to investigate and confirm Nguema's representations about his companies.  Relying on various bank resources and almost two dozen electronic databases and search engines, a fraud investigator with Riggs National Bank's investigation group in Washington D.C. concluded that no evidence of Sofona's or Somagui's existence in E.G. could be ascertained.

97.  Similarly, international development workers in E.G., commercial business persons, E.G. nationals and residents, and employees of non-governmental organizations ("NGOs"), including a major U.S.-based environmental NGO active in E.G.'s forestry sector ("NGO A"), all of whom lived or worked in E.G. between 2000 and 2007 and were knowledgeable about the E.G. forestry and/or infrastructure industries, reported that neither Sofona nor Somagui were known in E.G. as legitimate or substantial commercial businesses with actual operations.  For instance:

39

(i) An E.G. national who owned an E.G. timber company until 2003 explained that Somagui had no more than one or two employees; had an office in Bata that was rarely open; and had no function other than to open bank accounts and receive illegal payments during the time period he operated his timber company (1998-2003).

(ii) An American forestry expert employed by NGO A in Bata between 2005 and 2009 worked closely with E.G.'s Forestry Ministry on forestry conservation and management issues. Yet, he could not confirm that Sofona and Somagui existed and/or were active in either E.G.'s timber or construction industries.

(iii)    Several contractors employed by U.S. AID, an agency of the United States Government, who resided in E.G. between 2005 and 2009, were focused specifically on issues of economic and social development in E.G., and worked closely with the staff of E.G.'s Ministry of Planning, Economic Development and Public Investment, its Ministry of Finance, and its Ministry of Fishing and the Environment. These individuals reported that they had never heard of Sofona or Somagui.

(iv) A U.S. Department of Agriculture forestry expert, who visited Bata and various E.G. forests in 2004 to consult on technical assistance matters and survey forest management issues in E.G., also never heard of Sofona or Somagui in E.G.

(v) An American who worked for Afriam, a company that obtained a 25,000 hectare forestry concession in E.G. in 1994 and operated in or around Bata during the 1990s, also reported that he never heard of Sofona or Somagui.

(vi) China Road and Bridge Corporation, a civil engineering company based in Beijing, China, represented that it--not Somagui--constructed the Ebebiyin Highway, a 72 k.m. roadway that Nguema claims Somagui was responsible for building.

EXHIBIT B
Page 86

98.  Even when asked directly to provide evidence of the source of his wealth and income, Nguema has been unable to do so.  For example, in 2006, when lawyers at McAfee and Taft, an Oklahoma-based law firm and escrow agent, explicitly and repeatedly asked Nguema to provide details as to the source of his income in connection with his attempt to purchase a $38.5 million Gulfstream jet aircraft in the United States, Nguema did not respond.  Despite numerous attempts to obtain this information from Nguema and to ascertain the legitimacy of his wealth, Nguema refused to respond.  As a result, McAfee and Taft refused to participate further in the transaction and returned all funds deposited by Nguema to the aircraft escrow account. The lawyers on both sides of the transaction were so concerned about possible civil or criminal liability as a result of their involvement in handling Nguema's money that they attempted to obtain assurances from the U.S. Department of Justice as to the legitimacy of these funds.

99.  Likewise, at present, Nguema is the subject of a criminal investigation by law enforcement authorities in France. Nguema is under criminal investigation for money laundering, misappropriation and embezzlement of public funds, and misappropriation and embezzlement of corporate funds.  On September 28, 2011, French judges in Paris ordered the seizure

41

of eleven high-end automobiles from Nguema's home on Avenue Foch
in connection with their investigation.   In February 2012,
French judges authorized French police to enter and seize the
contents of Nguema's Paris home.   When Nguema refused to meet
with French authorities to answer questions regarding the
sources of his income and wealth, the French court issued a
warrant for Nguema's arrest.

G.    **Nguema Does Not Have Legitimate Income Sufficient to
      Account for His Hundreds of Millions of Dollars in Personal
      Purchases and Expenditures**

      100.   From 2000 to 2011, Nguema spent more than $300
million acquiring assets and property on four continents--North
America, South America, Europe and Africa.   In the United States
alone, Nguema spent $68 million during a period of less than
three months in 2006 on two assets:   the Sweetwater property,
for which the purchase price was $30 million, and a Gulfstream
G-V jet aircraft, which cost over $38 million.

      101.   For every year between 2000 and 2011, Nguema's
enormous personal expenditures vastly outpaced and were
inconsistent with **both** (i) his public official salary of less
than $100,000 per year, and (ii) the fraudulent income he
purportedly generated from his companies Sofona and Somagui.

      (i)   In **1999**, Sofona's financial statements reported that
            that the company incurred losses of 828,238,750 CFAs
            (approximately $1,129,930) and that the shareholders,

EXHIBIT B
Page 88

managers and directors of the company received no
compensation from the company.

(ii)  In **2000**, Sofona's financial statements reported that
the company incurred 236,005,058 CFAs (approximately
$321,971) in losses.  Like the prior year, these
statements again indicate that the company provided no
compensation or income to its shareholders, directors
and managers.  Yet, Nguema spent and/or wired in or
around approximately **$13,451,964** into the United
States and throughout the world.  Nguema, for
instance, spent approximately $857,000 acquiring
luxury automobiles in France, including an Aston
Martin, a Ferrari and a Peugeot, with no financing or
use of borrowed funds.  In the United States, Nguema's
account at Riggs Bank received two wires from
Somagui's account at CCEI Bank in E.G. for (i)
$1,099,980 on March 13, 2000, and (ii) $999,980 on
April 11, 2000, even though the company's financial
statements that year reported that Somagui had losses
of almost six-times that amount.  Nguema's Riggs Bank
account also received additional wires from accounts
in his own name at (i) Citibank for $5 million on
February 22, 2000, and (ii) CCF Banque Privee
Internationale, a French bank, for $5.495 million on
March 3, 2000.

(iii)     In **2001**, Nguema reported in Sofona's financial
statements that the company generated 2,245,980,864
CFAs ($3,064,093) in net income.  Yet, that year
Nguema spent and wired into the United States in or
around **$11,109,082**. Nguema spent $8,009,210 in
California alone, including purchasing a $6,500,000
property on Antelo Road in Bel Air, California and a
Bentley vehicle for $651,500.  In addition, Nguema's
Riggs Bank account received three wires from Somagui's
account at CCEI Bank in E.G. for (i) $999,932 on March
26, 2001, (ii) $999,980 on May 1, 2001, and (iii)
$999,980 on August 16, 2001.  Nguema's account at
Chase Manhattan received an additional wire from
Somagui's CCEI account in E.G. for $99,980 on November
7, 2001.  These expenses amounted to more than 250
percent of Sofona's purported total net income.

(iv)  In **2002**, Nguema received in or around **$3,326,650** in
wires from E.G.  Specifically, Nguema's Riggs Bank

EXHIBIT B
Page 89

account received two wires from Somagui's account at CCEI Bank in E.G. for (i) $266,439 on May 24, 2002, and (ii) $1,499,980 on June 28, 2002. In addition, Nguema's Riggs Bank account received additional wires from accounts in his own name at (i) Chase Manhattan Bank for $209,548 on April 25, 2002, and (ii) National Financial Services Corp. for $734,225 on July 8, 2002. In addition, Nguema's account at City National Bank in Los Angeles in the name of TNO Entertainment received three additional wires from Somagui's E.G. bank account: (i) a wire for $199,950 on January 22, 2002, (ii) a wire for $59,980 on June 13, 2002, and (iii) $149,980 on June 19, 2002.

(v)   In **2003**, Nguema spent and wired more than **$6,735,216** throughout the world. Specifically, Nguema's account at Riggs National Bank received five wires from Somagui's CCEI account for (i) $299,980 on March 19, 2003; (ii) $1,499,975 on July 11, 2003; (iii) $2,599,985 on July 17, 2003; (iv) $671,679 on August 11, 2003; and (v) $999,975 on September 17, 2003. Additionally, Nguema spent $663,622 on a Maybach 62 automobile in Paris.

(vi)  In **2004**, Nguema spent more than **$88 million** to acquire numerous personal assets around the world, including a property valued at approximately $80 million in Paris on Avenue Foch, and two properties in Cape Town, South Africa for $8 million. The value of these three assets alone equaled almost 43 percent of the total gross construction income Somagui had purportedly generated at that time throughout its entire existence.

(vii) In **2005**, Nguema spent more than **$11 million** on assets and expenditures, including acquiring (i) two 50-foot, high-performance racing boats in Ft. Myers, Florida, for over $2 million; (ii) $1 million on a ten day yacht cruise around St. Barthelemy in December; (iii) a Rolls Royce for €381,000; (iv) a Maserati for €82,000; (v) €1.8 million on renovations and decorations to his Paris home; and (vi) almost €3 million in jewelry and art, including three Piaget baguette diamond-studded watches for €777,400 (approximately $1,010,620) each. Nguema's expenses for 2004 and 2005 combined ($99 million) amounted to

44

more than 48 percent of the total gross income Somagui had supposedly generated from construction projects at that time throughout its entire existence.

(viii) In **2006**, Nguema spent more than **$88 million** on assets and expenditures, including (i) the defendant Sweetwater property for $30 million; (ii) a $38.5 million Gulfstream G-V jet aircraft; (iii) €7.34 million in renovations and decorations to his Paris home; (iv) €2.296 million on two Bugatti vehicles; and (v) €1,291,680 in jewelry and art, including a diamond-studded Vacherin Constantin watch for €586,040 (approximately $761,852). Nguema's expenditures for the period 2004-2006 combined (approximately $187 million) equaled almost 91 percent of the total gross income Somagui had supposedly generated from its construction projects at that time throughout its entire existence.

(ix) In **2007**, Nguema spent more than **$10,676,190.42** on assets and expenditures, including acquiring (i) a €347,010 Bentley; (ii) a €50,657 Peugeot; (iii) a €49,078 Mercedes; (iv) €1,868,573 in renovations and decorations to his Paris home; (v) €179,400 in jewelry; (vi) €4.4 million in antiques, including an antique cabinet made by André-Charles Boulle for €2,600,000 ($3,380,000); and (vii) $1,713,057.42 in servicing costs related to his Gulfstream. Nguema's combined expenditures between 2004-2007 (approximately $197,676,190.42) equaled almost 96 percent of the total gross construction income Somagui had purportedly generated at that time throughout its entire existence.

(x) In **2008**, Nguema spent more than **$65,196,403** in assets and expenditures, including (i) a property in Sao Paulo, Brazil worth approximately $15 million; (ii) a painting by Edgar Degas for $4,533,000; (iii) a painting by Pierre-Auguste Renoir for $6,424,000; (iv) a painting by Paul Gauguin for $8,905,000; (v) a painting by Henri Matisse for $8,905,000; (vi) a painting by Pierre Bonnard for $6,010,000; (vii) €8,410,000 in antiques; (viii) a painting by Edgar Degas for €5,600,000; (ix) a €364,940 Bentley; (x) $280,000 for the pre-design of a $280 million mega-yacht in Germany; (xi) €1,231,880 in jewelry; (xii)

$2,038,391.89 on a Bugatti Veyron in California; (xii)
a Rolls Royce in California for $609,973.29; and (xiv)
a second California Rolls Royce for $380,173.96.
Nguema's combined expenditures between 2004 and 2008
($255,149,536) equaled more than 120 percent of
Somagui's purported total gross construction income
generated at that time throughout its entire
existence, and exceeded the dollar amount purportedly
earned by Somagui during that time period by more than
$56 million.

(xi)    In **2009**, Nguema spent more than **$9,046,425.48** on
assets and expenditures, including (i) €2,199,980 on
renovations and decorations to his international
properties; (ii) €652,174 on 1,403 bottles of high-end
wine; (iii) €2,960,000 on art; (iv) €203,320 on
jewelry; (v) a Rolls Royce for $609,984.29 in
California; (vi) a second California Rolls Royce for
$499,910.45; and (vii) $116,414.74 on servicing costs
related to his Gulfstream.  Nguema's expenditures
between 2004 and 2009 (approx. $271,205,960.74)
equaled more than 100 percent of the total gross
construction income supposedly obtained by Somagui
from all of its construction projects throughout its
entire existence at that time.

(xii)   In **2010**, Nguema spent more than **$37,618,461.62** on
assets and expenditures, including (i) €18,347,952 on
109 items acquired at the auction of Yves Saint
Laurent's estate; (ii) a Bugatti vehicle for €1.9
million; (iii) €3,840,180 on high-end wine; (iv) a
€200,000 Ferrari; (v) €1.8 million on renovations and
decorations to his properties; (vi) €849,160 on
jewelry, including another Vacheron Constantin watch
for €432,354 (approximately $562,060); (vii)
$2,270,187.50 on various Michael Jackson memorabilia,
including some of the defendant assets, and (viii)
$460,149.12 on servicing costs related to his
Gulfstream.  Nguema's combined expenditures between
2004 and 2010 ($307,708,007.12) equaled more than 113
percent of Somagui's purported total gross
construction income obtained at that time throughout
its entire existence, and exceeded the actual dollar
figure by more than $40 million.

(xiii) In **2011**, Nguema spent more than **$7,620,452.18** on assets and expenditures, including (i) €1,602,671 on renovations and decorations for his properties; (ii) €3,198,928 on jewelry, including a diamond-studded Piaget watch for €980,720 ($1,274,936); (iii) the defendant Ferrari for $532,984.12 in California; and (iv) $494,700 on some of the defendant Michael Jackson memorabilia.  Nguema's combined expenditures between 2004-2011 ($314,868,310.62) equaled more than 116 percent of Somagui's total gross construction income purportedly generated at that time throughout its entire existence, and exceeded the actual dollar figure by more than $47 million.

**H.   To Funnel and Harbor His Criminal Proceeds Through U.S. Financial Institutions, Nguema Deceived U.S. Banks About His Identity and the True Source and Ownership of His Funds**

102.   Beginning in at least 2004, Nguema orchestrated and implemented a scheme to fraudulently open and use bank accounts at financial institutions in California in order to funnel millions of dollars into the United States from E.G., while concealing his association with the accounts, the source of funds, and his status as an E.G. Minister and the son of E.G.'s President.

103.   Having acquired the $30 million Sweetwater property in April 2006, Nguema continued to spend more than $100,000 per month to pay for the maintenance and upkeep of his newly acquired 12-acre Malibu estate.

104.   U.S. financial institutions face substantial criminal and civil penalties, as well as significant reputational harm, if they fail to adhere to the requirements of the Bank Secrecy

EXHIBIT B
Page 93

Act, 31 U.S.C. §§ 5311 and other anti-money laundering controls.
These obligations include, among others requirements, to
implement (i) due diligence policies and procedures governing
high-risk areas such as accounts of politically exposed persons
("PEPs"),[3] including senior foreign public figures ("SFPs"),[4]
and (ii) internal controls for managing accounts of PEPs and
SFPs and companies owned by such persons.

105.   Because Nguema is the son of President Obiang and an
E.G. minister, he is both a PEP and an SFP.

106.   In 2004, the conviction and $16 million criminal fine
against Riggs Bank, the additional $25 million in civil
penalties assessed against Riggs by federal regulators, and the
U.S. Senate PSI's scrutiny on private banking involving senior
foreign political figures -- specifically including Nguema and
the Inner Circle -- highlighted the risks of non-compliance with
U.S. anti-money laundering controls.

_____

[3]   The Federal Financial Institutions Examination Council's
Bank Secrecy Act Ant-Money Laundering Act Examinations Manual
defines a "politically exposed person" as including a "current
or former senior foreign political figure, their immediate
family, and their close associates."

[4]   An SFP is a current or former senior official in the
executive, legislative, administrative, military, or judicial
branches of a foreign government, whether or not they are or
were elected officials; a senior official of a major political
party; and a senior executive of a foreign government-owned
commercial enterprise.  Also included in the definition of a
senior foreign political figure are immediate family members of
such individuals, and those who are widely and publicly known
(or actually known) close associates of a senior foreign
political figure.  *See* 31 C.F.R. 1010.65(p).

48

107.   Since then, U.S. financial institutions have been unwilling to deal with Nguema because of concerns that his funds were derived from corruption in E.G.

108.   In fact, two weeks after the PSI's report was published on July 15, 2004, City National Bank in Los Angeles was contacted by Nguema after the bank had closed his personal bank account.   When Nguema called City National Bank on July 30, 2004, he told a CNB employee that he thought his account had been closed "due to [his] country and the oil."

109.   As a result, between 2004 and 2008, Michael J. Berger ("Berger"), a California lawyer, created several companies in California, including "Beautiful Vision, Inc." and "Unlimited Horizon, Inc.," to defraud U.S. financial institutions regarding Nguema's relationship to accounts opened and the source and ownership of funds he brought into the United States.

110.   Similarly, between 2005 and 2006, George Nagler ("Nagler"), another California lawyer, created additional companies in California for Nguema, including "Sweet Pink, Inc.," "Sweetwater Management, Inc.," and "Sweetwater Malibu LLC," to defraud U.S. financial institutions regarding Nguema's relationship to accounts opened, property acquired, and the source and ownership of funds he brought into the United States.

111.   As part of this scheme, Nguema, Berger and Nagler opened bank accounts in California in the names of these companies without disclosing Nguema's ownership of the companies or their funds and concealing his status as a SFP and a PEP.  At all times alleged herein, Berger and Nagler were working as Nguema's agents, and worked under his control and direction.

112.   Nguema and his intermediaries, including Berger and Nagler, then transferred funds received from Nguema into these fraudulently obtained bank accounts in the United States.

113.   In opening numerous California bank accounts and using intermediaries' accounts, Nguema, Berger and Nagler intentionally and deliberately concealed from these financial institutions Nguema's association with these bank accounts as well as his status as an SFP and a PEP.

114.   In variations of this scheme, Nguema wire transferred funds to bank accounts controlled by intermediaries, including the attorney client trust accounts of Berger and Nagler, who -- unbeknownst to the banks -- then conducted transactions with these proceeds of bank fraud to pay for, among other things, Nguema's personal expenses and the upkeep and maintenance of the defendant assets, or to transfer these funds to the shell companies from which such payments were made.

EXHIBIT B
Page 96

115.   By concealing Nguema's association with the bank accounts, as described in paragraphs 117-209, as well as his status as a PEP and an SFP, Nguema and his co-conspirators fraudulently gained access to banking services in the United States, including the capacity to wire, hold and receive millions of dollars to pay for expenses related to the maintenance and upkeep of the defendant assets in California, while escaping the heightened scrutiny and monitoring to which banks are required, and entitled, to treat SFPs and PEPs. Nguema also deprived these financial institutions of the ability to assess accurately the risks associated with Nguema's banking activities, and exposed these financial institutions to the risk of regulatory sanctions and penalties were they were to fail to comply with banking regulations and guidelines relating to SFPs.

116.   In addition to paying for the maintenance and upkeep of the defendant assets, funds transmitted into the United States banking system through these fraudulently opened bank accounts were used to promote and further perpetuate Nguema's fraudulent scheme to defraud financial institutions in the United States.  Funds were used to pay for, among other things, the salaries of Nguema's household staff who worked at the Sweetwater property and aided Nguema, at his direction, to execute this fraudulent scheme; maintenance of an office at the

Sweetwater property for Nguema to perpetuate and oversee this scheme; the professional and administrative services of various lawyers, accountants, and property managers, including Berger and Nagler; costs incurred by Nguema's household staff relating to this scheme; and the costs and fees of the Sweetwater property, where Nguema and his household staff maintained their business office for their companies and where much of the conduct described at paragraphs 117-209 were planned, coordinated, and occurred.

a. **Scheme to Defraud Bank of America: Oct. 2004-Nov. 2005**

117.   Less than five months after City National Bank closed Nguema's bank account in Los Angeles, Berger incorporated a company called Beautiful Vision, Inc. in California on or about October 12, 2004.   Beautiful Vision was owned by Nguema, but its Articles of Incorporation make no reference to Nguema.   In or around, October 25, 2004, Berger applied for and received an Employer Identification Number ("EIN") from the Internal Revenue Service ("I.R.S.") for Beautiful Vision.

118.   On or about October 19, 2004, opened two bank accounts at a Bank of America ("BOA") branch on Wilshire Boulevard in Beverly Hills, one block from Berger's law office.

119.   Although Nguema was also present at the bank when these accounts were opened, Nguema's status as a PEP and a SFP

EXHIBIT B
Page 98

was concealed from BOA.  Berger identified himself in bank
documents as the owner and president of Beautiful Vision when,
in fact, Nguema was the company's sole owner.  No banker looking
at the documents and information provided to BOA by Berger and
Nguema could have identified Nguema as being the owner of
Beautiful Vision, nor could they have readily identified the
account as one affiliated with an SFP and a PEP.

120.  Within three weeks of opening the BOA accounts,
Berger transferred $3.1 million from his BOA client trust
account to Nguema's Beautiful Vision accounts.  Between November
1, 2004 and November 2005, at least an additional $1 million in
funds originating from E.G. were funneled into these accounts.

121.  The funds in Beautiful Vision's accounts were used
and controlled by Nguema to pay for his personal expenses.

122.  In an email dated in or about June 10, 2005, to Jane
Doe B, Nguema's then-personal assistant, Berger confirmed that
Nguema controlled the funds in these accounts and provided
Nguema with the passwords for both accounts.  Berger explained:
"With this information, you and Mr. Nguema can check the bank
balances any time you want to."  Similarly two months later, in
a letter dated August 11, 2005, Berger again confirmed
explicitly that Nguema was "the owner of" Beautiful Vision, Inc.

EXHIBIT B
Page 99

123.   BOA closed the Beautiful Vision accounts in or around September 12, 2005, and September 15, 2005, respectively, after discovering that Nguema, a SFP and a PEP, was associated with Beautiful Vision, Inc.

   b. **Scheme to Defraud Union Bank of California: Sept. 2005-Oct. 2005**

124.   On or about September 15, 2005, three days after BOA closed Nguema's Beautiful Vision business checking account, George Nagler, another California lawyer retained by Nguema, formed a company called Sweet Pink, Inc., for Nguema.

125.   Sweet Pink's articles of incorporation identify Nagler as the company's initial agent for service of process, but make no reference to Nguema.  Nagler, however, later confirmed to PSI staff that Nguema was Sweet Pink's sole owner, and that Sweet Pink was formed to employ and pay individuals at Nguema's home before he purchased the Sweetwater property.

126.   On or about September 22, 2005, Nagler faxed a letter to John  Doe B, Nguema's accountant, at 12:51 p.m., directing him to open a bank account for Sweet Pink so that Nguema could wire additional funds into the United States.  Specifically, Nagler wrote to John Doe B that:

      You should plan to have two or three people in your office
      authorized to sign on the account.  You should add [Nguema]
      as the assistant treasurer as able to sign alone.

      ***

EXHIBIT B
Page 100

. . . I plan to use one of my people as the nominal officer and director but she will NOT be signing [the bank opening documents] either . . .

127.  Later that same day, Nagler asked his assistant to serve as a nominee officer of Sweet Pink and to sign and file an EIN application with the I.R.S. for Sweet Pink on Nguema's behalf.  Nagler wrote in an email to his assistant:

I am forming a new corporation for [Nguema], a new client. He asked if we could provide someone to act as the officer and director for him.  You will have no responsibility other than signing the standard minutes.  The company is being formed only to handle the payroll for the 3 people who work at his house and any other personal affairs here. You can resign at any time.  Assuming you agree, I need you to sign the attached application for a tax identification number and fax it back to me.

128.  At 3:26 p.m. on September 22, 2005, Nagler faxed John Doe B another letter:

I confirm our discussion today that you and three others from [your] accounting firm . . . will be authorized signatories [on the Sweet Pink account]. . . You will use your address as the business location.  Please mail a copy of the statement to [Nguema] and me.

Please confirm.  I will forward you the [EIN] as soon as I have it, probably Monday.  You then will open the account and send me the wiring instructions.

129.  On or about September 25, 2005, Nagler's assistant filed an EIN application for Sweet Pink with the I.R.S., identifying herself -- at Nagler's direction -- as Sweet Pink's "principal officer, general partner, grantor, owner, or trustor."  Nagler dictated instructions for how to complete the

I.R.S. EIN application form on a tape recorder.  Nagler's
assistant then completed the I.R.S. EIN application form exactly
as Nagler dictated it to her.  Neither Sweet Pink's articles of
incorporation, by-laws or other corporate documents identify
Nagler or his assistant as retaining such authority within the
corporation.  Rather, according to Sweet Pink's corporate
records, Nguema was Sweet Pink's sole shareholder.

130.  On or about September 29, 2005, Union Bank of
California ("UBOC") opened a checking account for Sweet Pink
using the EIN obtained by Nagler's assistant.  Obtaining and
using this EIN permitted Nagler and Nguema to open the account
without disclosing to UBOC the social security number of the
corporation's true owner -- Nguema.  The signatories on the
account were Jane Doe C, Nguema's then-girlfriend, and four
employees of an accountancy firm retained by Nguema.  On the
bank account opening documents, the accountancy firm's address
is listed as Sweet Pink's address.

131.  No banker looking at the documents and information
provided by Nagler and Nguema could have identified Nguema, as
being the owner of Sweet Pink, nor could they have identified
the account as one affiliated with an SFP and a PEP.  Again,
Nguema's involvement and association with Sweet Pink, as well as
his SFP and PEP status, were concealed from UBOC personnel.

EXHIBIT B
Page 102

132. Having obtained an EIN for Sweet Pink and thereby facilitated the opening of Sweet Pink's UBOC account, Nagler's assistant resigned as its vice president on or about October 5, 2005, six days after UBOC agreed to open the accounts.

133. On or about October 19, 2005, within three weeks of the account's opening, Nguema sent two wires, each for approximately $29,947.50, from Somagui in E.G. to Sweet Pink's UBOC account.

134. Approximately eight days later, on or about October 27, 2005, UBOC closed the Sweet Pink account. Having discovered the connection between Nguema and Somagui, and realizing that Nguema was using the Sweet Pink account to gain access to the U.S. banking system, UBOC closed Sweet Pink's account. This was the third time in less than fifteen months that a California bank closed an account after learning of Nguema's association with the account.

c. **Scheme to Defraud Commercial Capital Bank: Dec. 2005-Jun. 2006**

135. On or about December 7, 2005, less than two months after UBOC closed Nguema's Sweet Pink account, Berger opened an account at Commercial Capital Bank in Beverly Hills in the name of another company, Unlimited Horizon, Inc. This bank was located in the lobby of the same building where Berger

EXHIBIT B
Page 103

maintained his law office.  Berger was the account's only

signatory.

136.   Berger caused Unlimited Horizon, a California corporation owned by Nguema, to be incorporated in California on October 21, 2005.  Unlimited Horizon's articles of incorporation list Berger as the initial agent for service of process and the corporation's incorporator.  No reference is made to Nguema in these corporate documents.  In or around December 7, 2005, Berger filed an application with the I.R.S. to obtain an EIN for Unlimited Horizon.

137.   In opening this account, Berger withheld and concealed material information from the bank's personnel, including Nguema's association with this account and his status as an SFP and a PEP.  No banker looking at the documents and information provided by Berger and Nguema to Commercial Capital Bank could have identified Nguema as being the owner of Unlimited Horizon, nor could they have identified the account as one affiliated with an SFP and a PEP.

138.   According to PSI records, on or about February 8, 2006, Berger faxed a letter to John Doe C, an Italian national who served as the chief executive officer of General Work, S.A., one of the largest construction companies in E.G.  The letter, which was addressed to Nguema, provided Nguema with the

58

"information that you need to wire transfer money to the Unlimited Horizon, Inc. checking account at Commercial Capital Bank," including the account number, the Swift code, the address of the bank, and the bank's telephone number.

139.  This Commercial Capital Bank account received the following three wires from E.G.:  (i) a wire for $19,946.25 from Somagui on or about February 16, 2006; (ii) a wire for $49,945 from Somagui on or about March 23, 2006; and (iii) a wire for $39,944.81 from SOCAGE on or about June 16, 2006.

140.  On March 15, 2006, Berger faxed another letter to John Doe C's office addressed to Nguema, confirming that Berger "received [Nguema's] message on March 13 directing [Berger] to use the funds that Unlimited Horizon, Inc. is holding for [Nguema] to pay" three of Nguema's California employees.

141.  Berger continued to fax John Doe C's office periodically, requesting that Nguema send more money to Unlimited Horizon.  On February 9, 2006, for instance, Berger faxed a letter to John Doe C, which was addressed to Nguema, stating that $30,000 was "now due" for legal services he had provided and "costs advanced for you."  On or about March 13, 2006, Berger faxed to John Doe C another letter addressed to Nguema, stating that another $350,000 was "now due."

142.   Bank records show that most of the funds in the Commercial Capital Bank account were either withdrawn by Berger in the form of cash to pay himself or to pay for expenses related to Nguema's Sweetwater property, including payments made to Nguema's household staff.

143.   On or about June 22, 2006, Commercial Capital Bank closed Unlimited Horizon's account.  This was the fifth account in less than two years closed by a California bank after discovering its association with Nguema.

d.   **Scheme to Defraud California National Bank: May 2006-Jun. 2006**

144.   On or about May 16, 2006, after Nguema had acquired the Sweetwater property in April 2006, Nagler formed another company for Nguema called Sweetwater Management, Inc.  Nagler explained to PSI staff that Sweetwater Management was formed to employ individuals at the Sweetwater property, including executive assistants, estate managers, housekeepers, and gardeners, and to handle payroll and other matters related to the employment of the household staff.  Sweetwater Management's articles of incorporation make no reference to Nguema and identify Nagler as the corporation's initial agent for service of process.  The articles are signed by an employee of Gregory Holden Corporate Services Co., who resigned as Sweetwater

EXHIBIT B
Page 106

Management's incorporator approximately seven days after the articles were filed with California's Secretary of State.

145. Internal corporate records show that on or about May 23, 2006, Sweetwater Management resolved that Nguema would serve as the corporation's president, chief financial officer, secretary, sole director and sole shareholder. These records also reflect that only Nguema was authorized by the corporation to file an EIN application with the I.R.S.

146. On or about May 23, 2006, Nagler directed Nguema's personal assistant to file an application to obtain an EIN with the I.R.S., identifying herself as the "principal officer, general partner, grantor, owner, or trustor" of Sweetwater Management. Nothing in Sweetwater Management's corporate records suggests that Nguema's personal assistant retained such authority within the corporation. This EIN was then used by Sweetwater Management in opening bank accounts at California National Bank ("CNB").

147. On or about May 30, 2006, after agreeing to be named as an officer of Sweetwater Management and filing an EIN application with the I.R.S. for the corporation, Nguema's personal assistant asked Nagler whether she could "be held liable for anything" as an officer of Nguema's corporation. Nagler reassured her, "I am not aware of an officer having

personal liability for a company's bank account except if it is a payroll account and then only for the employment taxes that are not paid to the I.R.S. You would only be a backup signatory on the payroll account at most."

148.  That same day, John Doe D, Nguema's estate manager, opened an account at CNB in Los Angeles, in the name of "American Equity Properties, DBA:  American Property MGMT ITF: Sweet Water Malibu" ("AEP Account").  In opening this account, John Doe D concealed Nguema's involvement with the account as well as Nguema's status as a SFP and a PEP.  John Doe D identified the owner of Sweetwater Malibu as a "high profile" person who wanted to remain confidential.  When CNB insisted that John Doe D and Nagler provide the bank with Sweetwater Malibu's operating agreement, they agreed that they would do so in the future.  Based upon these assurances, CNB opened this account on a temporary basis.

149.  The following day, on or about May 31, 2006, Nguema's personal assistant opened three additional business accounts at CNB in the name of Sweetwater Management, Inc.  Both John Doe D and the personal assistant were named as signatories on these accounts.  The personal assistant identified herself to CNB as Sweetwater Management's vice president.  Again, Nguema's association with these accounts was not explicitly disclosed to

CNB, and his status as an SFP and a PEP was hidden from bank personnel.  By using the EIN obtained by Nguema's personal assistant to open the accounts, Nguema and Nagler were able to open these accounts without using Nguema's social security number and, thus, obscure further Nguema's association with the accounts.

150.  No banker looking at the documents and information initially provided to CNB by Nguema and Nagler, could have identified Nguema as being the owner of these accounts, nor could they have identified the accounts as affiliated with an SFP and a PEP.

151.  After opening these three accounts, Nagler emailed Nguema, confirming that John Doe D "has been able to open the accounts . . . in the name of Sweetwater Management, Inc."  Nagler further informed Nguema that his personal assistant should be made Sweetwater Management's secretary because, "It avoids you having to go into the bank and sign documents. . . . Please advise if anything differently should be done."

152.  In another e-mail dated on or about May 31, 2006, Nagler informed Nguema that "[John Doe D] is waiting for you to wire in the first $250,000.  I told him that I assumed he should have it by the end of this week.  Please advise if you expect to send it later.  I also told [John Doe D] that [Nguema's personal

assistant] is setting up a household account that will have a maximum of $10,000 to allow her to pay certain household expenses."

153.   On or about June 12, 2006, within two weeks of opening his CNB bank account, Nguema sent a wire from E.G. in the name of SOCAGE for $249,899 to the AEP Account.   The following day, Nguema's personal assistant requested that CNB transfer these funds to one of the Sweetwater Management accounts, where she was a signatory.   After being reprimanded for contacting the bank directly, Nguema's personal assistant apologized in an email stating, "Sorry if I didn't go about it the correct way.   I didn't realize that speaking with [the bank manager] wasn't proper."

154.   Soon thereafter, Nagler sent CNB a copy of Sweetwater Malibu's operating agreement, which lists Nguema as the company's owner.   After receiving this document, CNB for the first time identified Nguema as being associated with Sweetwater Malibu, a fact which had been withheld from the bank.

155.   Soon thereafter, CNB informed John Doe D that it was CNB's policy to have only "'clients that are not politically connected' [and] . . . that the bank accounts (that were just opened) could be closed by the bank due to their findings." John Doe D relayed this same information to Nagler.

156.   On or about June 22, 2006, CNB closed all four bank accounts.   The funds in these accounts were transferred to Nagler's client trust account and used for expenses related to Sweetwater Management, and its maintenance of the defendant Sweetwater property.   Between July 2004 and June 22, 2006, a period of less than two years, _five_ different banks in the Los Angeles area had closed _nine_ bank accounts controlled by Nguema after learning of his association with them.

e.   **Scheme to Defraud Union Bank of California: Aug. 2006-Jun. 2007**

157.   On or about August 28, 2006, two months after Unlimited Horizon's account at Commercial Capital Bank was closed and Nguema's four accounts at CNB were closed, Berger opened two Basic Business Checking Accounts in the name of Unlimited Horizon, Inc. at a UBOC branch on Wilshire Boulevard in Beverly Hills.   UBOC's Wilshire branch is located directly across the street from the BOA branch that had closed Nguema's Beautiful Vision accounts nine months earlier, and next door to both Commercial Capital Bank and Berger's law office.   Like Nguema's accounts at CNB and Commercial Capital Bank, these accounts were for Nguema's exclusive use and control.

158.   Bank records show that Berger identified himself to UBOC as Unlimited Horizon's president, and was the sole signatory on both UBOC accounts.   Berger again concealed

65

material information from UBOC, including Nguema's association with Unlimited Horizon, as well as Nguema's status as a SFP and a PEP.  No banker looking at the documents and information provided to UBOC by Nguema and Berger, could have identified Nguema as being the owner of these accounts, nor could they have identified the account as one affiliated with an SFP and a PEP. Also, by using the EIN obtained for Unlimited Horizon, rather than Nguema's social security number, to open these accounts, Nguema and Berger were able to further conceal Nguema's association with these accounts.

159.  After opening both checking accounts, Berger emailed Nguema that day informing him that Unlimited Horizon's two checking accounts had been opened at UBOC and that $30,000 of Nguema's funds, which were deposited in Berger's BOA client trust account, were used to fund these accounts.

160.  In addition to the Unlimited Horizon accounts, Berger opened a client trust account at UBOC on or about October 16, 2006.  Berger and Nguema agreed that future wires from E.G. should be sent by Nguema initially to this new client trust account.  From there, Berger agreed to transmit Nguema's funds to Unlimited Horizon's UBOC accounts.  Berger explained to Nguema in an email dated on or about November 1, 2006, that future wires should be sent "to my new client trust account at

[UBOC].  I will transfer it from there to the Unlimited Horizon, Inc. General Account.  I will send you a separate e-mail and fax requesting a $200,000 wire transfer and providing wire transfer information for this new account."

161.  Within three months of opening these accounts, Nguema began wiring hundreds of thousands of dollars into the United States through Berger's client trust accounts at both UBOC and BOA.  Between November 24, 2006 and June 6, 2007, Berger's UBOC client trust account received eight wires from Nguema, including from Somagui's account at CCEI Bank in E.G., amounting cumulatively to approximately $1,599,419.

162.  Upon receiving these wires in his client trust accounts, Berger withdrew these funds and deposited them into Unlimited Horizon's UBOC accounts in the form of checks and bank drafts.  Between November 29, 2006 and May 11, 2007, Berger deposited seven checks totaling $1,399,485 into Unlimited Horizon's UBOC accounts, after withdrawing these funds as "cash" from his client trust account.  In addition, on June 8, 2007, Berger wired $153,101 from his client trust account directly to Guernsey's Auction House in New York to purchase personal assets for Nguema.

163.  Berger sent Nguema an email on or about October 16, 2006, confirming that any funds wired to this client trust

account by Nguema would, in turn, be transferred to Unlimited Horizon's UBOC accounts.  Specifically, Berger reminded Nguema, "I have spent or transferred to the Unlimited Horizon Accounts all of the funds that you wired to my [client trust] account . . . . . Unlike my [client trust] account [at BOA] which is used for many clients, the 2 Unlimited Horizon Accounts are used exclusively for your business . . . ."

164.  UBOC records show that Unlimited Horizon's accounts were used to support, maintain and enhance the Sweetwater property, including, among other things, paying in or around $54,000 per month for home security services; $10,000 per month in electricity bills; $8,000 per month in phone bills; $73,649.95 in property taxes; $6,875 for the installation of a sauna; more than $10,000 for home theater equipment; more than $4,000 for home insurance; more than $12,000 in landscaping fees; more than $36,000 in tree care-related fees; and more than $30,000 per month in payroll for Nguema's household staff, including estate managers, maintenance crews, and housekeepers.

165.  Berger obtained Nguema's consent before disbursing any checks from Unlimited Horizon's accounts.  Berger would make payments from these accounts after receiving a "check request form" signed in Nguema's handwriting authorizing Berger to pay a specific vendor a specified amount.  In an email to Berger from

Nguema's then-personal assistant on or about August 8, 2006, she wrote, "Mr. Nguema wanted me to inform you that he does not want you to use or allocate any of Mr. Nguema's funds, either existing or forthcoming, without his written approval."

166.  PSI records show that even when Nguema was in E.G., Berger faxed "check request forms" to Nguema and received signed "check request forms" back from Nguema via John Doe E, an employee of General Work.

167.  On or about June 12, 2007, after an investigation by UBOC discovered that Berger represented Nguema, an SFP and a PEP, and that Berger was using corporate vehicles to "disguise the identity of" Nguema to pay for the Sweetwater property and Nguema's living expenses, UBOC closed all three accounts.

f.  Bank Account at Comerica Bank:  Feb.-Mar. 2007

168.  On or about February 6, 2007 -- eight months after CNB closed Nguema's four accounts -- Nguema applied to open a bank account at Comerica Bank on the Avenue of the Stars in Los Angeles.

169.  On this occasion, Nguema directed Jane Doe D, an accountant, to open the account in his name and to identify himself as an E.G. citizen to the bank, but he nonetheless concealed from Comerica the fact that he was a PEP and an SFP. When asked explicitly whether Nguema "ever performed important

public functions for a foreign state (PEP)?" Jane Doe D answered in the negative.  When asked whether Nguema was "closely associated with person(s) who perform public functions for a foreign state (PEP)?" Jane Doe D again answered in the negative. Had Nguema disclosed his status as a SFP or PEP, the banker would have been required under Comerica's policies to contact the bank's AML Compliance OFAC/PEP Officer before opening this account.

170.  Furthermore, instead of identifying Nguema as E.G.'s Minister of Forestry and Agriculture, Jane Doe D claimed that Nguema was not employed and that his source of income was "family inheritance, sale of automobiles . . . [and] trading expensive & custom automobiles."  In connection with his family inheritance, Jane Doe D informed the bank that Nguema receives $50,000 per week (or approximately $1.2 million per year) "from France, Spain or England from private funds received re inheritance."

171.  Once this account was opened, Nguema deposited $158,086.99 in checks into it.

172.  On or about March 22, 2007, Comerica closed this account after the bank's compliance personnel discovered that Nguema was a PEP and an SFP.  The remaining balance of $153,100.99 was provided to Nguema in the form of a bank check

EXHIBIT B
Page 116

that, in turn, was deposited into Berger's BOA client trust account.  These funds were again used to pay for Nguema's personal expenses, including maintenance and upkeep of the defendant Sweetwater property.

   g.  **Citibank Accounts:  June 2007-May 2008**

   173.  On or about June 25, 2007, approximately thirteen days after UBOC closed Nguema's accounts, Berger opened another account in the name of Unlimited Horizon at a Citibank branch on Wilshire Boulevard, one block from UBOC and across the street from his law office.  Although during the preceding three years five different banks in California closed twelve different accounts used by Nguema after learning that Nguema controlled or used those accounts to transmit funds into the United States, Berger represented to Citibank that he alone was Unlimited Horizon's president and concealed from Citibank Nguema's association with the company as well as Nguema's status as an SFP and a PEP.

   174.  Furthermore, in opening the Citibank account, Berger made several explicit misrepresentations to mislead Citibank personnel.  Berger fraudulently represented that:

>      (i)  He was the sole shareholder and director of
>           Unlimited Horizon, a single stockholder
>           corporation, when, in fact, Nguema was Unlimited
>           Horizon's sole owner;

EXHIBIT B
Page 117

(ii) Unlimited Horizon was in the business of providing legal and accounting services when, in actuality, Unlimited Horizon provided no commercial services of any kind, let alone legal and accounting services; and

(iii)   Unlimited Horizon generated $400,000 in annual sales per year and $100,000 in profit when, in actuality, Unlimited Horizon made no such earnings.

175.   Furthermore, prior to opening this bank account, a Citibank banker explicitly asked Berger:

(i) whether "any signer/owner (owning 25% or more) [of Unlimited Horizon]. . . is a citizen of a country other than the United States or Puerto Rico?" and

(ii) "If yes, are any of such owners a Senior Public Figure (SPF) (for example, a current or former Senior Public Figure or Senior Official in the executive, legislative, administrative, military or judicial branch of a government) or a close associate/family member of an SPF?"

In response, Berger fraudulently answered "no" to both questions.

176.   On or about June 26, 2007, a Citibank employee performed a site visit at the Wilshire Boulevard location where Unlimited Horizon was purportedly located.  Upon arriving at this location, the Citibank employee noticed that an entity called the "Law Offices of Michael J. Berger" operated at the location and used the same address and phone number as the one provided for Unlimited Horizon.  The banker, however, saw no evidence of any signage or marketing by Unlimited Horizon at the

EXHIBIT B
Page 118

location.   Furthermore, even though Berger was present at the time the site visit occurred, he -- again -- failed to clarify that Nguema, a PEP and an SFP, owned or was associated with Unlimited Horizon.

177.   On or about July 10, 2007, Berger withdrew $100,000 of Nguema's funds from his client trust account at BOA to open Unlimited Horizon's Citibank account.   In an email to Nguema on or about July 12, 2007, Berger confirmed, "[A]s we discussed this morning, on July 10, 2007 I went to Bank of America, withdrew $100,000.00 of your money from my Bank of America [client trust] account, purchased a cashier's check for $100,000.00 made out to Unlimited Horizon, Inc. and deposited said cashier's check into the new Unlimited Horizon, Inc. account at Citibank.".

178.   Over the course of the next five months, Nguema transferred over $1 million directly from E.G. into Berger's client trust account.   Berger, in turn, transferred these funds into Unlimited Horizon's Citibank account.   Specifically:

(i)   On or about July 27, 2007, Nguema wired approximately $199,948.82 in the name of Somagui in E.G. into Berger's BOA client trust account.   Berger then withdrew these funds in cash and deposited them in the form of a bank check into Unlimited Horizon's Citibank account;

(ii)  On or about August 16, 2007, Berger withdrew $199,908.45 of Nguema's money from his BOA client trust account as cash and deposited these funds in the

73

form of a bank check into the Unlimited Horizon Citibank account;

(iii)    On or about September 11, 2007, Nguema wired approximately $199,934.10 in the name of Somagui in E.G. into Berger's BOA client trust account.  Berger then withdrew these funds as cash and deposited them in the form of a bank check into the Unlimited Horizon Citibank account;

(iv)  On or about October 12, 2007, Nguema wired $199,931.82 in the name of Somagui in E.G. into Berger's BOA client trust account.  That same day, Berger withdrew $199,896.82 as cash from his BOA client trust account and deposited these funds in the form of a bank check into the Citibank account; and

(v)  On or about November 6, 2007, Nguema wired $169,178.26 in the name of Somagui in E.G. into Berger's BOA client trust account.  Three days later, Berger transferred $169,143.26 to the Citibank account from his BOA client trust account.

179.  Citibank records show that the funds in Unlimited Horizon's Citibank account were used to pay for expenses relating to the Defendant Sweetwater property, including, among other things, approximately $54,000 per month on the home's security detail, over $9,000 per month on the power bill to Southern California Edison, over $5,000 per month on the home's water bill to Los Angeles County Waterworks, $37,000 on landscaping costs, $3,773 on maintenance for the home's fish tank, $24,700 on outdoor landscape lighting, $7,577 for the "Fish Physician" in connection with the home's Koi pond, $9,600 on audio-video equipment, $1,304 for swimming pool maintenance, and thousands of dollars for home furniture and decorations.

74

180.   In an email dated on or about December 7, 2007, Berger confirmed with Nguema, "I know that all payments [from the Citibank account] must be approved by you . . . I understand the importance of the principle.  This e-mail will reconfirm that I will only pay bills approved by you."

181.   When the Citibank account ran low on funds, Berger contacted Nguema to wire more money from E.G.  On or about October 30, 2007, for instance, Berger emailed Nguema and advised him, "[t]he bottom line is that it is time to send more money to my [client trust] account.  I have prepared a bill and wire transfer instructions and attached those conditions."

182.   On or about May 20, 2008, after uncovering Nguema's association with Unlimited Horizon and this account, Citibank closed Unlimited Horizon's account.  When a Citibank banker from the Wilshire Branch telephoned Berger to advise him that this account needed to be closed, Berger neither commented nor raised any questions as to why such a decision had been made.  As of May 2008, six banks in California had closed thirteen accounts during the preceding four years after learning of their association with Nguema.

   h.  Berger's Use of Client Trust Accounts at BOA and UBOC

183.   Berger has maintained a client trust account at BOA since 1996.  Berger opened his UBOC client trust account on

October 16, 2006.   Under California's Rules of Professional Conduct ("RPC"), California lawyers are permitted to open and maintain client trust accounts to maintain client funds in connection with or related to the provision of legal services. *See* Rule 4-100.   Under the RPC, funds in which a client maintains an interest must be deposited in a client trust account.   *See* Rule 4-100(A).   Funds in a client trust account, however, are precluded from being used to pay for expenses not directly related to a lawyer's duty to provide legal services to a client.   Rule 4-210 ("A member shall not directly or indirectly pay or agree to pay, guarantee, represent, or sanction a representation that the member or member's law firm will pay the personal or business expenses of a prospective or existing client . . . .").

184.   Between 2004 and 2007, Nguema transmitted more than $1.5 million dollars into the U.S. from E.G. through Berger's client trust accounts at BOA and UBOC.   By wiring funds into Berger's client trust account, Berger implicitly represented that the funds in this account were payment for legal services or otherwise directly related to his law practice.   Unbeknownst to BOA, these funds had nothing to do with legal services provided by Berger and, instead, were used to pay for Nguema's personal expenses, including the maintenance and upkeep of the

EXHIBIT B
Page 122

defendant assets.  By deceptively representing implicitly to BOA that the funds being transmitted by Nguema into Berger's client trust account were directly related to legal services, Berger succeeded in providing Nguema with access to, and the use of, a BOA account to receive and pay for personal expenses.

185.  Furthermore, by permitting Nguema to wire money into Berger's client trust account, before transferring those funds to Unlimited Horizon's bank accounts at UBOC and Citibank, Nguema and Berger were able to further conceal from financial institutions in the United States Nguema's association with these accounts.

186.  Upon receiving funds from Nguema, Berger either (i) transmitted these funds to various bank accounts held in the names of various California corporations used by Nguema to pay his personal expenses, including for the maintenance and upkeep of the defendant assets, or (ii) used the funds to pay Nguema's personal bills directly.

187.  Specifically, Berger's BOA account received the following wires from E.G.:  (i) a wire for $299,933.50 from Nguema on or about August 8, 2005; (ii) a wire for $299,923.68 from SOCAGE on or about August 4, 2006; (iii) a wire for $199,975.90 from SOCAGE on or about September 26, 2006; (iv) a wire for $199,976.17 from SOCAGE on or about October 20, 2006;

(v) a wire for $199,948.82 from SOCAGE on or about July 26,

2007; (vi) a wire for $199,933.45 from Somagui on or about

August 14, 2007; and (vii) a wire for $199,934.10 from Somagui

on or about September 11, 2007.

188.   After receiving these wires, Berger frequently wrote

checks to "cash" and used the funds to purchase cashier's checks

that were then deposited in Unlimited Horizon's accounts at UBOC

and Citibank.[5]  For instance, Berger (i) on or about October 23,

2006, wrote a check to cash and used the funds to purchase a

cashier's check for $199,931.17 that was deposited in Unlimited

Horizon's UBOC account; (ii) on or about July 10, 2007, wrote a

check to cash and used the funds to purchase a cashier's check

for $100,000 that was deposited in Unlimited Horizon's Citibank

account; (iii) on or about July 27, 2007, wrote a check to cash

and used the funds to purchase a cashier's check for $199,948.82

that was deposited in Unlimited Horizon's Citibank account; (iv)

on or about August 16, 2007, wrote a check to cash and used the

funds to purchase a cashier's check for $199,908.45 that was

deposited in Unlimited Horizon's Citibank account; (v) on or

_____

[5]   Lawyers "should **NEVER** make out a client trust bank
account check to cash, because there's no way to know later who
actually cashed the check."  *See* State Bar of California,
*Handbook on Client Trust Accounting for California Attorneys*
(2009),
http://www.calbar.ca.gov/LinkClick.aspx?fileticket=ndD6TpJbR8q%3
D&tabid=2326, (emphasis in original).

about September 11, 2007, wrote a check to cash and used the funds to purchase a cashier's check for $199,934.10 that was deposited in Unlimited Horizon's Citibank account; (vi) on or about October 12, 2007, wrote a check to purchase a cashier's check for $199,896.82 that was deposited in Unlimited Horizon's Citibank account; (vii) on or about November 9, 2007, wrote a check to purchase a cashier's check for $169,143.26 that was deposited in Unlimited Horizon's Citibank account; and (viii) on or about December 14, 2007, wrote a check to purchase a cashier's check for $230,687.84 that was deposited in Unlimited Horizon's Citibank account.  The funds in Unlimited Horizon's UBOC and Citibank accounts were then used by Nguema to pay for various personal expenses, including the maintenance and upkeep of the defendant assets.

189.  In addition, at other times, Berger wrote checks directly from his BOA client trust account to pay for various personal expenses incurred by Nguema, including some relating to the maintenance and upkeep of the Sweetwater property.  For instance, (i) on or about August 31, 2006, October 4, 2006, and July 6, 2007, Berger paid $56,544, $54,720, and $54,720, respectively, to the Sweetwater property's security service; and (ii) on or about December 10, 2007, Berger paid $169,242.68 in

county property taxes for the Sweetwater property from this account.

190.   After BOA investigated Berger's use of his client trust account in 2008, BOA closed Berger's client trust account as it "wasn't comfortable" with Berger's use of this account. Likewise, as explained above, UBOC closed Berger's client trust account in June 2007.

### i.   Nagler's Client Trust Account and Business Account at City National Bank

191.   Nagler's law practice maintained both a client trust account and a business account at City National Bank since 1995. Nagler told PSI staff that after CNB closed Nguema's four accounts in June 2006, Nagler -- at Nguema's request -- permitted Nguema to use his client trust account between on or about June 26, 2006 and August 23, 2006, to pay various personal expenses, including those relating to the maintenance and upkeep of the Sweetwater property, with funds provided to the account by Nguema.

192.   When CNB closed Nguema's accounts in June 2006, approximately $213,149 was transferred from these accounts into Nagler's client trust account.   Until Nguema opened his Unlimited Horizon accounts at UBOC, Nguema used Nagler's client trust account to pay for thousands of dollars in personal

EXHIBIT B
Page 126

expenses, including the maintenance and upkeep of the Sweetwater property.

193.  Nagler concealed the fact that these funds belonged to Nguema, who is both a PEP and an SFP.  Furthermore, Nagler failed to disclose to City National Bank that these funds had no direct connection to any legal service being offered by his office and, instead, were being used primarily to pay for the personal expenses of an SFP and a PEP.

194.  In fact, Nagler even printed "Sweetwater Management, Inc.," the name of Nguema's company, on a set of checks linked to his law office's business checking account to pay for Nguema's personal expenses.  These checks were funded with transfers from Nagler's client trust account.

195.  Between on or about June 26, 2006 and August 23, 2006, Nagler received Nguema's consent to make a payment from his client trust account or business account by requesting and having Nguema sign a "Check Request Form."  These forms would identify who the check should be issued to; the amount of the check; the purpose of the check; and the address of the recipient.

196.  Like Berger, Nagler issued dozens of checks for expenses related to the upkeep and maintenance of the Sweetwater property, including paying for Nguema's household employees at

the Sweetwater property; the phone bill; the gas bill;
landscaping and gardening bills; the "Fish Physician" who cared
for the estate's Koi pond; the water bill; the security guards;
and insurance fees.

197.  On or about July 20, 2006, Nagler even faxed Nguema a
letter advising him that only $40,000 of Nguema's funds remained
in the client trust account and that Nguema should make
"arrangements to have another $250,000 transferred to my trust
account."

198.  Between on or about June 26, 2006 and August 23,
2006, Nagler -- unbeknownst to City National Bank -- expended in
or around $309,607.71 from his client trust account on Nguema's
personal expenses.

199.  Nagler informed PSI staff that he received the
following amounts in fees for services he provided to Nguema,
Sweet Pink, Inc., Sweetwater Management, Inc., and Sweetwater
Malibu, LLC:  (i) $13,992 in 2005; (ii) $152,393 in 2006; and
(iii) $30,184 in 2007.

j.  **Scheme to Defraud Wells Fargo Bank: Opened Mar. 2008**

200.  On or about March 14, 2008, approximately nine months
after UBOC closed Nguema's Unlimited Horizon accounts and Berger
fraudulently opened another Unlimited Horizon account at
Citibank, Nguema directed his employee John Doe F to open more

bank accounts at various banks located on Pacific Coast Highway in Malibu.  Specifically, Nguema directed John Doe F to open these account for Nguema's exclusive use and control in the name of Mecafis Estate Services LLC ("Mecafis") at various banks, including a branch of Wells Fargo Bank, N.A., located on Pacific Coast Highway in Malibu less than one mile from the Sweetwater property.

201.  Nguema explained to John Doe F that because banks in the United States would never open an account for him if they knew he was associated with it, all of these accounts must be opened by third parties -- like John Doe F -- in the names of various companies -- like Mecafis.  As a result, Nguema warned John Doe F not to disclose his involvement or association with this account to the bank.  Nguema provided John Doe F with $2,000 in cash to open this account.  No banker looking at the documents and information provided to Wells Fargo by John Doe F and Nguema, could have identified Nguema as being the owner of this account, nor could they have identified the account as one affiliated with an SFP and a PEP.

202.  As of about March 14, 2008, when this Wells Fargo account was opened, five different banks in California had closed twelve different accounts associated or controlled by Nguema during the preceding four year period.  Yet, John Doe F,

at Nguema's direction, did not disclose Nguema's association with this account, nor did he disclose Nguema's status as an SFP or PEP. When John Doe F opened this account, he informed Wells Fargo that he was Mecafis' owner.

203. Over the course of the following seventeen months, eight other signatories cycled through this account for varying periods of time. These individuals included Nguema's accountants in Pasadena, California; various household employees of Nguema; and a girlfriend of Nguema. None of these individuals ever disclosed Nguema's association and use of this account, as well as his status as an SFP and PEP, to Wells Fargo.

204. Between on or about April 14, 2008, and March 25, 2010, Mecafis' Wells Fargo account received 23 wires from Nguema in E.G. In total, these wires amount to in or around $3,980,109. These wires originated from E.G. bank accounts held by Nguema, SOCAGE, Somagui, and Sofona at three E.G. banks: CCEI Bank, BGFI Bank and Societe Generale Guinee Equatoriale.

205. The funds in this account were used to pay for the maintenance and upkeep of the Sweetwater property.

206. When John Doe F, who originally opened the account, asked Nguema to have his name removed from the account, his name

was replaced by John   Doe G, an accountant in Pasadena.   The next day Nguema terminated John Doe F as an employee.

**k.  Scheme to Defraud J. P. Morgan Chase Bank:  Opened Oct. 2010**

207.  Two years after Nguema fraudulently opened the Mecafis account at Wells Fargo, John Doe G opened an account for Nguema's use and control under the name of Sweetwater Canyon, Inc. at a branch of J.P. Morgan Chase Bank, N.A., located on East Colorado Boulevard in Pasadena, California in or around one mile from John Doe G's accounting firm, on October 5, 2010. John Doe G stated that he was Sweetwater Canyon's president but neither disclosed Nguema's association with this account nor his status as a PEP and a SFP.  The initial deposit for the account's opening was funded with a check from Mecafis' account at Dominica Bank.  No banker looking at the documents and information, provided to J.P. Morgan Chase by John Doe G and Nguema, could have identified Nguema as being the owner of this account, nor could they have identified the account as one affiliated with an SFP and a PEP.

208.  This account is used to pay for the maintenance and upkeep of the defendant assets, including the Sweetwater property's gas bills, phone bills, water bills, swimming pool maintenance fees, maintenance fees for the property's aquarium, gardening and landscaping bills, legal bills, accounting bills,

and the salaries of the Sweetwater property's employees.  This account was also used to pay for, among other things, the insurance for the defendant Ferrari and the storage fees for Rockin Boxes, where the defendant Michael Jackson memorabilia was stored and secured.

209.  The account received several wires from E.G. for Nguema's use including (i) $150,000 in the name of G.E. Port SA in Bata on or about January 20, 2011; (ii) $149,987 in the name of Eloba Construcion on or about October 22, 2010.

I.  Purchase of the Defendants In Rem

a. Purchase of the Defendant White Crystal-Covered "Bad Tour" Glove and Other Michael Jackson Memorabilia

210.  In August 2010, an intermediary registered Nguema to bid in a live auction of celebrity memorabilia (called the "Legends" auction) taking place on October 9, 2010, in Macau, China (October 8, 2010, in California).  The intermediary advised the auction house by email to "Please make sure that [Nguema's] name does not appear anywhere, he should be invisible," and to "please make sure that where a name needs to be, my name is there.  This is very important."

211.  At the "Legends" auction, the intermediary bid on various auction items by telephone from Los Angeles, for Nguema, and was the winning bidder on numerous items of Michael Jackson

memorabilia.  The auction house prepared two invoices in the name of the intermediary, totaling $1,398,062.50, using the address of the Sweetwater property.

212.  When one of Nguema's assistants received the invoices, she instructed the auction house to revise the invoices to indicate that the purchases were being billed to "Amadeo Oluy, Malabo, Guinea Equatorial."  These items were shipped to E.G.

213.  In December 2010, another auction of celebrity memorabilia was held by the same auction house, this time in Beverly Hills, California.  An intermediary came to the auction on Nguema's behalf and successfully bid on the defendant white crystal-covered "Bad Tour" glove and other defendant items listed in Attachment A-1.  The total cost of these items was $872,125.00.

214.  In accordance with the instructions it had previously received, the auction house prepared invoices that did not list the buyer as Nguema, but instead used another name, with the address Sweetwater, Malabo, Guinea Equatorial.

215.  On January 31, 2011, Nguema caused $872,112.00 to be wire transferred from an account in the name of "Eloba Construccion, S.A.," in E.G. to an account at American Business Bank in Los Angeles in the name of the auction house, Julien

Entertainment, to pay for the items purchased at the December

2010 auction.   These items were subsequently packed for shipment

and delivered to the defendant Sweetwater property.

216.   In March 2011, the auction house held another

auction, called "Rock & Roll."   Again, an intermediary bid on

items on Nguema's behalf.   Through the intermediary, Nguema

purchased the items listed in Attachment A-2, for a total

purchase price of $115,000.

217.   On March 29, 2011, an employee of the auction house

sent her employer an email regarding the invoices for the items

purchased on Nguema's behalf asking,

> I assume I need to rewrite the invoices in the same
> fashion as I've done in prior sales? (putting all lots
> on one page, adding catalog page numbers and changing
> the Buyer's name)

218.   The invoices were prepared listing the intermediary,

rather than Nguema, as the buyer.

219.   On April 15, 2011, Nguema caused a net total of

$119,974.00 to be wire transferred from his account in the name

of "Eloba Construccion S.A." in E.G. to the bank account of the

auction house at American Business Bank in Los Angeles,

California, to pay for the items purchased at the March   2011

auction.

///

///

220.   The items listed in Attachment A-2 were transported to the defendant Sweetwater property on or about September 8, 2011.

221.   In June 2011, Nguema again used an intermediary to bid on more Michael Jackson memorabilia at a "Music Icons" auction.   The intermediary successfully bid on items costing a total of $379,700.00.   On or about August 22, 2011, Nguema paid for the items through a wire transfer in the amount of $379,692.00 sent by "Oluy Amadeo" in Equatorial Guinea to the bank account of the auction house at American Business Bank in Los Angeles, California.   The items purchased by Nguema at the June 2011 auction are listed in Attachment A-3 and were also delivered to the defendant Sweetwater property on or about September 8, 2011.

b.   **Purchase of the Defendant Real Property**

222.   The defendant real property is located in a gated community in Malibu, California, and at the time of purchase in 2006, it included approximately 12 acres of land overlooking the Pacific Ocean, a 15,000 square-foot main house, a 2,500 square-foot guest house, two gate houses, a pool overlooking the ocean, a putting green, and a tennis court.

///

///

223.  In approximately February 2006, Nguema reached an agreement to purchase the defendant real property for approximately $30 million.

224.  Although Nguema was in Bata, E.G. during much of the negotiations with the seller and the title company prior to closing, Nguema remained actively engaged in these discussions. According to PSI records, Nguema, for instance, (i) signed in his own handwriting a "Residential Lease After Sale" ("Lease") with the  seller, faxing the signed contract to Nagler on April 2, 2006, using John Doe C's General Work office fax line in Bata; (ii) initialed an addendum to the Lease on April 2, 2006, and faxed the document back to Nagler from John Doe C's office fax line; (iii) requested that the title company amend the escrow instructions, using John Doe E's General Work fax line on April 2, 2006; and (iv) signed in his own handwriting the "Amended/Supplemental Escrow Instructions" on April 5, 2006, again faxing the document to Nagler from John Doe E's fax line.

225.  Nguema did not purchase the defendant real property in his own name.  On or about February 8, 2006, Nguema caused the formation of a limited liability company called Sweetwater Malibu, LLC, for the purpose of taking title to the defendant real property.  Nguema was the sole member of the company at all

times, and provided Sweetwater Malibu, LLC with all necessary

funds to take title to the defendant real property.

226. In addition, Nguema took steps to conceal the source, ownership and control of the Sweetwater property. For instance:

(i) Sweetwater Malibu's articles of organization, which were filed with the California Secretary of State on February 8, 2006, make no reference to Nguema anywhere in the document. Instead, Nagler is listed as the company's initial agent for service of process and an unrelated nominee signed the document as the company's purported "organizer."

(ii) Although Sweetwater Malibu was required under California law to file a Statement of Information disclosing publicly the name and address of its manager, the type of business it engages in, and the name and address of its chief executive officer, by May 7, 2006, no such statement was filed. Sweetwater Malibu did not file such a statement until September 25, 2006, after the transaction to purchase the Sweetwater property was completed.

(iii) In obtaining an EIN for Sweetwater Malibu, Nagler's assistant, the same Nagler employee who filed the false EIN application for Sweet Pink, Inc., filed a false EIN application with the I.R.S. for Sweetwater Malibu. In that application, Nagler's assistant, at Nagler's direction, claimed falsely to the I.R.S. that she was Sweetwater Malibu's "principal officer, general partner, grantor, owner or trustor." In addition, she claimed falsely to the I.R.S. that she, rather than Nguema, was Sweetwater Malibu's lone member. No reference is made anywhere in this application to Nguema's involvement and/or association with Sweetwater Malibu. Again, Nagler dictated information directly into a tape recorder that his assistant then used to complete the relevant I.R.S. EIN application form.

(iv) Nguema required his realtor to enter into a confidentiality agreement barring him from discussing or disclosing Nguema's identity or details and facts relating to the Sweetwater property transaction.

(v)   Nguema also required his realtor not to disclose his identity as the listing agent on the Multiple Listing Service database, which ordinarily records and discloses real estate transactions and the names of the realtors who handled a transaction.

(vi)  On April 3, 2006, Nagler recommended that Nguema ask that the escrow company draft the deed so as to "show [Nagler's] office address so that there is no tie in with [Nguema's current residential] address." Nagler reminded Nguema that, "The deed is a public document. The other closing documents should [also] go to my address."

(vii) On April 4, 2006, Nguema responded to, and explicitly approved, Nagler's recommendation that the Sweetwater property's deed list Nagler's office address. Nguema signed the letter in his own handwriting and faxed his response back to Nagler using John Doe E's fax line in Bata.

227. A grant deed was recorded indicating that the seller sold the defendant real property to "Sweetwater Malibu, LLC" on February 27, 2006. However, escrow did not close, and the deed was not recorded, until          April 27, 2006.

228. Nguema paid a total of $30,442,000 into escrow account #LGL-226-1234 at First American Title Company, 520 North Central Avenue, Glendale, California 91203, held at First American Trust FSB in Santa Ana, California, for the purchase of the defendant real property. These payments were made as follows on or about the following dates, according to the records of the PSI.

///

229.  On February 2, 2006, West Coast Escrow, on behalf of Nguema, wire transferred $900,000 from one of its escrow accounts to First American Title Company's escrow account. These funds had come from Nguema's unsuccessful attempt to buy a private jet directly from Gulfstream Aerospace Corporation in 2005.  When it cancelled the sale, Gulfstream released approximately $20 million plus interest that it had received as partial payment for the plane to Nguema through a United States law firm.  Per Nguema's instructions, the law firm transferred $900,000 of these funds to West Coast Escrow on December 22, 2005, in connection with an earlier attempt by Nguema to purchase the defendant real property.  West Coast Escrow, in turn, executed this transfer into the First American Title Company escrow account in California in February 2006.

230.  From April 5, 2006 through April 26, 2006, Nguema sent five wire transfers, each in the amount of $5,908,400, from Equatorial Guinea to the First American Trust escrow account. The funds originated at Société Générale de Banque en Guinée Équatoriale, where Nguema held a personal account.  The total amount of these five wire transfers was $29,542,000.  Added to the $900,000 initial payment into escrow, the total amount paid into escrow was $30,442,000.

///

231.  The total purchase price for the defendant real property was paid in full from funds provided by Nguema.

    c.   **Purchase of The Defendant 2011 Ferrari**

232.  On or about November 11, 2010, Nguema took delivery of the defendant 2011 Ferrari 599 GTO from Ferrari of Beverly Hills.  Nguema caused his forestry company, Somagui, to make initial down payments on his behalf by executing wire transfers of approximately $25,131, $39,912, and $14,929.65 to the account of Ferrari of Beverly Hills at Pacific Western Bank in California in November and December of 2009.  On October 21, 2010, Nguema faxed a wire transfer request from the Sweetwater property to an E.G. bank, requesting that $493,010.99 be wired to the Ferrari dealer at Pacific Western Bank.  Although the signature line on the document reads "Amadeo Oluy," Nguema signed the document in his own handwriting.  In December 2010, $493,010.99 was paid via wire transfer to Pacific Western Bank. The total recorded purchase price for the vehicle was $532,984.12.  When the Ferrari dealer realized that Nguema had overpaid by $39,973.13, this money was refunded to Nguema on December 23, 2009, by wiring this amount directly to the Mecafis account at Wells Fargo, as referenced in paragraphs 200-206. The defendant Ferrari was located at the Sweetwater property

when this action was originally filed and is currently in the custody of the United States.

### CONCLUSION

233.  As set forth above, despite a relatively modest government salary, Nguema has acquired vast personal wealth in excess of one hundred million dollars through corrupt schemes. Nguema also has taken significant steps to conceal the source and ownership of his funds and assets.

234.  On information and belief, the approximately $32 million used by Nguema to purchase the defendant assets was derived from funds obtained through extortion, bribery of a public official and/or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G.

### FIRST CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(C))

235.  Paragraphs 1-234 above are incorporated by reference as if fully set forth herein.

236.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.

237.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv) to include, among other things, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; and (iii) foreign offenses involving bribery of a public official. "Specified unlawful activity" is also defined in 18 U.S.C. § 1956(c)(7)(A) as including bank fraud (18 U.S.C. § 1344).

238.  As set forth above, the defendant assets constitute property that constitutes or is derived from proceeds traceable to extortion, bribery of a public official, and the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G., or domestic bank fraud in violation of 18 U.S.C. § 1344.

239.  The foreign offenses at issue include violations of the following provisions of the Spanish Penal Code of 1968, which are still the law in E.G.:  Article 131 (abuse of public office);  Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession directly related to scope of official duties); Article 200 (collection of illegal taxes); Article 202 (demanding payment of unauthorized taxes); Article 385

EXHIBIT B
Page 142

(prohibiting public officials from demanding or accepting bribes to perform a crime); Article 386 (prohibiting public officials from demanding or accepting bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts), Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-profit transactions within the limits of their jurisdiction); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 503 (forcibly requiring someone to sign, grant or quit claim a public instrument or document); Article 514 (theft); and Articles 528 and 533 (fraud).

240.   Therefore, the defendant assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), on the grounds that they constitute or are derived from proceeds traceable to a specified unlawful activity.

///

### SECOND CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(A))

241.  Paragraphs 1-240 above are incorporated by reference as if fully set forth herein.

242.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

243.  18 U.S.C. § 1957 imposes a criminal penalty on any person who:

> knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

244.  For purposes of Section 1957, "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv) to include, among other things, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; and (iii) foreign offenses involving bribery of a public official.  "Specified unlawful activity" is also defined in 18 U.S.C. § 1956(c)(7)(A) as including bank fraud (18 U.S.C. § 1344).

245.  As set forth above, the defendants *in rem* were the subject of, or traceable to, monetary transactions or attempted transactions involving criminally -- derived property of a value greater than $10,000 and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official";(iii) foreign offenses involving bribery of a public official; and (iv) bank fraud. The foreign offenses at issue are as set forth in paragraph 239, above.

246.  The funds involved in these transactions were used to acquire the defendants *in rem* as well as to provide for the enhancement, decoration, maintenance and upkeep of the defendant *in rem*, including paying for the taxes and insurance fees associated with these assets, the payroll of individuals retained to manage and care for the defendant assets, as well as provide for the general security, preservation and safeguarding of the defendant assets.

247.  Therefore, the defendants *in rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in

transactions or attempted transactions in violation of 18 U.S.C. § 1957, or are traceable to such property.

### THIRD CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(A))

248.   Paragraphs 1-247 above are incorporated by reference as if fully set forth herein.

249.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

250.   18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a
> financial transaction represents the
> proceeds of some form of unlawful
> activity, conducts or attempts to conduct
> such a financial transaction which in
> fact involves the proceeds of specified
> unlawful activity –
> . . .
>
>       (B) knowing that the transaction is
>       designed in whole or in part –
>
>             (i) to conceal or disguise the
>             nature, the location, the
>             source, the ownership, or the
>             control of the proceeds of
>             specified unlawful activity[.]

///

///

251.  For purposes of Section 1956, "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv) to include, among other things, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; and (iii) foreign offenses involving bribery of a public official.  "Specified unlawful activity" is also defined in 18 U.S.C. § 1956(c)(7)(A) as including bank fraud (18 U.S.C. § 1344).

252.  As set forth above, the defendant real property and memorabilia were the subject of, or traceable to, financial transactions or attempted financial transactions and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official";(iii) foreign offenses involving bribery of a public official; and (iv) bank fraud.  The foreign offenses at issue are as set forth in paragraph 239, above.

253.  Also, as set forth above, the transactions were designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful

activity, in that, among other things, the nominal purchaser of the defendant real property was Sweetwater Malibu, LLC, and the invoices for the defendant memorabilia were in the name of Nguema's assistant or a different name, rather than the name of the true owner, Teodoro Nguema Obiang Mangue.

254.   The funds involved in these transactions were used to acquire the defendants *in rem* as well as to provide for the enhancement, decoration, maintenance and upkeep of these defendants *in rem*, including paying for the taxes and insurance fees associated with these assets, the payroll of individuals retained to manage and care for the defendant assets, as well as provide for the general security, preservation and safeguarding of these defendant properties.

255.   Therefore, the defendant real property and the defendant memorabilia are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or are traceable to such property.

### FOURTH CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(A))

256. Paragraphs 1-255 above are incorporated by reference as if fully set forth herein.

257.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

258.   18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a
> financial transaction represents the
> proceeds of some form of unlawful
> activity, conducts or attempts to conduct
> such a financial transaction which in
> fact involves the proceeds of specified
> unlawful activity –
>
> . . .
>
>       (A)(i) with the intent to promote
>       the carrying on of specific unlawful
>       activity.

259.   For purposes of Section 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and 18 U.S.C. 1961(1) to include bank fraud (18 U.S.C. § 1344).

260.   As set forth above, the defendant real property was the subject of, or traceable to, financial transactions or attempted financial transactions and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, bank fraud.

EXHIBIT B
Page 149

1     261.  Also, as set forth above, the transactions were

2 designed in whole or in part to promote the carrying on of

3 specified unlawful activity (bank fraud).

4

5     262.  Therefore, the defendant real property is subject to

6 forfeiture to the United States pursuant to 18 U.S.C.

7 § 981(a)(1)(A), on the grounds that it was involved in

8 transactions or attempted transactions in violation of 18 U.S.C.

9 § 1956(a)(1)(A)(i), or is traceable to such property.

10

11                    **CLAIM FOR RELIEF**

12     WHEREFORE plaintiff, the United States of America, requests

13 that judgment be entered in its favor and against the defendants

14 *in rem*, and that process issue to enforce the forfeiture of the

15 defendants *in rem*, and that all persons having an interest in

16 the defendants *in rem* be cited to appear and show cause why the

17

18 forfeiture should not be decreed, and that this Court decree

19 forfeiture of the defendants *in rem* to the United States of

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

1    America for disposition according to law, and that this Court

2    grant the United States such further relief as this Court may

3    deem just and proper, together with the costs and disbursements

4    in this action.

5

6

7    DATED: June 11, 2012        JENNIFER SHASKY CALVERY, CHIEF
                                  LINDA M. SAMUEL, Deputy Chief
8                                 DANIEL H. CLAMAN, Assistant Deputy
                                  Chief
9                                 ASSET FORFEITURE AND MONEY
10                                  LAUNDERING SECTION, Criminal Division

11

12

13

14                               WOO S. LEE
                                 STEPHEN GIBBONS
15                               Trial Attorneys
                                 Criminal Division
16                               United States Department of
                                 Justice
17

18                               ANDRÉ BIROTTE, JR.
                                 United States Attorney
19                               STEVEN WELK
                                 Assistant United States Attorney
20

21                               Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA
22

23

24

25

26

27

28

## VERIFICATION

I, Robert Manzanares, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations, that I have read the foregoing Second Amended Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Second Amended Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, files and records compiled by the Senate Permanent Subcommittee on Investigations, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of Homeland Security Investigations.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 11 day of June , 2012, at 2:50 pm .

ROBERT MANZANARES
Special Agent
Homeland Security Investigations
U.S. Department of Homeland Security

106

ATTACHMENT A-1:

## ICONS AND IDOLS

| Lot No. | Description | Price |
|---|---|---|
| 586 | MICHAEL JACKSON BAD TOUR GLOVE | 275,000.00 |
| 573 | "WE ARE THE WORLD" MTV VIDEO MUSIC AWARD | 60,000.00 |
| 585 | MICHAEL JACKSON STAGE WORN FEDORA | 60,000.00 |
| 621 | MICHAEL JACKSON STAGE WORN FEDORA | 60,000.00 |
| 553 | MICHAEL JACKSON SIGNED FEDORA | 42,500.00 |
| 549 | MICHAEL JACKSON SIGNED THRILLER JACKET | 40,000.00 |
| 650B | M.J. STAGE WORN SIGNED GOLD FENCING SHIRT | 30,000.00 |
| 606 | MICHAEL JACKSON WORN FEDORA | 25,000.00 |
| 556 | MICHAEL JACKSON "GOLD" RECORD AWARD | 10,000.00 |
| 576 | "WE ARE THE WORLD" SIGNED DOCUMENT ARCHIVE | 10,000.00 |
| 575 | "WE ARE THE WORLD" SIGNED ALBUM | 8,000.00 |
| 650 | M.J. NEVERLAND RANCH GOLD & COUNTRY BY | 7,000.00 |
| 580 | MICHAEL JACKSON SIGNED SHEET MUSIC | 6,500.00 |
| 617 | MICHAEL JACKSON SIGNED PHOTOGRAPH | 5,250.00 |
| 624 | MICHAEL JACKSON KATHERINE BAUMANN BAG | 5,000.00 |
| 557 | MICHAEL JACKSON "THRILLER" RECORD AWARD | 4,500.00 |
| 589 | MICHAEL JACKSON SIGNED BAD ERA POSTER | 4,000.00 |
| 635a | M. JACKSON AND TROY AIKMAN SIGNED FOOTBALL | 4,000.00 |
| 579 | MICHAEL JACKSON "PLATINUM" RECORD AWARD | 3,500.00 |
| 588 | MICHAEL JACKSON SIGNED PHOTO | 3,250.00 |
| 558 | M. JACKSON SIGNED "THRILLER" 12-INCH SINGLE | 3,000.00 |
| 584 | M.JACKSON AND PAUL MCCARTNEY SIGNED BAG | 3,000.00 |
| 540 | JACKSON 5 "GOLD" SINGLE AWARD | 2,500.00 |
| 614 | MICHAEL JACKSON SIGNED BANNER | 2,400.00 |
| 616 | MICHAEL JACKSON SIGNED POSTER | 2,400.00 |
| 550 | M. JACKSON SIGNED PHOTOGRAPH FROM DISNEYLAND | 2,250.00 |
| 647 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 2,250.00 |
| 645 | M. JACKSON NEVERLAND RANCH LIFE SIZED SEATED | 2,000.00 |
| 646 | M. JACKSON NEVERLAND RANCH LIFE SIZE INDIAN F | 2,000.00 |
| 648 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE Y | 2,000.00 |
| 539 | JACKSON 5 "GOLD" RECORD AWARD | 1,500.00 |
| 650C | M. JACKSON SIGNED "LIVE AND DANGEROUS" BOOK | 1,500.00 |
| 555 | M. JACKSON "THRILLER" COMMEMORATIVE STATUE | 1,400.00 |
| 623 | M. JACKSON KATHARINE BAUMANN FOOTBALL BAG | 1,400.00 |
| 610 | M. JACKSON SIGNED HISTORY MAGAZINE CUTOUT | 1,300.00 |
| 643 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 1,300.00 |
| 642 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 700.00 |
| 644 | M. JACKSON NEVERLAND RANCH LIFE SIZE WESTERN | 700.00 |
| 603 | MICHAEL JACKSON STATUETTE | 600.00 |
| | SUBTOTAL | 697,700.00 |
| | PLUS 25% BUYER'S PREMIUM | 174,425.00 |
| | TOTAL | 872,125.00 |

4K
107

ATTACHMENT A-2:

## ROCK N ROLL

| Lot No. | Description | Price |
|---------|-------------|-------|
| 180 | MICHAEL JACKSON'S PERSONAL MTV MOONMAN | 50,000.00 |
| | PLUS 20% BUYER'S PREMIUM | 10,000.00 |
| | TOTAL | **60,000.00** |
| | | |
| 152 | M. JACKSON "GOLD" RECORD AWARD FOR "BEAT IT" | 10,000.00 |
| 139 | JACKSON 5 "GOLD" RECORD AWARD | 6,500.00 |
| 164 | M. JACKSON ARTIST OF THE DECADE LIMITED EDITION | 6,500.00 |
| 148 | MICHAEL JACKSON SIGNED THRILLER DISPLAY | 6,000.00 |
| 153 | MICHAEL JACKSON THRILLER RECORD AWARD | 4,500.00 |
| 154 | MICHAEL JACKSON THRILLER DISPLAY | 4,500.00 |
| 147 | M. JACKSON THRILLER COMMEMORATIVE AWARD | 3,000.00 |
| 186 | M. JACKSON  CARLITTA COLLECTION FIGURINES | 1,600.00 |
| 185 | M. JACKSON PORCELAIN HISTORY FIGURINE | 600.00 |
| 183 | M. JACKSON CARLITTA COLLECTION FIGURINE | 400.00 |
| 184 | MICHAEL JACKSON WHITE HISTORY FIGURINE | 400.00 |
| | SUBTOTAL | 44,000.00 |
| | PLUS 25% BUYER'S PREMIUM | 11,000.00 |
| | TOTAL | **55,000.00** |

GRAND TOTAL                                                              **115,000.00**

47
108

ATTACHMENT A-3

| Lot # | Item | Price | |
|---|---|---|---|
| 565 | MICHAEL JACKSON "SCREAM" SHIRT | 60,000.00 | |
| 606 | MICHAEL JACKSON WIG | 60,000.00 | |
| 467 | MICHAEL JACKSON MOTOWN PERF. SHIRT | 51,000.00 | |
| | 20% BUYER'S PREMIUM | 34,200.00 | |
| | TOTAL | | 205,200.00 |
| 585 | MICHAEL JACKSON MILITARY STYLE JACKET | 25,000.00 | |
| 481 | MICHAEL JACKSON "PLATINUM" RECORD AWD | 16,000.00 | |
| 479 | MICHAEL JACKSON "GOLD" RECORD AWARD | 15,000.00 | |
| 525 | MICHAEL JACKSON IN-HOUSE RECORD AWARD | 9,500.00 | |
| 509 | MICHAEL JACKSON "GOLD" RECORD AWARD | 8,500.00 | |
| 484 | MICHAEL JACKSON SIGNED THRILLER NOTE | 7,250.00 | |
| 446 | EPIC PRESENTATION AWARD | 6,500.00 | |
| 458 | EMMY AWARD FOR THE JACKSONS: AMER DRM | 6,500.00 | |
| 486 | M. JACKSON SIGNED PRESENTATION AWARD | 6,000.00 | |
| 488 | MICHAEL JACKSON "GOLD" RECORD AWARD | 5,000.00 | |
| 444 | MICHAEL JACKSON PLATINUM RECORD AWARI | 4,500.00 | |
| 469 | M. JACKSON & P. MCCARTNEY SIGNED PHOTO | 4,500.00 | |
| 474 | MICHAEL JACKSON LIFE MASK | 4,500.00 | |
| 592 | RIAA "PLATINUM" RECORD AWARD | 4,500.00 | |
| 490 | MICHAEL JACKSON IN-HOUSE RECORD AWARD | 4,250.00 | |
| 405 | MOTOWN PRESENTATION RECORD | 3,500.00 | |
| 443 | MICHAEL JACKSON "GOLD" RECORD AWARD | 3,250.00 | |
| 449 | THE JACKSONS "PLATINUM" RECORD AWARD | 2,750.00 | |
| 569 | MICHAEL JACKSON PORCELAIN STATUETTE | 1,600.00 | |
| 403 | MOTOWN RECORD AWARD | 1,000.00 | |
| | SUBTOTAL | 139,600.00 | |
| | 25% BUYER'S PREMIUM | 34,900.00 | |
| | TOTAL | | 174,500.00 |
| | GRAND TOTAL | | 379,700.00 |

43
109



**LEGAL DESCRIPTION**

Real property in the City of Malibu, County of Los Angeles, State of California, described as follows:

PARCEL 1:

A PARCEL OF LAND BEING A PORTION OF RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGE 407, ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS, SAID POINT OF BEGINNING BEING NORTH 46° 08' 15" WEST 60 FEET FROM ENGINEER'S CENTER LINE STATION 936 PLUS 62.94 AT THE WESTERLY EXTREMITY OF THAT CERTAIN CENTER LINE COURSE DESCRIBED AS NORTH 43° 51' 45" EAST 362.63 FEET IN THE DEED OF THE 80 FOOT STRIP OF LAND FROM T. R. CADWALADER, ET AL., TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 15228 PAGE 342, OFFICIAL RECORDS; THENCE NORTH 43° 51' 45" EAST 189.63 FEET ALONG THE NORTHERLY LINE OF SAID FIRST MENTIONED STRIP; THENCE NORTH 46° 08' 15" WEST 192.92 FEET; THENCE NORTH 31° 32' 55" EAST 214.93 FEET; THENCE NORTH 42° 01' 59" EAST 186.06 FEET; THENCE NORTH 54° 23' 15" EAST 77.65 FEET, MORE OR LESS, TO THE NORTHWESTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO CHESTER A. VOUGHT AND WIFE RECORDED IN BOOK 20254 PAGE 69, OFFICIAL RECORDS; THENCE NORTH 53° 17' 55" EAST 152.26 FEET ALONG THE NORTHERLY LINE OF SAID PARCEL TO THE NORTHEASTERLY CORNER THEREOF; THENCE NORTH 32° 19' 55" WEST 119.27 FEET; THENCE NORTH 46° 58' 55" EAST 28.96 FEET; THENCE 50° 59' 55" WEST 161.73 FEET; THENCE NORTH 62° 09' 00" WEST 123.16 FEET; THENCE SOUTH 60° 48' 00" WEST 21.76 FEET; THENCE SOUTH 29° 12' EAST 75 FEET; THENCE SOUTH 60° 48' WEST 183.01 FEET; THENCE SOUTH 45° 17' 30" WEST 139.76 FEET; THENCE SOUTH 62° 12' 40" WEST 258.81 FEET; THENCE NORTH 44° 07' 06" WEST 158.98 FEET TO THE CENTER LINE DESCRIBED IN THE DEED TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 AS INSTRUMENT NO. 973 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS; THENCE ALONG SAID CENTER LINE AS TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 183.32 FEET SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 171.24 FEET, TANGENT SOUTH 01° 48' 25" WEST 256.65 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE EASTERLY WITH A RADIUS OF 253.04 FEET SOUTHERLY ALONG THE ARC OF SAID CURVE 79.24 FEET; TANGENT SOUTH 17° 30' 35"; THENCE EAST 104.43 FEET, SOUTH 27° 05' 15" EAST 386.93 FEET AND SOUTH 20° 53' 35" EAST 25.83 FEET, MORE OR LESS, TO A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS, SAID LAST MENTIONED POINT BEING ON THE ARC OF A CURVE CONCAVE NORTHWESTERLY WITH A RADIUS OF 1450 FEET AND THE RADIAL BEARING TO SAID POINT BEING SOUTH 22° 47' 36" EAST; THENCE EASTERLY ALONG THE ARC OF SAID CURVE 590.71 FEET; THENCE TANGENT NORTH 43° 51' 45" EAST 12.21 FEET TO THE POINT OF BEGINNING.

EXCEPT ALL RIPARIAN RIGHTS OF SAID LANDS AND ALL MINERALS, OIL, PETROLEUM, ASPHALTUM, GAS, COAL AND OTHER HYDROCARBON SUBSTANCES IN, ON, WITHIN AND UNDER SAID LANDS BUT WITHOUT SURFACE RIGHT TO GO UPON SAID LANDS TO EXTRACT SAID SUBSTANCES AS CONTAINED IN DEED FROM MARBLEHEAD LAND COMPANY, A

06 0927085

Attachment B

EXHIBIT B
Page 156

CORPORATION RECORDED FEBRUARY 14, 1944 IN BOOK 20657 PAGE 140, OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND CONVEYED TO THE STATE OF CALIFORNIA BY A DEED RECORDED NOVEMBER 16, 1948 AS INSTRUMENT NO. 2085 IN BOOK 28732 PAGE 310, OFFICIAL RECORDS.

PARCEL 2:

A PARCEL OF LAND BEING A RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGE 407 ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS AT THE NORTHEASTERLY EXTREMITY OF THE COURSE DESCRIBED AS "NORTH 43° 51' 45" EAST 189.63 FEET" IN THE DEED TO THE MYLES EDWARD CONNOLLY AND WIFE RECORDED IN BOOK 20657 PAGE 146, OFFICIAL RECORDS; THENCE ALONG THE BOUNDARY OF THE LAND DESCRIBED IN SAID DEED TO CONNOLLY AND WIFE; NORTH 46° 00' 15" WEST 192.92 FEET AND NORTH 31° 32' 55" EAST 193.51 FEET; THENCE SOUTH 45° 44' 11" EAST 234.25 FEET TO A POINT IN THE NORTHWESTERLY LINE BEING A CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 2060 FEET, THE RADIAL BEARING TO SAID POINT BEING NORTH 45° 44' 11" WEST; THENCE ALONG SAID NORTHWESTERLY LINE SOUTHWESTERLY ALONG SAID CURVE 14.42 FEET AND SOUTH 43° 51' 45" WEST 173.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, PETROLEUM, ASPHALTUM, GAS, COAL AND OTHER HYDROCARBON SUBSTANCES IN, ON, WITHIN AND UNDER SAID LANDS AND EVERY PART THEREOF BUT WITHOUT RIGHT OF ENTRY, AS RESERVED BY MARBLEHEAD LAND COMPANY IN DEED RECORDED OCTOBER 17, 1944 IN BOOK 21321 PAGE 347, OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED NOVEMBER 16, 1948 AS INSTRUMENT NO. 2085 IN BOOK 28732 PAGE 310, OFFICIAL RECORDS.

PARCEL 3:

A. AN EASEMENT FOR ROAD PURPOSES TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 40 FEET IN WIDTH, THE CENTER LINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEASTERLY EXTREMITY OF THE COURSE DESCRIBED AS NORTH 62° 09' 00" WEST 123.16 FEET IN THE DESCRIPTION OF THE PARCEL HEREIN CONVEYED; THENCE NORTH 62° 09' 00" WEST 123.16 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE NORTHEASTERLY WITH A RADIUS OF 229.33 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE 262.44 FEET; THENCE TANGENT NORTH 03° 25' 05" EAST 38.35 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE WESTERLY WITH A RADIUS OF 136.48 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE 129.36 FEET TO THE BEGINNING OF A COMPOUND CURVE CONCAVE SOUTHERLY WITH A RADIUS OF 91.02 FEET; THENCE WESTERLY ALONG THE ARC OF SAID CURVE 138.63 FEET; THENCE TANGENT SOUTH 41° 50' 55" WEST 114.41 FEET, MORE OR LESS TO A POINT IN THE CENTER LINE OF THE EASEMENT FOR ROAD AND HIGHWAY PURPOSES 50 FEET IN WIDTH DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS, SAID LAST MENTIONED POINT BEING NORTH 20° 32' 35" EAST 124.79 FEET FROM THE SOUTHWESTERLY EXTREMITY OF THAT

06  0927085



CERTAIN COURSE DESCRIBED IN SAID DEED AS NORTH 20° 32' 35" EAST 158.00 FEET.

EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN THE LINE OF PARCEL 1.

B. AN EASEMENT FOR ROAD PURPOSES TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 50 FEET IN WIDTH LYING 25 FEET ON EACH SIDE OF A CENTER LINE DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER LINE DESCRIBED IN THE DEED TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS DISTANT THEREON NORTH 20° 32' 35" EAST 124.79 FEET FROM THE SOUTHWESTERLY TERMINUS OF THAT COURSE DESCRIBED IN SAID DEED AS NORTH 20° 32' 35" EAST 158.00 FEET; THENCE SOUTH 26° 32' 35" WEST 124.79 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 206.84 FEET; THENCE ALONG SAID CURVE AND SAID CENTER LINE SOUTHERLY 130.93 FEET TO THE BEGINNING OF A REVERSE CURVE CONCAVE WESTERLY HAVING A RADIUS OF 178.67 FEET; THENCE SOUTHERLY ALONG SAID CURVE AND CENTER LINE 136.89 FEET TO THE BEGINNING OF A COMPOUND CURVE CONCAVE NORTHWESTERLY HAVING A RADIUS OF 487.46 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE 221.52 FEET TO THE NORTHWESTERLY TERMINUS OF THE COURSE IN THE BOUNDARY OF THE LAND ABOVE DESCRIBED AS NORTH 44° 07' 06" WEST 158.98 FEET; THENCE ALONG SAID BOUNDARY AS FOLLOWS:

SOUTH 55° 19' 33" WEST 229.74 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 183.32 FEET SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 171.24 FEET TANGENT SOUTH 01° 48' 25" WEST 256.55 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 235.04 FEET SOUTHERLY ALONG THE ARC OF SAID CURVE 79.24 FEET TANGENT SOUTH 17° 30' 35" EAST 104.43 FEET, SOUTH 27° 05' 15" EAST 386.93 FEET AND SOUTH 20° 53' 35" EAST 25.83 FEET, MORE OR LESS, TO A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS.

EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN THE LINES OF PARCEL 1.

APN: 4452-017-009 and 4452-019-001

04/27/86

06 0927085

446
112

ATTACHEMENT C

Penal Code of Equatorial Guinea

Article 131

Any public official who, abusing his position, compromises the dignity or the interests of the Spanish Nation in a manner not included in this chapter shall be punished with long-term imprisonment and debarment.

Article 196.

Any public official who expropriates the property of a national or foreigner, outside of the permitted cases and without meeting the legal requirements, shall incur the penalties of suspension and a fine of 5,000 to 25,000 pesetas.

Article 198

Any Authority or public official who, taking advantage of his position, practices any profession directly related to the sphere of his official authority or involves himself directly or indirectly in private associations or companies with the intent to profit, shall incur debarment and a fine of 5,000 to 250,000 pesetas.

Article 200

Any Minister who orders payment of a tax not authorized by law shall be punished with permanent debarment and a fine of 10,000 to 500,000 pesetas.

Article 202

Any public officials who demand, from State, Provincial, or Municipal taxpayers, the payment of taxes not authorized by the respective laws or Councils shall incur the penalties of suspension and a fine of 5,000 to 50,000 pesetas. If such exaction took effect, the maximum of the penalties herein provided shall be imposed. If compulsion or another means of coercion is used, the penalties shall be permanent debarment and the fine herein provided.

Article 385

Any public official who solicits or receives, on his own or through an intermediary, a gift or contribution, or accepts an offer or promise in exchange for carrying out an act which is related to the duties of his position and which constitutes a crime, shall be punished with short-term imprisonment and a fine equal to or up to three times the value of the gift, without prejudice to the penalty for the crime committed in connection with the gift or promise.

## Article 386

Any public official who solicits or receives, on his own or through an intermediary, a gift or contribution, or accepts an offer or promise in exchange for carrying out an unjust act which is related to the duties of his position and which does not constitute a crime, and who carries out such act, shall incur the penalty of short-term imprisonment and a fine of equal to or up to three times the value of the gift; if the unjust act is not carried out, the penalties of brief imprisonment and a fine of equal to or up to two times the value of the gift shall be imposed.

## Article 387

When the gift is solicited, received, or promised with the intent that the public official refrain from an act which he should carry out in the discharge of his duties, the penalties shall be brief imprisonment and a fine of equal to or up to three times the value of such gift.

## Article 390

Any public official who accepts gifts that may be presented to him in the normal course of duties for his office, or in order to secure a just act that should not be compensated, shall be punished with suspension and a fine of 5,000 to 25,000 pesetas.

## Article 394

Any public official who steals or consents to the stealing by another person of the public funds or property that may be under his control or at his disposal by virtue of his duties shall be punished:

1st    With the penalty of brief imprisonment if the theft does not exceed 2,500 pesetas.

2nd    With the penalty of short-term imprisonment if the theft exceeds 2,500 pesetas and is not greater than 50,000 pesetas.

3rd    With the penalty of long-term imprisonment if the theft exceeds 50,000 pesetas and is not greater than 250,000 pesetas.

4th    With the penalty of long-term imprisonment if the theft exceeds 250,000 pesetas.

The Court shall impose the penalty it deems appropriate of those provided in the preceding numbers if, in its judgment, theft occurred, and the amount thereof is not proven. In all cases, the penalty of permanent debarment shall be imposed additionally.

EXHIBIT B
Page 160

**Article 400**

Any public official who, in the normal course of duties for his position, on a committee related to supplies, contracts, adjustments, or liquidations of public property or assets, acts in concert with the interested parties or speculators, or uses any other artifice to defraud the State, Provinces, or Municipality, shall incur the penalties of short-term imprisonment and debarment.

**Article 401**

Any public official who, directly or indirectly, holds an interest in any type of contract or operation in which he must be involved by reason of his position shall be punished with the penalties of debarment and a fine equal to or up to three times the interest he held in the arrangement. This provision is applicable to experts, arbiters, and private accountants, in respect of the property or things in the appraisal, partition, or awarding of which they took part, and to guardians or executors in respect of the property or things belonging to their wards or decedents' estates.

**Article 404**

Any Judges, officials from the Office of the Attorney General, military Commanders, or government or economic Leaders, except Mayors, who during the discharge of their duties take part directly or indirectly in speculative, trading, or for-profit transactions, within the limits of their jurisdiction or command, involving objects that are not the product of their own property, shall be punished with suspension and a fine of 5,000 to 25,000 pesetas. This provision does not apply to those who invest their funds in shares of a Bank or of any enterprise or company, as long as they do not hold a position or have direct, administrative, or economic involvement therein.

**Article 493**

Anyone who threatens to cause felonious physical or moral harm or property damage to another individual or his family shall be punished:

   1st   By a misdemeanor prison term if the threat was made by demanding payment of a sum or imposing any other condition, even if not illegal, and the guilty party was able to achieve his end; and by a period of brief imprisonment if the end was not achieved. The maximum punishment shall be imposed if the threats were made in writing or in the name of real or fictitious entities.

   2nd   By a period of brief imprisonment and a fine of 5,000 to 25,000 pesetas if the threat was not conditional.

### Article 496

Anyone who, without being legally authorized to do so, and through violent means, prevents another from doing anything that the Law does not prohibit, or forces him to do something he does not want to do, whether fairly or unfairly, shall be punished by brief imprisonment and a fine of 5,000 to 50,000 pesetas.

### Article 503

Anyone who, through violence or intimidation, and in order to defraud another individual, forces him  to sign, grant or quit claim a public instrument or another document shall be punished, as guilty of theft, by the penalty indicated in this chapter.

### Article 528

Any person who defrauds another in regard to the substance, quantity, or quality of the things he delivers to such person pursuant to an obligation shall be punished:

1st   With the penalty of long-term imprisonment if the fraud exceeds 100,000 pesetas.

2nd   With the penalty of short-term imprisonment if it exceeds 25,000 pesetas and is not greater than 100,000 pesetas.

3rd   With the penalty of brief imprisonment if the fraud exceeds 2,500 pesetas and is not greater than 25,000 pesetas.

4th   With the penalty of brief imprisonment if the fraud does not exceed 2,500 pesetas and the defendant previously was convicted of the offense of robbery, larceny, fraud, misappropriation, check floating, or concealment, or tried two times for misdemeanor offenses of larceny, fraud, or misappropriation. *Worded in accordance with Law 3/1967, of 8 April.*

### Article 533

Any person who defrauds or adversely affects another using any deception not provided for in the preceding articles of this section shall be punished with a fine equal to or up to two times the harm he may have caused, but which shall be not less than 5,000 pesetas, and in the case of subsequent violations, with the same fine and brief imprisonment.

PROOF OF SERVICE BY MAILING

I am over the age of 18 and not a party to the within action.  I am employed by the Office of the United States Attorney, Central District of California.  My business address is 312 North Spring Street, 14th Floor, Los Angeles, California 90012.

On June 11, 2012, I served a SECOND AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM* on each person or entity named below by enclosing a copy in an envelope addressed as shown below and placing the envelope for collection and mailing on the date and at the place shown below following our ordinary office practices.

TO:  **See Attached Service List**

 X  I am readily familiar with the practice of this office for collection and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on: June 11, 2012 at Los Angeles, California.


TINA KELESHYAN

1

**SERVICE LIST**

2

3   Duane R. Lyons, Esq.
    Brian M. Wheeler, Esq.
    Quinn Emanuel Urquhart and Sullivan LLP
4   865 South Figueroa Street, 10th Floor
    Los Angeles, CA 90017-2543
5

6   M. Andres Sanchez-Ross, Esq.
    Mike Degeurin, Esq.
7   Foreman Degeurin & Degeurin
    300 Main Street, 3rd Floor
8   Houston, TX 77002

9
    R. Kevin Fisher, Esq.
10  Fisher & Krekorian
    2121 Park Avenue
11  Los Angeles, CA 90026

12
    James Q. McDermott, Esq.
13  Ferguson Case Orr Paterson LLP
    1050 S. Kimball Rd
14  Ventura, CA 93004-2000

15

16

17

18

19

20

21

22

23

24

25

26

27

28