# **<u>Exhibit C</u>**

EXHIBIT C
Page 165

FILED

COPY

2014 MAY 16  PM 3: 56

CL...
CL...
L...
BY

1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   STEVEN R. WELK
4  Assistant United States Attorney
   Chief, Asset Forfeiture Section
5  FRANK D. KORTUM (Cal. Bar No. 110984)
   Assistant United States Attorney
6  Asset Forfeiture Section
       1400 United States Courthouse
7      312 North Spring Street, 14th Floor
       Los Angeles, California 90012
8      Telephone: (213) 894-5710
       Facsimile: (213) 894-7177
9      E-mail: Frank.Kortum@usdoj.gov
10
11 Attorneys for Plaintiff
   United States of America
12
                  UNITED STATES DISTRICT COURT
13
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
14
                     SOUTHERN DIVISION
15
16
17 UNITED STATES OF AMERICA,        )  No. SA CV 14-772-JVS CANH
18              Plaintiff,          )
                                    )  VERIFIED COMPLAINT FOR
19              v.                  )  FORFEITURE
                                    )
20 $29,400.00 IN UNITED STATES      )  [21 U.S.C. § 881(a)(6) and
21 CURRENCY,                        )  18 U.S.C. § 981(a)(1)(C)]
                                    )
22              Defendant.          )         [I.C.E.]
23 _____)
24
25
26
27
28

EXHIBIT C
Page 166

For its claim against the defendant asset, described more specifically below, the United States of America alleges:

### JURISDICTION AND VENUE

1.   This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 881(a)(6).

2.   This court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

3.   Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

### PERSONS AND ENTITIES

4.   The plaintiff in this action is the United States of America.

5.   The defendant, $29,400.00 in United States currency (the "defendant currency"), was seized by Customs and Border Protection ("CBP") from Nhung Tran ("Tran") and Ruby Nguyen ("Nguyen") following a consensual vehicle search on December 11, 2013 in the driveway of a Garden Grove, California residence.[1]

6.   The defendant currency is currently in the custody of the CBP where it shall remain subject to the jurisdiction of this Court during the pendency of this action.

7.   The interests of Tran, Nguyen, Lam Quang ("Quang"), and Anh Khoa Nguyen Pham ("Pham") may be adversely affected by these proceedings.

### FACTS SUPPORTING FORFEITURE

A.   Background

8.   As part of an investigation of a drug trafficking

---

[1] Pursuant to Local Rule 5.2-1, personal residence addresses have been omitted from this Complaint.

2

EXHIBIT C
Page 167

1    organization ("DTO") operating in Southern California, the
2    agents with Homeland Security Investigations and the Orange
3    County Public and Commercial Narcotic Enforcement Team obtained
4    evidence that Quang (also known as "Tony") and Tran were
5    conspiring with Pham to transport the proceeds of transactions
6    in controlled substances.  As explained more fully below, Pham's
7    role in the conspiracy was to deliver the proceeds to Quang,
8    while Tran (who was Quang's girlfriend) communicated with and/or
9    about Pham regarding the deliveries.
10        9.   During the investigation the agents on September 26,
11   2013, detected a suspicious parcel at the FedEx inbound sorting
12   facility in Costa Mesa, California.  A certified drug detection
13   canine alerted to the presence of a controlled substance
14   emanating from the parcel, which (according to the parcel label)
15   had been sent by Agatha Andre of Greenivy Group, a business in
16   Orlando, Florida (the "Florida business") to Q Italy Shoes in
17   Westminster, California.  The Fedex parcel had in fact been sent
18   by someone later identified as Peter Trong ("Trong").  Trong has
19   a previous conviction for narcotics trafficking in Florida.
20        10.  The agents conducted a controlled delivery of the
21   FedEx parcel to Q Italy Shoes where they encountered two
22   individuals behind the counter of the business.  The individuals
23   were identified as Quang Ngo ("Ngo"), who was the owner of the
24   business, and Pham.
25        11.  Ngo stated that he had not been expecting any parcel
26   deliveries, but that he occasionally received unexpected parcel
27   deliveries.  In addition, Ngo stated that when he received
28   unexpected parcel deliveries, a Vietnamese man named "Tony"

3

EXHIBIT C
Page 168

1  usually stopped by the store to pick up the parcel.  Ngo also
2  stated that he was not aware of the contents of the parcels, and
3  that he merely turned them over to "Tony."  The government
4  alleges that Ngo's reference to "Tony" was in fact a reference
5  to Quang.

6      12.  Ngo gave his written consent for the agents to open
7  the FedEx parcel.  The agents discovered $11,500 in U.S.
8  currency inside the parcel, vacuum sealed in plastic.  Ngo
9  denied that the currency was his and signed a Notice of
10  Abandonment of his interest in the currency.

11      13.  The agents then interviewed Pham, who admitted that he
12  was at the store specifically to pick up the FedEx parcel as
13  well as a UPS package which was due to arrive at Q Italy Shoes
14  that day.  Approximately half an hour later a UPS delivery truck
15  dropped off a package.  According to the parcel label the sender
16  was the same Florida business that had shipped the FedEx parcel
17  and the recipient was listed as Q Italy Shoes.  (In fact, Trong
18  had shipped the UPS parcel as well.)

19      14.  Ngo gave written consent to open the UPS parcel, which
20  contained $11,605.00 in U.S. Currency wrapped in vacuum sealed
21  plastic.  Ngo also denied that these funds were his and signed a
22  Notice of Abandonment of his interest as to these funds.  A
23  certified drug detection canine alerted to the presence of a
24  controlled substance emanating from the UPS package.  The
25  currency seized on September 26, 2013 from the FedEx and UPS
26  parcels is in the process of being administratively forfeited.

27      15.  Pham later admitted to the agents that he was at Q
28  Italy Shoes for the purpose of picking up the FedEx and UPS

EXHIBIT C
Page 169

1  packages for Tony (*i.e.*, the person to whom Ngo had referred to

2  earlier).  Pham stated he had met Tony approximately one year

3  earlier, had been picking up packages daily since then, and

4  received $100 per package he picked up for Tony.

5     16.  Pham told the agents that after he picked up a package

6  he would call or text Tony to make arrangements to deliver it,

7  with the preferred delivery location being a Westminster,

8  California Starbucks.  Pham also stated that he was unemployed

9  but had been told by Tony to say that he (Pham) was employed at

10  NT Trading, Inc. in El Monte, California.

11     17.  Pham gave consent for the agents to search his

12  vehicle.  Inside the vehicle the agents found a gas company bill

13  addressed to Quang at Stanton, California.  The agents

14  subsequently identified Quang as the owner of NT Trading, the

15  business Pham was told by Tony to say employed him.

16     18.  On October 18, 2013, the agents observed Pham leaving

17  Tran's residence in Stanton, California (the same address listed

18  on the gas bill addressed to Quang and found in Pham's vehicle),

19  traveling to a U.S. Bank branch and a residence on Falcon Avenue

20  in Fountain Valley, California, and finally to Viet Travel and

21  Cargo, a business in Westminster, California.  The agents made

22  contact with Pham after he left Viet Travel and Cargo carrying a

23  white envelope.

24     19.  Pham told the agents that he had a large amount of

25  currency in his possession.  Pham consented to a search of his

26  vehicle.  During the search the agents found under the front

27  passenger seat a white envelope containing $40,000 and under the

28  driver's seat $39,200 wrapped in newspaper.  A certified drug

5

EXHIBIT C
Page 170

1  detection canine alerted to the presence of a controlled
2  substance emanating from both the unwrapped currency and the
3  currency in the white envelope.  The government alleges that the
4  white envelope found in Pham's vehicle was the white envelope
5  that Pham had carried out of Viet Travel and Cargo.  Pham denied
6  ownership of the currency and signed a Notice of Abandonment of
7  his interest in it.
8      20.  Pham stated that he had picked up the $49,000 from a
9  person named "Mu" at a residence on Falcon Avenue in Fountain
10 Valley, California and $40,000 from Viet Travel.  Pham further
11 stated that he was waiting for delivery instructions from an
12 unknown Hispanic male regarding delivery of the $40,000.  The
13 currency seized from Pham on October 18, 2013, is in the process
14 of being administratively forfeited.
15     B.   Seizure of the Defendant Currency
16     21.  On December 11, 2013, the agents observed Pham exiting
17 an Arco gas station in Garden Grove, California, carrying a
18 small black bag.  Pham placed the bag into the trunk of his
19 vehicle and drove to a local diner.  When he exited the diner he
20 was observed carrying a white bag.  Pham got into his vehicle
21 and drove back to the Arco gas station in Garden Grove.  As Pham
22 exited his vehicle he was carrying a small black bag.  Pham then
23 got into a BMW that was parked in the Arco station parking lot.
24 The driver of the BMW drove to Tran's residence in Stanton,
25 California where two women and a child exited the house and got
26 into the BMW, which the driver then drove back to the Arco
27 station in Garden Grove.  Pham exited the BMW carrying a plastic
28 bag, got into his vehicle, and drove out of the Arco station

6

EXHIBIT C
Page 171

1   parking lot.

2        22.   The agents followed the BMW to a residence in Garden

3   Grove, California.   The agents followed the BMW to the driveway

4   of the residence and instructed the occupants of the BMW to

5   remain in the vehicle.   After additional the agents arrived at

6   the residence, the driver (later identified as Tran) and her

7   three passengers were instructed to exit the vehicle.   The

8   passengers of the vehicle were identified as (A) Ruby Nguyen, a

9   Vietnamese citizen visiting the United States (sitting in the

10  front passenger seat); (B) Khanh Linh Pham ("K.L. Pham" (no

11  relation to Anh Pham)), a Vietnamese citizen also visiting the

12  United States; and (C) a child who was the daughter of a friend

13  of Nguyen. (K.L. Pham and the child were sitting in the back

14  seat of the vehicle.)   Nguyen and K.L. Pham stated that they

15  were friends and that they had just met Tran that morning.

16  Nguyen stated Tran was taking her and K.L. Pham to see the house

17  at Garden Grove.

18       23.   Upon questioning by the agents, Tran stated that the

19  residence belonged to a friend of hers, Angela Quang ("A.

20  Quang"), who had asked Tran to check on the contractors who were

21  remodeling the property.   Tran gave A. Quang's telephone number

22  to the agents so that they could verify Tran's story with the

23  property's owner.   A. Quang confirmed that the property belonged

24  to her, and that she had given permission to her brother to

25  check on the house.   A. Quang then remembered that she had also

26  given Tran permission, as well.   The agents later discovered

27  that A. Quang was Quang's sister.

28       24.   The agents asked Tran who owned the BMW (which was

EXHIBIT C
Page 172

1  valued at $130,000).  Tran stated the vehicle belonged to "Keit"

2  who lived somewhere in Orange County.  The agents ran DMV

3  records on the BMW and discovered the vehicle was actually

4  registered to someone named Wang Chang, a resident of San

5  Leandro, California.

6       25.  The agents asked Tran if there was any money or drugs

7  in the BMW.  Tran stated that there were no drugs or money in

8  the vehicle, and consented to the vehicle's search.  During the

9  search the agents discovered in a paper bag in Nguyen's purse

10  $20,000 U.S. currency (i.e., a portion of defendant currency).

11  (Nguyen had been sitting in the front passenger seat when the

12  agents arrived.)  The agents also discovered $9,400 in U.S.

13  currency in Tran's purse (i.e., the remainder of the defendant

14  currency).  The currency found in Nguyen's and Tran's purses was

15  bound in red and green rubber bands.  The agents also found in

16  the trunk of the BMW two large bundles of counterfeit $100

17  bills, wrapped in cellophane.

18       26.  Tran stated the defendant currency belonged to her,

19  and that it was not related to any drug activity but instead

20  constituted proceeds from her businesses in Vietnam.  Tran

21  stated that a friend from Vietnam (whom she did not identify)

22  brought the money with her from Vietnam.  Tran also stated that

23  she (Tran) was unemployed and that her family in Vietnam would

24  wire-transfer funds to her as she needed them.  The agents found

25  no evidence that Tran had any legitimate sources of income, or

26  that she had received any wire transfers from Vietnam.

27       27.  On March 21, 2014, the agents received information

28  from the State of California Employment Development Department

EXHIBIT C
Page 173

1   indicating that there was no record that Tran had received

2   income from wages.

3       28.  Tran would not explain the presence of the counterfeit

4   $100 bills which the agents had found in the trunk.  The

5   government alleges that the counterfeit money constituted "flash

6   cash," commonly used by drug dealers as a false symbol of wealth

7   in order to facilitate drug transactions.

8       29.  Nguyen and K.L. Pham asked to speak to the agents

9   outside of Tran's presence.  They told the agents that Tran had

10  asked Nguyen to put a paper bag containing $20,000 in Nguyen's

11  purse, when the car was stopped by the agents, and that Tran

12  told Nguyen to say that she (Nguyen) was visiting from Vietnam

13  and had personally brought the money from there.  Nguyen stated

14  that she told Tran that she would not say that the defendant

15  currency belonged to her (Nguyen).  Nguyen believed that Tran

16  put the money in her (Nguyen's) purse while Nguyen was getting

17  out of the vehicle.

18      30.  When the agents asked Tran about the statements Nguyen

19  made concerning the defendant currency, Tran denied that she had

20  hidden the money in Nguyen's purse and would not answer any

21  further questions from the agents concerning the incident.

22      31.  Pursuant to a state search warrant issued in January

23  2014, the agents reviewed text messages contained in one of

24  Tran's cell phones seized on December 11, 2013, which revealed

25  the following:

26          a.  On December 14, 2012, Tran received a text

27  message (from an unknown number) reading "***** falcon ave fv

28  92708."  92708 is the zip code for Fountain Valley.  The

9

EXHIBIT C
Page 174

1    government alleges that "fv" in the text message is an

2    abbreviation for the Fountain Valley location where Pham picked

3    up currency for delivery to Quang, as described above.

4            b.    On April 24, 2013, Tran sent a text message (to

5    an unknown number) which read "Q.Italy.Shoes. Shoe repair, 9918

6    Bolsa Avenue, Westminster, CA, 920683." Q Italy Shoes is the

7    business where agents first encountered Pham and seized a FedEx

8    parcel containing $11,500 in cash and a UPS parcel containing

9    $11,605 in cash.

10           c.    On September 12, 2013, Tran sent the following

11   text message to an unknown number: "lay cua anh khoa, vietcargo

12   78.300 con nha."  The government alleges that "anh khoa" is a

13   reference to Pham's first and middle names, and that "vietcargo"

14   is a reference to Viet Travel and Cargo, where Pham picked up

15   money for Quang (as described above).

16       32.  Pham, a citizen of Vietnam, was one of the subjects of

17   a previous investigation into a large-scale marijuana

18   trafficking operation.  Specifically, Pham's bank account with

19   Bank of America had been used in 2012 to launder proceeds of the

20   operation.  The bank closed Pham's account before the government

21   could seize any money from it.  Quang was arrested in 2007 for

22   cultivating over 600 marijuana plants at a house in Roseville,

23   California.  Quang was subsequently convicted of a misdemeanor

24   charge of operating a public nuisance.

25       33.  Based upon the above, plaintiff alleges that the

26   defendant currency represents or is traceable to proceeds of

27   illegal narcotics trafficking, or was intended to be used in one

28   or more exchanges for a controlled substance or listed chemical

EXHIBIT C
Page 175

1   in violation of 21 U.S.C. § 841 et seq.  The defendant currency

2   is therefore subject to forfeiture pursuant to 21 U.S.C. §

3   881(a)(6).  In addition, the government alleges that the

4   defendant currency constitutes proceeds traceable to a

5   conspiracy to commit one or more violations of 21 U.S.C. § 841

6   (narcotics trafficking), and is therefore subject to forfeiture

7   pursuant to 18 U.S.C. § 981(a)(1)(C).

8       WHEREFORE, the United States prays that due process issue

9   to enforce the forfeiture of the defendant currency, due notice

10   be given to all interested parties to appear and show cause why

11   forfeiture should be not be decreed, that this court decree

12   forfeiture of the defendant currency to the United States of

13   America for disposition according to law, and for such other and

14   further relief as this court may deem just and proper, together

15   with the costs and disbursements of this action.

16   DATED: May 16, 2014

17

18                         ANDRÉ BIROTTE JR.
                         United States Attorney
19                         ROBERT E. DUGDALE
                         Assistant United States Attorney
20                         Chief, Criminal Division
                         STEVEN R. WELK
21                         Assistant United States Attorney
                         Chief, Asset Forfeiture Section
22

23

24                         FRANK D. KORTUM
                         Assistant United States Attorney
25

26                         Attorneys for Plaintiff
                         United States of America
27

28

                              11

EXHIBIT C
Page 176

<u>VERIFICATION</u>

1

2       I, Edward C. Angeo, declare and say that:

3       1.   I am a Special Agent with Homeland Security

4   Investigations.

5       2.   I have read the attached Verified Complaint for

6   Forfeiture and know the contents thereof.

7       3.   The information contained in the Complaint is either

8   known to me personally, was furnished to me by official

9   government sources, or obtained pursuant to subpoena.  I am

10  informed and believe that the allegations set out in the

11  Complaint are true.

12      I declare under penalty of perjury under the laws of the

13  United States that the foregoing is true and correct.

14      EXECUTED this __15ᵀᴴ__ day of May 2014 at Santa Ana,

15  California.

16

17                              _____
                                EDWARD C. ANGEO
18                              Special Agent-HSI

19

20

21

22

23

24

25

26

27

28

                                12

EXHIBIT C
Page 177

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

UNITED STATES OF AMERICA

**DEFENDANTS** ( Check box if you are representing yourself ☒ )

$29,400.00 IN U.S. CURRENCY

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)
FRANK D. KORTUM, Assistant United States Attorney
California Bar Number 110984
Federal Courthouse, 14th Floor , 312 North Spring Street, Los Angeles, Ca 90012
Telephone: 213-894-5710; Fax: (213) 894-7177;Email: Frank.Kortum@usdoj.gov

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

| | |
|---|---|
| ☒ 1. U.S. Government Plaintiff | ☐ 3. Federal Question (U.S. Government Not a Party) |
| ☐ 2. U.S. Government Defendant | ☐ 4. Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1. Original Proceeding | ☐ 2. Removed from State Court | ☐ 3. Remanded from Appellate Court | ☐ 4. Reinstated or Reopened | ☐ 5. Transferred from Another District (Specify) | ☐ 6. Multi-District Litigation |

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No        ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. § § 981(a)(1)(C) and 21 U.S.C. § 881 (a)(6)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**        Case Number:

CV-71 (09/13)                    CIVIL COVER SHEET                    Page 1 of 3

SACV 14-772

EXHIBIT C
Page 178

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [X] Yes  [ ] No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [X] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |

| C.1.  Is either of the following true?  If so, check the one that applies: | C.2.  Is either of the following true?  If so, check the one that applies: |
|---|---|
| [ ] 2 or more answers in Column C | [ ] 2 or more answers in Column D |
| [ ] only 1 answer in Column C and no answers in Column D | [ ] only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the SOUTHERN DIVISION.<br>Enter "Southern" in response to Question D, below.<br><br>If none applies, answer question C2 to the right.  ➡ | Your case will initially be assigned to the EASTERN DIVISION.<br>Enter "Eastern" in response to Question D, below.<br><br>If none applies, go to the box below.  ⬇ |

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above  ➡ | SOUTHERN |

| CV-71 (09/13) | CIVIL COVER SHEET | Page 2 of 3 |
|---|---|---|

EXHIBIT C
Page 179

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ NO ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**          DATE: May 16, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

EXHIBIT C
Page 180

1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
3  Assistant United States Attorney
   Chief, Criminal Division
4  STEVEN R. WELK
   Assistant United States Attorney
5  Chief, Asset Forfeiture Section
6  FRANK D. KORTUM
   Assistant United States Attorney
7  Asset Forfeiture Section
   California Bar No. 110984
8     1400 United States Courthouse
9     312 North Spring Street
      Los Angeles, California 90012
10    Telephone:  (213) 894-5710
      Facsimile:  (213) 894-7177
11    E-mail: Frank.Kortum@usdoj.gov
12
   Attorneys for Plaintiff
13 United States of America

14                 UNITED STATES DISTRICT COURT
15            FOR THE CENTRAL DISTRICT OF CALIFORNIA
                     SOUTHERN DIVISION
16 _____  SA  14-772-JVS (ANx)
   UNITED STATES OF AMERICA,          ) NO. CV
17                                     )
           Plaintiff,                  )
18                                     )          NOTICE
      vs.                              )
19                                     )
   $29,400.00 IN U.S. CURRENCY,        )
20                                     )
           Defendant.                  )
21                                     )
22                                     )
                                       )
23                                     )
                                       )
24                                     )
                                       )
25 _____ )

26      In obedience to a Warrant of Arrest In Rem to me directed,
27 in the above-entitled cause, I have, on the ____ day of _____,
28 2013, seized and taken into my possession, the following

EXHIBIT C
Page 181

1   described defendant, to wit: $29,400.00 IN U.S. CURRENCY, for

2   the cause set forth in the Complaint, to wit: violation of

3   federal laws, now pending in the United States District Court

4   for the Central District of California, at Los Angeles,

5   California.   Amount demanded is the sum of $-0-, plus interest

6   and costs.

7       I HEREBY GIVE NOTICE to any person who claims an interest

8   in  the above-described defendants that, pursuant to Rule G(5)

9   of the Supplemental Rules for Admiralty or Maritime Claims and

10  Asset Forfeiture Actions of the Federal Rules of Civil

11  Procedure, said person must file with the Clerk of the United

12  States District Court at Los Angeles, California and serve upon

13  the attorney for the plaintiff, a verified Claim identifying the

14  property claimed and his or her interest in the property not

15  later than thirty-five (35) days after the date of service of

16  the Complaint, or within such additional time as the court may

17  allow; that said person must file and serve an Answer within

18  twenty (20) days after the filing of the verified Claim; that if

19  notice was published but direct notice was not sent to said

20  person or to said person's attorney, the Claim must be filed no

21  later than sixty (60) days after the first day of publication on

22  an official internet government forfeiture site or legal notice

23  under Rule G(4)(a); and that all interested persons must file

24  verified Claims and Answers within the time so fixed; otherwise,

25  default may be entered and forfeiture ordered of the interest in

26  the defendants of any person not so complying.   Applications for

27  intervention under Rule 24 of the Federal Rules of Civil

28  Procedure by persons claiming maritime liens or other interests

2

EXHIBIT C
Page 182

1 shall be filed within the time fixed by the court.  A claim

2 filed by a person asserting an interest as a bailee must

3 identify the bailor, and if filed on the bailor's behalf must

4 state the authority to do so.

5   Pursuant to General Order 10-07 of the United States

6 District Court for the Central District of California, this

7 action is subject to the Electronic Case Filing ("ECF") System.

8 ECF User Registration Forms may be obtained from the Court.

9   Please check http://www.forfeiture.gov for a listing of all

10 judicial forfeiture notices.

11   Plaintiff's attorney is Assistant United States Attorney

12 Frank D. Kortum, 312 North Spring Street, 14th Floor, Los

13 Angeles, California 90012, (213)894-5710.

14   The custodian of the defendant property is the Department

15 of Homeland Security, Bureau of Customs and Border Protection,

16 Seized Property Custodian for U.S. Customs and Border

17 Protection, 301 East Ocean Boulevard, Suite 620, Long Beach, CA,

18 90802 (562)624-3800.

19

20 DATED:  This _____ day of _____ , 2014.

21         U.S. CUSTOMS AND BORDER PROTECTION

22

23         _____

          FINES, PENALTIES, AND FORFEITURES

24         OFFICER

25

26

27

28

3

EXHIBIT C
Page 183

# **Exhibit D**

```
 1  THOMAS P. O'BRIEN
    United States Attorney
 2  CHRISTINE EWELL
    Assistant United States Attorney
 3  Chief, Criminal Division
    STEVEN R. WELK
 4  Assistant United States Attorney
    Chief, Asset Forfeiture Section
 5  FRANK KORTUM
    Assistant United States Attorney
 6  Asset Forfeiture Section
    California State Bar No. 110984
 7       1400 United States Courthouse
         312 North Spring Street
 8       Los Angeles, California  90012
         Telephone:  (213) 894-5710
 9       Facsimile:  (213) 894-7177
         Email:      frank.kortum@usdoj.gov
10
    Attorneys for Plaintiff
11  United States of America
```

FILED
2009 JUN 17 PM 2:42
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY: ___

12              UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                  SOUTHERN DIVISION

15                                    **SACV09-716 JVS(MLGX)**

```
16  UNITED STATES OF AMERICA,    )  NO.  SACV
                                 )
17          Plaintiff            )  COMPLAINT FOR FORFEITURE
                                 )
18          v.                   )  18 U.S.C. § 981(a)(1)(A), (C)
                                 )
19  REAL PROPERTY IN SAFETY      )
    HARBOR, FLORIDA,             )  [F.B.I.]
20                               )
            Defendant.           )
21  _____ )
```

22

23      For its claims against the defendant real property in

24  Safety Harbor, Florida, plaintiff United States of America

25  alleges:

26              **JURISDICTION AND VENUE**

27      1.   This is a civil _in rem_ forfeiture action pursuant to

28  18 U.S.C. § 981(a)(1)(A) & (C).

1      2.   This Court has subject matter jurisdiction under 28

2  U.S.C. §§ 1345 and 1355.

3      3.   Venue lies in this district pursuant to 28 U.S.C.

4  §§ 1355(b) and 1395, because a substantial portion of the

5  conduct that is the basis for forfeiture was planned and

6  initiated in this district.

7                 **PERSONS AND ENTITIES**

8      4.   Plaintiff is the United States of America

9  ("plaintiff" or the "government")

10      5.   The defendant is real property in Safety Harbor,

11  Florida (the "defendant property").  The legal description of

12  the defendant property is as follows:

13         Lot 1, Cypress Hollow, according to the map or plat

14         thereof as recorded in Plat Book 121, Pages 78 and 79,

15         Public Records of Pinellas County, Florida.  Parcel

16         Identification Number: 33/28/16/20195/000/0010

17         5.1.  A title report dated May 7, 2009, issued by

18         Land Records of America, indicates that title to the

19         defendant property is held in name of "Lonnie Kocontes

20         and Katherine Kern, husband and wife as joint tenants."

21         The title report reveals no other persons or entities

22         with a recorded interest in the defendant property.

23             **FACTS SUPPORTING FORFEITURE**

24      6.   The FBI currently is investigating the murder of

25  Miki Kanesaki ("Kanesaki"), which occurred on the high seas

26  while Kanesaki was a passenger on a cruise ship.  The

27  investigation has thus far revealed evidence that (1)

28  Kocontes, an attorney, met Kanesaki while they both worked a

2

EXHIBIT D
Page 186

1  law firm in Los Angeles, and they married on or about November
2  1995; (2) Kanesaki was a millionaire based on financial
3  investments and her ownership of several pieces of real
4  property; (3) in 2000, the law firm fired Kocontes after he
5  was arrested (although not charged) for having sexual contact
6  with a minor he met on the internet; (4) Kocontes and Kanesaki
7  subsequently divorced "on paper" in order to protect their
8  assets from potential civil litigation from the minor's family
9  (although they continued to live together); (5) following
10  Kocontes' arrest, Kanesaki's and Kocontes' relationship
11  deteriorated; (6) Kocontes and Kanesaki had numerous verbal
12  altercations, some of which led to the Orange County Sheriff's
13  Department being called to the residence; (7) just five months
14  prior to her death, Kanesaki nevertheless executed a will
15  naming Kocontes as the sole beneficiary, meaning that he stood
16  to inherit all of her assets upon her death; and (8) while
17  living in Orange County, California, Kocontes booked a
18  Mediterranean cruise for himself and Kanesaki.
19      7.   In May 2006, Kanesaki and Kocontes flew from the
20  Central District of California to Spain in order to take the
21  Mediterranean cruise.  The cruise ship was traveling in
22  international waters on May 25 and 26, 2008.  Kanesaki was
23  last seen alive on May 25.  In the early morning hours of May
24  26, Kocontes contacted ship personnel and informed them that
25  Kanesaki was missing.  After a search of the vessel failed to
26  locate Kanesaki, Kocontes was interviewed by ship personnel,
27  and later by Italian authorities.  During these interviews he
28  gave accounts of Kanesaki's last known whereabouts and

1   activities that were inconsistent with the physical and other

2   evidence known then and later discovered.  Kocontes returned

3   home by plane to Los Angeles before the authorities' search

4   for Kanesaki was complete.  The government alleges that while

5   aboard the cruise ship, Kocontes strangled Kanesaki to death

6   and threw her overboard into the sea.  Only days after her

7   murder, Kanesaki's remains were found at sea off the coast of

8   Paola (Italy), a coastal city the ship passed as it sailed

9   from Messina to Naples.  A subsequent autopsy report indicated

10   death by strangulation.

11       8.    Following Kanesaki's death Kocontes obtained full

12   control over (1) Kanesaki's trust fund; (2) a Citibank account

13   ending in number 6608 (the "Citibank Account") and jointly

14   held by Kocontes and Kanesaki; (3) other bank accounts

15   Kanesaki jointly held with Kocontes; and (4) other assets

16   owned by Kanesaki.

17       9.   Based on a review of available bank records during

18   the course of the investigation, the government alleges that

19   the funds in the Citibank Account as of September 22, 2006

20   were derived in part from the following sources:

21      -   $52,000 wired to the Citibank Account on July 31,

22          2006 from an Ameritrade account in the name of

23          Kocontes and Kanesaki ("Joint Ameritrade Account");

24      -   $253,116.91 wired to the Citibank account on August

25          4, 2006 from the Joint Ameritrade Account; and

26      -   $14,646.94 deposited in the Citibank account on May

27          31, 2006, using a handwritten deposit slip of the

28          type available at a bank branch, and including (a)

4

1   an income tax refund check in the amount of

2   $4,474.22 made payable to Kocontes and Kanesaki; and

3   (b) a check for $2745.42 issued to Kanesaki on May

4   23, 2006 (while she was on the cruise), but

5   nevertheless purportedly endorsed by her.

6   **THE DEFENDANT PROPERTY**

7   10.  Only six months after Kanesaki's murder, Kocontes

8   purchased the defendant property for $607,000 in liquid funds

9   derived from the Citibank Account.  A review of title and bank

10   records revealed the following:  On or about September 22,

11   2006, Kocontes purchased the defendant property for $607,000

12   from Abdul Qassam and Nilofer Qassam with a personal check and

13   wire transfer drawn on the Citibank Account.  Specifically, a

14   Citibank personal check number 1661 in the amount of $20,000

15   was issued to Equity National Title on September 22, 2006, as

16   a deposit/earnest money towards the purchase of the defendant

17   property.  The check appears to be signed by Kocontes, the

18   address of the defendant property was written in the memo

19   section of the check, and the check shows Kanesaki and

20   Kocontes as the payors.  In addition, records show that on or

21   about October 6, 2006, $582,912.77 was wired from the Citibank

22   account to an Equity National Title bank account for the

23   purchase of the defendant property.  The wire transfer records

24   revealed that transaction was "set up by Micki Kanesaki";

25   given that Kanesaki was deceased at the time of the transfer,

26   there is probable cause to believe that Kocontes used

27   Kanesaki's online banking sign-on information to initiate and

28   execute the wire transaction.

5

11.   A Warranty Deed (Deed of Trust) dated October 10, 2006, showed Kocontes purchased the defendant property as a single man; however, a Quit-Claim Deed dated December 27, 2007, showed Kocontes quit-claimed the defendant property to himself and Kern.

12.   As set forth in paragraphs 12-15 herein, the investigation has also revealed further evidence showing that Kocontes was motivated in part by greed to murder Kanesaki. Specifically, on or about January 23, 2008, $1.5 million was wired from the Citibank Account to Global Trustees Services, Ltd. Belize, an unknown entity.  On October 9, 2008, Kocontes and Katherine Kern (his current wife) opened an account at Bank of America ("BofA") with a $25 deposit.  On October 15, 2008, the BofA account received an incoming wire in the amount of $1,276,768 from Global Trustees Services, Ltd. Belize.  The government alleges that (1) the $1,276,768 wired from Global Trustees Services, Ltd. Belize to the BofA account was part of the same $1.5 million wired to Global Trustees Services, Ltd. Belize from Kocontes' and Kanesaki's Citibank account; and (2) Kocontes wired the money from the Citibank account to Belize in order to conceal the funds from United States law enforcement officials, who were then known to him to be investigating his conduct.

13.   On October 9, 2008, Kocontes requested a withdrawal of $600,000 in cash from the BofA account and requested the remainder to be wired to China.  BofA refused, closed the account, and issued Kocontes a cashier's check in the amount of $1,276,768.

EXHIBIT D
Page 190

1    14.   On October 24, 2008, Kocontes deposited the above

2  BofA Cashier's Check in his Florida Capital Bank Account (the

3  "FCB Account").   Kocontes told FCB personnel that the source

4  of the funds was from his deceased wife's trust fund.

5  Kocontes requested to withdraw the entire $1,276,768 in cash,

6  upon which the FCB personnel advised they would need to place

7  a hold on the funds.   FCB personnel subsequently told Kocontes

8  that he would not be allowed to withdraw that much money in

9  cash and that he would be issued a cashier's check upon the

10  bank closing his account.   On November 4, 2008, Kocontes sent

11  FCB a letter demanding that he be allowed to withdraw the

12  entire amount in cash and if the bank did not comply, he would

13  sue.   FCB ordered the cash and planned to release the money to

14  Kocontes upon its receipt.   In November 2008, the Government

15  seized all the funds in the FCB account pursuant to a federal

16  seizure warrant.

17    15.   On June 4, 2008, an income tax refund check issued

18  on May 30, 2008 and payable to Kanasaki and Kocontes in the

19  amount of $15,091.54 was deposited to the Citibank account.

20  Kanesaki purportedly endorsed the this check even though she

21  had been deceased for several years at the time the check was

22  issued.

23                    **CLAIMS FOR RELIEF**

24    16.   Plaintiff repeats and realleges each and every

25  allegation set forth in paragraphs 1 through 15, above.

26                 **FIRST CLAIM FOR RELIEF**

27                [18 U.S.C. § 981(a)(1)(C)]

28    17.   Pursuant to 18 U.S.C. § 981(a)(1)(C), any property,

7

1   real or personal, which constitutes or is derived from proceeds

2   traceable to a violation of any offense constituting a

3   "specified unlawful activity," or a conspiracy to commit such

4   offense, is subject to forfeiture to the United States.

5       18.   Pursuant to 18 U.S.C. §§ 1956(c)(7) and 1961(1),

6   murder in violation of 18 U.S.C. § 1111 constitutes a specified

7   unlawful activity for purposes of 18 U.S.C. § 981(a)(1)(C).  As

8   set forth above, the defendant property was purchased with

9   proceeds traceable to violations of 18 U.S.C. § 1111 and is,

10  therefore, subject to forfeiture pursuant to 18 U.S.C. §

11  981(a)(1)(C).

12                  **SECOND CLAIM FOR RELIEF**

13                  [18 U.S.C. § 981(a)(1)(A)]

14      19.   Pursuant to 18 U.S.C. § 981(a)(1)(A), any property,

15  real or personal, involved in a transaction or attempted

16  transaction in violation of 18 U.S.C. § 1957, or any property

17  traceable to such property, is subject to forfeiture to the

18  United States.

19      20.   Pursuant to 18 U.S.C. §§ 1956(c)(7) and 1957, murder

20  in violation of 18 U.S.C. § 1111 constitutes a specified

21  unlawful activity for purposes of 18 U.S.C. § 981(a)(1)(A).  As

22  set forth above, the defendant property is traceable to

23  property involved in a monetary transaction in criminally

24  derived property, which transaction was in or affected

25  interstate commerce.

26      WHEREFORE, plaintiff United States of America prays that:

27      (a) due process issue to enforce the forfeiture of the

28  defendant property;

8

1       (b) due notice be given to all interested parties to

2 appear and show cause why forfeiture should not be decreed;

3       (c) judgment be entered declaring that the defendant

4 property is forfeited to the United States of America for

5 disposition according to law;

6       (d) the United States be awarded all of its costs,

7 expenses and disbursements; and

8       (e) the United States be awarded any other relief that the

9 Court deems just and proper.

10 DATED: June _16_, 2009       THOMAS P. O'BRIEN
                        United States Attorney

11                         CHRISTINE EWELL
                        Assistant United States Attorney

12                         Chief, Criminal Division
                        STEVEN R. WELK

13                         Assistant United States Attorney
                        Chief, Asset Forfeiture Section

14

15                         _____

16                         FRANK KORTUM
                        Assistant United States Attorney

17                         Attorneys for Plaintiff
                        United States of America

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT D
Page 193

JUN-16-2009  18:41          FBI                                714 543 6119      P.02

## VERIFICATION

1  I, Frank Bernal, hereby declare that:

2      1.   I am a Special Agent with the Federal Bureau of
3  Investigation.

4      2.   I have read the above Complaint for Forfeiture and
5  know its contents.

6      3.   Official government sources furnished the information
7  set forth in the Complaint.  Based on information and belief,
8  the allegations in the Complaint are true.

9      I declare under penalty of perjury under the laws of the
10 United States of America that the foregoing is true and
11 correct.

12     Executed June 16, 2009, in Santa Ana, California

13

14

15

16                              _____
17                              Frank Bernal
                                Special Agent, FBI

10

TOTAL P.02

EXHIBIT D
Page 194

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV09- 716 JVS (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

EXHIBIT D
Page 195

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| United States of America | Real Property in Safety Harbor, Florida |

| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):  Orange County |
|---|---|

| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)  THOMAS P. O'BRIEN, United States Attorney  FRANK D. KORTUM, Assistant United States Attorney  United States Attorney's Office, California Bar No. 110984  U.S. Courthouse, 312 N. Spring St., Ste. 1400, Los Angeles, CA 90012 | Attorneys (If Known) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No    ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
21 U.S.C. § 881(a)(7)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☑ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No ☐ Yes

If yes, list case number(s):

| FOR OFFICE USE ONLY: | Case Number: | **SACV09-716 JVS(MLGX)** |
|---|---|---|

| CV-71 (07/05) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|

EXHIBIT D
Page 196

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET
##### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b). RELATED CASES: Have any cases been previously filed that are related to the present case? ☑ No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                        ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                        ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                        ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

IX. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☑ Check here if the U.S. government, its agencies or employees is a named plaintiff.
   Orange County

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
   Pinellas County, Florida

List the California County, or State if other than California, in which EACH claim arose. (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.
   Orange County

X. SIGNATURE OF ATTORNEY (OR PRO PER): _~Fah Gato~_____   Date _6/17/09_

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

EXHIBIT D
Page 197

# **<u>Exhibit E</u>**

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   STEVEN R. WELK
4  Assistant United States Attorney
   Chief, Asset Forfeiture Section
5  MICHELE C. MARCHAND
   Assistant United States Attorney
6  California Bar No. 93390
        U.S. Courthouse, 14th Floor
7       312 North Spring Street
        Los Angeles, CA 90012
8       Telephone: (213)894-2727
        Facsimile: (213)894-7177
9       E-Mail: Michele.Marchand@usdoj.gov

10 Attorneys for Plaintiff
   United States of America

11

12            UNITED STATES DISTRICT COURT

13        FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                 WESTERN DIVISION

15 UNITED STATES OF AMERICA,        )  NO. CV
                                    )
16        Plaintiff,                )  COMPLAINT FOR FORFEITURE
                                    )
17        v.                        )  [18 U.S.C. § 981(a)(1)(A) and
                                    )  (C)]
18 $61,098.00 IN MONEY ORDERS;      )
   $12,850 IN TRAVELERS CHECKS;     )        [I.C.E.]
19 $17,741.00 IN U.S. CURRENCY;     )
   $208,220.00 IN U.S. CURRENCY;    )
20 $1,031,900.00 IN U.S. CURRENCY;  )
   $404,600.01 IN BANK FUNDS,       )
21                                  )
          Defendants.               )
22 _____ )

23

24     The United States of America brings this claim against the

25 defendant $61,098.00 in money orders; $12,850 in travelers

26 checks; $17,741.00 in U.S. currency; $208,220.00 in U.S.

27 currency; $1,031,900.00 in U.S. currency; and $404,600.01 in bank

28 funds (collectively, "defendants"), which are more particularly

described below, and alleges as follows:

## JURISDICTION AND VENUE

1.   This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

2.   This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.   Venue lies in this district pursuant to 28 U.S.C. § 1395(b) and (c).

## PERSONS AND ENTITIES

4.   The defendants consist of the following:

   a.   $61,098.00 in Money Orders, $12,850 in Travelers Checks, and $17,741.00 in U.S. currency seized on April 9, 2008, at Concord English Language Center ("Concord"), 3435 Wilshire Boulevard, Suite 152, Los Angeles, California.

   b.   $208,220.00 in U.S. currency seized on April 9, 2008 at the residence of Behzad Zaman in Beverly Hills, California (the "Zaman residence").

   c.   $1,031,900.00 in U.S. currency seized on April 14, 2008 from safe deposit box number *****3352 in the name of Bezhad and Neda Zaman at California Bank & Trust, 6500 Wilshire Boulevard, Los Angeles, California.

   d.   The following amounts seized on April 21, 2008 from bank accounts at First Bank, 933 North Broadway, Los Angeles, California: $14,308.95 from account number ******1837 held in the name of Jila

2

Zaman; $5,378.26 from account number ******2801 held in the name of Black and White Rent-A-Car, and $112,617.54 from account number ******1811 held in the name of Bahman Zaman.[1]

e.   The following amounts were seized on April 22, 2008 from accounts at Bank of America, 100 South Broadway, Los Angeles, California: $66,612.78 from account number ******-3132 in the name of Behzad Zaman; $26,510.35 from account number ******-9091 held in the names of Jinette M. Zaman and Behrouz Zaman; $68,908.70 from account number ******-1069 held in the name of Concord Educational Group, Inc., and $92,599.06 from account number ******-2201 held in the name of Concord Educational Group, Inc.

f.   $16,012.64 was seized on April 21, 2008 from an account at Center Bank, 3435 Wilshire Boulevard, Suite 700, Los Angeles, California from account number ***-1017 held in the name of Bahman Zaman.

g.   $1,651.73 was seized on April 21, 2008 from an account at California Bank & Trust, 3250 Wilshire Boulevard, Los Angeles, California from account number ******6461 held in the name of Zaman Plaza, LLC.

5.   The interests of the account holders listed above may

---

[1]   In compliance with Rule 79-5.4 of the Local Rules for the Central District of California ("Local Rules"), only the last four digits of the account numbers are identified.

3

1  be adversely affected by these proceedings.

2       6.    The defendants are in the custody of the United States

3  Treasury, where they shall remain subject to this court's

4  jurisdiction during the pendency of this action.

5                    <u>EVIDENCE SUPPORTING FORFEITURE</u>

6  **A.    BACKGROUND REGARDING STUDENT VISA FRAUD**

7       7.    From at least 1999 to April 9, 2008, Behzad Zaman, also

8  known as Ben Zaman (hereinafter "Zaman"), owned, controlled,

9  and/or managed the following businesses, which were located

10  within the Central District of California:

11            a.    The Concord English Language Center (hereinafter

12                  "Concord"), located at 3435 Wilshire Boulevard, Suite

13                  152, Los Angeles, California 90010; and

14            b.    The International College for English Studies

15                  ("ICES"), located at 3345 Wilshire Boulevard, Suite

16                  1106, Los Angeles, California 90010.

17       8.    The Department of Homeland Security ("DHS") is

18  responsible for processing requests submitted by foreign citizens

19  and/or their sponsors for lawful entry into and authority to

20  remain in the United States, and for maintaining accurate records

21  of non-immigrant aliens living in the United States.

22       9.    DHS runs several programs through which foreign

23  citizens can obtain permission to enter and remain in the United

24  States.  One such program is called the F-1 Student Visa Program.

25  In order to obtain the immigration benefits afforded by this

26  program, a DHS-approved educational institution is required to

27  verify the names of all foreign students attending the

28

                              4

1  institution, and that a "Certificate of Eligibility for Non-
2  immigrant (F-1) Student Status - For Academic and Language
3  Students" (commonly referred to as a "Form I-20") has been
4  properly issued to each student.  A DHS-approved educational
5  institution is also required to verify that the foreign students
6  are attending the institution for full-time study, and have the
7  financial ability to remain in the United States and pay the
8  applicable tuition.  Individual students who have been accepted
9  at a DHS-approved educational institution and who have received
10  the Form I-20 from that educational institution are eligible to
11  receive an F-1 visa to enter and remain in the United States.
12  Once a student completes his or her studies at a DHS-approved
13  educational institution, the visa must be terminated and the
14  student must return to his or her country of origin.

15       10.  The Student Exchange Visitors Information System
16  ("SEVIS") is a computer database required to be used by
17  educational institutions that admit foreign students to maintain
18  up-to-date and accurate records regarding the foreign students
19  attending the school, including when the students have completed
20  their studies so their F-1 immigration status can be terminated.
21  This computer database is the method by which immigration
22  officials are able to determine which foreign individuals are in
23  the United States attending school.

24       11.  Concord and ICES were approved by DHS as educational
25  institutions that were authorized to issue Form I-20s.

26  B.   **THE FRAUDULENT SCHEME**

27       12.  Beginning on an unknown date but believed to be in or

28

EXHIBIT E
Page 203

1  about 1999, and continuing to on or about April 9, 2008, in Los

2  Angeles County, Zaman, and others, knowingly and with intent to

3  defraud, devised, participated in, and executed a scheme to

4  defraud and to obtain money and property by means of false and

5  fraudulent material pretenses and representations, and the

6  concealment of material facts.  It is estimated that the

7  fraudulent student visa scheme generated at least $1.6 million

8  per year.

9      13.  The fraudulent scheme operated in the following manner:

10     a.  Zaman opened and operated "English as a second

11  language schools" in the Los Angeles area, such as Concord and

12  ICES.

13     b.  Zaman accepted applications from individuals who

14  were living in foreign countries and sought lawful admission into

15  the United States and individuals living in the United States who

16  sought legal immigration status.

17     c.  After accepting individuals for admission into one

18  of the schools, Zaman and others would sign and provide the Form

19  I-20 to the individual which would then be used to obtain a F-1

20  Visa for authorized admission into, or the authority to remain

21  in, the United States.

22     d.  Zaman and others would enter information into

23  SEVIS indicating that the individual accepted for admission into

24  one of the schools was actually attending Concord and/or ICES

25  when in fact those individuals were not attending classes at

26  either school.

27     e.  Zaman and others were aware that the purported

28

6

1  students did not in fact attend Concord and/or ICES, and that the

2  information being input into SEVIS was false.  In fact, as Zaman

3  well knew, many of the purported students lived outside the State

4  of California, and actually resided in states such as Florida,

5  Illinois, Louisiana, Massachusetts, New Jersey, and Virginia.

6          f.    Zaman and others would mail documentation to

7  students residing outside the State of California to support the

8  claim that they were attending Concord and/or ICES.  These

9  materials included student identification cards, Form I-20s, and

10  other documents.

11          g.    Zaman and others would also e-mail the purported

12  students and give them assurances that they were registered in

13  SEVIS and properly documented and/or that they could be

14  registered as a student and not attend classes.

15          h.    Zaman and others received payments from the

16  purported students as "tuition" in exchange for being listed as a

17  current student in the SEVIS database.

18          i.    Since the inception of the SEVIS database, over

19  5,000 individuals have been registered as foreign students

20  attending Concord or ICES.

21      14.    In exchange for payment, Zaman and others used Concord

22  and ICES as vehicles through which they have caused the

23  fraudulent issuance of non-immigrant visas for ineligible foreign

24  citizens, and kept ineligible students enrolled for extended

25  periods of time, even though they were not attending classes.

26  After receiving payments from the purported students, Zaman and

27  others would deposit the money into bank accounts held primarily

28

7

1  in the names of Zaman's family members.   Once deposited into an
2  account, the money obtained from the fraudulent scheme would be
3  used to support the activities of Concord or ICES, transferred
4  into other bank accounts to conceal the source of the money, or
5  used to purchase real estate or property in the name of one of
6  Zaman's family members, among others.

7  C.   **DETAILS OF THE STUDENT VISA FRAUD**

8       15.   In January, 2002, Police Officers from the Los Angeles
9  Police Department ("LAPD") and Special Agents of ICE executed a
10 search warrant at Concord at the Wilshire Boulevard address.
11 Among the items seized were:   blank INS letterhead stationary,
12 blank California Federal Bank (CFB) letterhead stationary, and
13 partially blank Bank of America letterhead stationary.   These
14 materials were indicia of student visa fraud because F-1 students
15 have to establish that while in the United States they have the
16 financial resources required to pay for their education.
17 Following the search, agents subpoenaed information concerning
18 bank accounts purportedly held by students (discovered during the
19 Concord search) and learned that the bank accounts listed in the
20 student files were not in fact associated with the students
21 named.

22      16.   During the execution of the search warrant, LAPD
23 Officers and ICE agents encountered Zaman, who stated that he
24 currently had 100-150 students attending Concord.   Zaman further
25 explained that Concord had five classrooms and a computer room.
26 Agents later learned that many more individuals were registered
27 as students at the school, but the school had very limited space

28

8

EXHIBIT E
Page 206

for students to attend.

17.   LAPD discovered that several Russian and Latvian prostitutes that had obtained F-1 visas by claiming to be attending Concord.

18.   All of them were enrolled at Concord and had approved Form I-20s signed by Zaman.   The prostitutes did not attend classes at Concord but made payments to Zaman to maintain their student visas in the United States.

19.   On or about July 30, 2007, a confidential informant ("W-1"), who was located in New York, placed a consensually-monitored telephone call to Zaman at 213-381-6644, the telephone number subscribed to Behzad Zaman, dba Concord.   The following is a summary of this consensually monitored call:

a.   W-1 informed Zaman that he/she was a foreign citizen that entered the United States; that his/her current visa to the United States had expired; that he/she was present in the United States beyond the authorized period of time and was in violation of United States immigration law; and that he/she wanted to enroll at Concord to obtain a valid immigration status in the United States.

b.   W-1 informed Zaman that he/she did not want to actually attend Concord (as required by law), but solely wanted to be enrolled at Concord to maintain valid immigration status in the United States.   In response, Zaman told W-1 that he would assist W-1.

c.   Zaman instructed W-1 that he/she would need to travel to Uzbekistan, where an individual identified only as

9

1   "Lola" would assist W-1 in obtaining a new student visa.

2          d.   Zaman told W-1 that, in exchange for school

3   processing fees and valid Immigration documents, W-1 would pay

4   $3,600 to Zaman.  Subsequently, from New York, ICE shipped a

5   $3,600 bank check addressed to Zaman at Concord at the Wilshire

6   Boulevard address.

7      20.  On or about August 30, 2007, ICE agents in New York

8   received the documents mailed to W-1 by Zaman.  These documents

9   were inside an envelope mailed from Zaman at Concord.  The

10  following is a summary of the documents Zaman mailed to W-1:

11         a.   A brochure for Concord and other miscellaneous

12  Concord documents regarding tuition, dormitory services, airport

13  pickup, and class schedules;

14         b.   An acceptance letter, dated August 28, 2007, from

15  Concord;

16         c.   A "Certificate of Eligibility for Non-Immigrant

17  (F-1) Student Status – For Academic and Language Students" (Form

18  "I-20"), signed by Zaman, noting W-1's eligibility for enrollment

19  at Concord; and,

20         d.   A note informing W-1 to contact a "Lola Aripova"

21  in Tashkent (Uzbekistan) and providing contact numbers for "Lola

22  Aripova."

23     21.  On or about October 29, 2007, W-1 placed a

24  consensually-monitored telephone call to Zaman at 213-381-6644,

25  Concord's registered telephone number.  The following is a

26  summary of the call:

27         a.   W-1 informed Zaman that he/she had traveled to

28

10

EXHIBIT E
Page 208

1  Uzbekistan and returned to the United States without assistance
2  from "Lola Aripova;"
3          b.    Zaman then requested that W-1 provide his/her
4  passport, visa, I-94 document, I-20 document, address in New
5  York, telephone number, and email address;
6          c.    W-1 agreed to pay $1,992 to Zaman in exchange for
7  a valid student status at Concord until February 19, 2008.
8  Subsequently, ICE New York obtained and mailed $1,992 in United
9  States Postal Money Orders addressed to Zaman at Concord;
10         d.    Zaman stated that he would contact W-1 in February
11 to see if W-1 wanted an extension on his/her student immigration
12 status.  In addition, Zaman stated that if W-1 decided to extend
13 his/her student immigration status, Zaman would discount the fee
14 and W-1 would be eligible for a two-year extension.
15         e.    Zaman informed W-1 that he could assist W-1's
16 transfer to another educational institution.
17     22.  On or about November 13, 2007, ICE agents in New York
18 received correspondence from Concord addressed to W-1.  The
19 correspondence included a fee receipt, dated October 29, 2007,
20 for $1,992 and reflected that W-1's tuition was paid until
21 February 19, 2008.
22     23.  On or about February 21, 2008, W-1 placed a
23 consensually-monitored telephone call to 213-381-6644, the listed
24 telephone number for Concord.  During this call, Zaman agreed
25 that, in exchange for $1,692, Zaman would extend W-1's student
26 immigration status for an additional four months.
27     24.  On or about December 20, 2007, ICE New York contacted
28

                                11

1    Witness 2 ("W-2").  The following is a summary of the contact:

2           a.   W-2 stated that he/she currently resided in the

3    New York, NY metropolitan area and that he/she was currently

4    enrolled at Concord.

5           b.   W-2 stated that a friend informed him/her that W-2

6    could pay the owner of the Concord and would not have to attend

7    the required classes.

8           c.   In January 2007, W-2 contacted Zaman, at 213-381-

9    6644, the listed telephone number for Concord.  During this call,

10   the W-2 informed Zaman that he/she wanted to enroll at Concord to

11   obtain a valid immigration status in the United States, and that

12   he/she did not want to attend class.

13          d.   Also, during this call, Zaman requested that W-2

14   provide a transfer form, copies of his/her passport and visa, and

15   a fictitious California address so it appeared that he/she was

16   residing in the Los Angeles, California area.

17          e.   In addition, Zaman told W-2 that, in exchange for

18   $1,500, Zaman would enroll W-2 at Concord.  Subsequently, W-2

19   paid $1,500 to Zaman and received a fee receipt, dated January

20   30, 2007, from Zaman that indicated W-2 had paid for tuition at

21   Concord for 24 weeks.

22      25.  In July 2007, from New York, NY, W-2 sent an additional

23   $1,400 to Zaman, in the Central District of California, and

24   received a fee receipt via email indicating that W-2 had paid

25   tuition for an additional 24 weeks.  This emailed fee receipt was

26   provided to ICE New York.

27      26.  On or about December 20, 2007, W-2 placed a

28

12

1  consensually-monitored telephone call to Zaman at 213-381-6644,

2  Concord's listed telephone number.  During this call, W-2 and

3  Zaman agreed to extend the W-2's student immigration status at

4  Concord in exchange for $1,400.  Subsequently, ICE agents in New

5  York mailed $1,400 in United States Postal Money Orders addressed

6  to Zaman at Concord.

7       27.  On or about January 28, 2008, W-2 received

8  correspondence from Concord.  The correspondence was mailed to W-

9  2 at his/her New York address inside an envelope labeled,

10  "Extension I-20 Form & Acceptance Letter."  The following is a

11  summary of the correspondence:

12          a.  A fee receipt, dated January 16, 2008, for $1,400;

13          b.  A Concord extension letter, dated December 20,

14  2007 and signed by Zaman, indicating that W-2 had student

15  immigration status; and,

16          c.  A "Certificate of Eligibility for Non-immigrant

17  (F-1) Student Status – For Academic and Language Students" (Form

18  I-20) "Application . . ." (Form I-20) dated December 20, 2007 and

19  signed by Zaman.

20       28.  On February 21, 2008, Witness 3 ("W-3") informed agents

21  that, on or about May 20, 2001, he/she entered the U.S. through

22  Los Angeles, California, as an F-1 non-immigrant student enrolled

23  to attend Concord.  W-3 stated that he/she paid approximately

24  $5,000 for the initial enrollment at Concord and approximately

25  $500 per month thereafter.  W-3 stated that he/she attended

26  Concord for a short period of time (approximately two months)

27  before informing Zaman that he/she no longer wanted to actually

28

13

1   attend Concord.   In response, Zaman advised W-3 that he/she did
2   not have to attend classes at Concord if W-3 agreed to continue
3   to pay him approximately $300 per month to maintain his/her F-1
4   student immigration status.

5       29.   W-3 stated that, for approximately three years, he/she
6   continued to pay Zaman the agreed fee of approximately $300 per
7   month to maintain his/her non-immigrant F-1 student visa even
8   though W-3 no longer attended Concord.   W-3 stated that during
9   the three-year period, Zaman required W-3 to contact him weekly
10  via telephone at 213-381-6644, the listed telephone number for
11  Concord.

12      30.   W-3 stated that after W-3 stopped paying Zaman, Zaman
13  contacted W-3 and W-3's family regarding the money Zaman wanted
14  in order to maintain W-3's F-1 student immigration status.

15      31.   A check of SEVIS indicated that W-3 was enrolled as a
16  student at Concord from August 13, 2003 to February 13, 2005.   In
17  addition, unbeknownst to W-3, he/she had been transferred from
18  Concord to ICES on March 17, 2005 until August 23, 2006.

19      32.   On or about February 5, 2008, a search of SEVIS
20  revealed that 321 students were listed as actively attending
21  Concord and 723 were listed as actively attending ICES, for a
22  total of 1,044.   These numbers far exceed the seating capacity
23  for both schools.   Based on surveillance of the Concord and ICES
24  facilities by ICE Los Angeles Special Agents, it is estimated
25  that each school has approximately 5-7 classrooms.   Each
26  classroom is estimated to have the capacity for 15 to 20
27  students.

28

14

EXHIBIT E
Page 212

33. Witness 4 ("W-4") informed agents that he/she paid $2,000 dollars to an "Education Agent" in her country to attend Concord. The $2,000 was for his/her fees at Concord. W-4 said that when he/she arrived in the United States he/she went to see Zaman at his office at Concord. When he/she met Zaman, Zaman asked him/her to pay $988 in addition to the $2,000 that he/she had already paid. This total amount was to cover his/her tuition for six months of study at Concord.

34. Zaman asked W-4 if he/she wanted to attend school and told W-4 that if he/she did not want to attend school it would cost him/her $1,500 for six months. W-4 stated that he/she wanted to attend for the first six months for which he/she had paid. However, Zaman told W-4 that he/she could not attend Concord. W-4 stated that Zaman gave him/her a discounted fee of $1,450 for another six months. He/she paid the $1,450 in cash in person at Zaman's office at Concord.

35. W-4 received a letter from Concord via mail notifying W-4 that his/her I-20 was expiring. W-4 contacted Zaman who informed him/her that the fee had increased to $1,800 for the next six months keeping W-4 enrolled through June 2008. W-4 paid an additional $1,800 by personal check. After paying the $1,800, W-4 received a new Form I-20 from Concord. W-4 has receipts for all of the amounts paid. A check of the SEVIS system indicated that W-4 is still active at Concord. By cross-referencing SEVIS records, agents determined that forty students were transferred from Concord to ICES and from ICES to Concord.

D.   INTERVIEWS OF PURPORTED STUDENTS

15

36.   The following are indicative of the various methods used by Zaman to obtain false F-1 status for purported students.

Witness "DY"

37.   On or about February 13, 2008, witness "DY" who was entering Los Angeles International Airport on a F-1 student visa to attend ICES told agents the following:

a.   His main purpose was to attend CAS Academy, Inc ("CAS") which offers a Certified Public Accountant Certification at the same location as International American University ("IAU").

b.   DY had an acceptance letter from IAU dated January 14, 2008, along with his acceptance letter from ICES dated January 2, 2008.

c.   DY did not know his starting date or the specific dates that he would be attending ICES, but DY was planning to attend ICES three days a week for approximately three hours a day.

d.   DY planned to attend CAS five days a week for approximately three hours each day.  DY stated that he paid CAS approximately $20,000, of which $5,000 was intended for ICES.  DY had an e-mail printout of the dormitory address for CAS in Palmdale, CA.

38.   A check of the SEVIS database revealed that CAS is not a certified school for the admission of F-1 students.  The F-1 visa issued to DY was for the purpose of attending ICES. However, DY did not intend to attend ICES full-time and, as a result, the visa was fraudulently issued.  Furthermore, according

16

EXHIBIT E
Page 214

1  to the State Department's Consular Consolidated Database ("CCD"),

2  which provides a summary of the Non-Immigrant Visa Applicant

3  detail and the United States Department of State Non-Immigrant

4  Visa Application, DY obtained an F-1 Visa by indicating that he

5  was to attend ICES.

6  Witness "CN"

7      39.  On January 18, 2008, witness "CN", a citizen and

8  national of Thailand, attempted to enter the United States

9  through the Seattle Tacoma International Airport as a B1/B2 (Non-

10 immigrant visitor for pleasure) and told Customs and Border

11 Patrol Officers that she had been a student in the United States

12 for five years.  Records checks indicated that CN was enrolled at

13 ICES from November 2005 to November 2007.  CN stated that she had

14 worked in different restaurant jobs in Washington State from

15 approximately 2005 to July 2007.

16     40.  CN stated that ICES was not a real school and that she

17 paid KC International travel agency $2,000 a year to get her a

18 valid Form I-20 from ICES without having to attend classes. CN

19 stated that she paid a total of $4,000 to KC International to

20 maintain her active student status in SEVIS.

21 Witness "IW"

22     41.  On or about April 4, 2008, witness "IW", an individual

23 Concord claimed was a student at its institution, told ICE agents

24 that he entered the United States on November 20, 2005 as an F-1

25 student to attend Concord.  IW stated that his uncle paid a

26 travel agency in Indonesia approximately $1,000 to obtain a Form

27 I-20 from Concord.  IW met with Zaman the day after his arrival

28

17

1  into Los Angeles, at the Wilshire Boulevard facility, and paid
2  Zaman an additional $1,500 in cash for tuition fees for the next
3  2 months (for the time period of December 2005 and January 2006).
4  Zaman told IW he did not have to come to classes if he had other
5  things to do.  Zaman stated that as long as IW paid Zaman
6  tuition, Zaman would keep IW in F-1 student status.

7       42.  Zaman also told IW that if IW did not pay Zaman, Zaman
8  would report IW to Immigration.  IW stated that he paid $500 in
9  cash to Zaman for tuition fees for February 2006 and an
10 additional $500 in cash for March 2006.

11      43.  IW stated that he attended Concord for approximately
12 four months, and attending classes two to three times a week from
13 9 a.m. to 1 p.m.  IW stated that he stopped attending Concord in
14 March 2006 because he moved to Lancaster, California, and could
15 not afford to continue paying Zaman.

16      44.  IW stated that he received several phone calls from
17 Concord requesting tuition payment.  A check of the SEVIS
18 database showed that Concord reported that IW completed his
19 studies at Concord on September 27, 2006.  Furthermore, Concord
20 reported that IW was a full-time student at Concord for the
21 period November 2005 through to September 2006.  To be a full-
22 time student and eligible for maintaining F-1 status, the student
23 must be enrolled for a minimum of 18 hours per week, not the 8 to
24 12 hours IW stated he attended the school.

25 / / /

26

27 Witness "SHT"

28

18

45.  On or about April 4, 2008, witness "SHT",  an individual Concord listed as a student at its institution, told ICE agents that she entered the United States on a non-immigrant F-1 student visa on September 4, 2005.  The visa was issued for SHT to attend Concord.  SHT paid an agent in Indonesia $2,200 for her ticket, visa, and tuition for 3 months.  SHT stated that she went to Concord shortly after arriving in the United States and spoke to Zaman in his office.  Zaman told her that she could just pay and not attend classes and did not need to go to school and he (Zaman) would keep her enrolled.  Zaman informed SHT that she had to pay or he (Zaman) would report SHT to immigration.

46.  At some later point, Zaman called SHT and informed her that her tuition payment was due.  SHT paid $650 (part cash and part check made payable to Zaman) for 6 months of tuition.  When the 6-month period had expired, Zaman called SHT again and told her that her tuition was due and the fee was approximately $700, which she paid in cash.  After one year, Zaman contacted SHT for additional payments.  At that time, SHT told Zaman that she did not want to pay any more.  Zaman told SHT that he  would report her to Immigration.  As a result, SHT changed her cellular telephone number and has not had any further contact with Zaman. SHT never attended Concord as a student.

47.  A check of the SEVIS database revealed that Concord reported that SHT completed her studies at Concord on October 12, 2006.  Furthermore, Concord reported that SHT was a full-time student at Concord for the period of October 2005 through to October 2006.

19

Witness "PJ"

48.   On or about November 25, 2003, "PJ" told agents that she arrived in the United States in 1998 as an F-1 student to study English at the University of California Los Angeles.  She attended the University of California Los Angeles ("UCLA") for four days and remained in the United States illegally under her student status and not attending school.

49.   In 2000, PJ sought to obtain F-1 student status and was referred to a travel agency named "BJP travel/KC International" that would be able to obtain an I-20 for her without having to pay tuition or having to attend the school.  A representative of BJP travel/KC International told PJ that she would not have to study or attend Concord.  Further, the representative from KC international stated that he was good friends with Zaman, who was identified as the president of Concord.

50.   PJ stated that she paid $800.00 initially and $700.00 to BJP travel when she received her I-20 from Concord.  PJ stated that she never attended or enrolled at Concord.

E.   ARREST AND SEIZURES

51.   On April 9, 2008, Zaman was arrested and on April 15, 2008, he was charged in a First Superseding Indictment with violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1546(a) (Fraud and Misuse of Visas, Permits, and Other Documents), 18 U.S.C. § 1956(a) and (h)(Money Laundering and Conspiracy), 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), and 18 U.S.C. § 2 (Aiding and Abetting).  On April 9, 2008, ICE agents executed search warrants

EXHIBIT E
Page 218

1  at Concord, ICES and Zaman's residence, and seized a portion of
2  the defendants.

3       52.  At Concord, agents seized defendant $61,098.00 in money
4  orders, $12,850 in travelers checks, and $17,741.00 in U.S.
5  currency.  Defendant $208,220.00 in U.S. currency was seized from
6  the Zaman residence.  After the search was completed, agents
7  learned that Neda Zaman was attempting to access a safe deposit
8  box at California Bank & Trust.  Agents obtained a federal search
9  warrant for the box and seized the defendant $1,031,900.00 in
10 U.S. currency on April 14, 2008.

11      53.  A review of financial records seized during the
12 searches and subpoenaed bank records relating to Zaman, Bahman
13 Zaman (believed to be the brother of Behzad Zaman), Neda, and
14 others, revealed the following:

15                **FIRST BANK ACCOUNT NO. ****2801**

16      a.   Center Bank account no. 850-0401 ("Center Bank
17 acct. no. ***0401") records, a personal money market account held
18 in the name of Bahman Zaman, indicates that Bahman Zaman
19 ("Bahman") does not use this account, and that the power of
20 attorney for this account is held by Neda, Zaman's wife.

21      b.   Zaman and Neda have been depositing checks and
22 monetary instruments intended for Concord or ICES into Bahman's
23 personal money market account in order to launder the proceeds
24 from their student-visa-fraud activities as evidenced by the
25 following transactions:

26           i.   Between approximately November 15, 2005 and
27           September 30, 2006, 128 checks and other monetary

28

                                21

1    instruments, such as money orders and traveler's
2    checks, were deposited into the account.
3         ii.   The majority of the checks and money orders
4    were made payable to "Ben Zaman" or "B. Zaman."  Most
5    of the checks bearing a memo section had at least one
6    of the following notations on the document: "tuition,"
7    "Concord," "Application," "Concord English Language
8    (unintelligible)," "Concord Fee," "Fee," "School,"
9    "School Tuition," "Student Fee," "Concord ELC," or
10   "School of English."
11        c.   The memo section on some checks included a name and
12   a four-digit number or only a four-digit number which referred to
13   a "student number" associated with Concord or ICES records.
14        d.   Some of the money orders included the address of
15   the Concord English Language School, 3435 Wilshire Boulevard,
16   Suite 152, Los Angeles, CA.
17        e.   The overwhelming majority of deposited checks and
18   monetary instruments were endorsed by Behzad Zaman.
19        f.   All of the deposited checks were endorsed by
20   either Behzad Zaman or Neda Zaman who were authorized
21   signatories.  Many of the checks paid from the account appear to
22   have been for Zaman's personal expenses.
23        g.   At least $80,000 in student visa fraud proceeds
24   from Center Bank acct. no. ****0401 were deposited in the form of
25   checks into First Bank and Trust acct. no. ******2801 in the name
26   of Black and White Rent A Car.  On April 21, 2008, agents seized
27   the defendant $5,378.26 in U.S. currency from this account
28

                                22

1   pursuant to a federal seizure warrant.

2   **FIRST BANK ACCOUNT NO. ******1811**

3   h.   Center Bank acct. no. ****0401 was closed on March

4   28, 2008.  Records seized from Zaman's control during the

5   execution of the search warrant included a purchaser's copy of a

6   cashier's check drawn on the Center Bank account in the amount of

7   $112,568.82 dated March 28, 2008 which was signed for by Neda.

8   Bahman Zaman opened First Bank acct. no. ******1811 in his own

9   name with a deposit of $112,586.82 on the same day.   The

10  government alleges that the funds used to open First Bank acct.

11  no. *****1811 were student visa fraud proceeds that had been

12  withdrawn from Center Bank acct. no. ******0401 in the form of a

13  cashier's check.   On April 21, 2008, agents seized the defendant

14  $112,617.54 in U.S. currency from First Bank account no.

15  ******0401 pursuant to a federal seizure warrant.

16  **CENTER BANK ACCOUNT NO. ****1017**

17  i.   Center Bank account no. ****1017, held in the name

18  of Behzad Zaman and opened on July 7, 2003, is also alleged to

19  have received funds from the student visa fraud scheme.   Between

20  July 22, 2003 and July 13, 2006, this Center Bank account

21  received twenty-eight (28) wire transfers from the British Virgin

22  Islands, Latvia, Uzbekistan and Kazakhstan, a few of the

23  countries from which many Concord/ICES foreign students

24  originated.   Furthermore, funds from this account were then used

25  to pay Zaman's personal or investment expenses.   For example, a

26  number of checks were issued to pay the Los Angeles County Tax

27  Collector and a September 4, 2003, check to Billie Davis Escrow

28

23

1  was used to refinance Behzad and Neda Zaman's residence located

2  in Beverly Hills, California.   On April 21, 2008, agents seized

3  the defendant $16,012.64 in U.S. currency from this account

4  pursuant to a federal seizure warrant.

5  **BANK OF AMERICA ACCOUNT NUMBERS *****1069 AND *****2201**

6       j.   Records for Bank of America ("BofA") account

7  numbers *****1069 and *****2201 show that BofA Account No.

8  *****1069 was opened on June 15, 2005 and BofA Account No.

9  *****2201 opened on January 30, 2001.   Both accounts are held in

10  the name Concord Education Group, Inc. ("Concord") with Neda

11  Zaman as the President of the Corporation and Behzad Zaman as a

12  signer.

13       k.   Between March 8, 2006 and July 30, 2007, 166 wire

14  transfers totaling $520,102.48 were deposited into BofA acct. no.

15  *****1069.   Examples of the wire transfers are as follows:

16  / / /

17  / / /

18  / / /

19

20

21

22

23

24

25

26

27

28

24

| DATE | AMOUNT | ORIGINATOR INFO | COMMENTS |
|---|---|---|---|
| 03/08/06 | $2,527.00 | Jakarta | "Tuition fee payment for TJU LIE SHIANTJANG MARIJONO" |
| 04/10/06 | $30,374.00 | Succeo Co Ltd Osaka Japan | "Pls pay in full. If any chg. Pls claim us directly. Student ID no. 8205, 8204, 8202, 8203, 8348, 8347" |
| 12/29/06 | $29,207.70 | Education to the Future | "12 students 6 months tuition fee" |
| 04/16/07 | $1,000.00 | Maya Sari, Jakarta | "To Ben Zaman pymnt tuition fe (sic) NG Windra P. 023760 SEVIS No. N.0003959377" |
| 06/07/07 | $1,494.00 | New Link International Co. Ltd | "Tuition fee B. Bayarsai Khan/9534/" |

1.   Debits to the account were as follows:

      i.   $4,150 and $6,015 to the law offices of Neda
A. Zaman;

      ii.  $4,900, $4000 and $4,000 to Bank of America
for taxes;

      iii. $6,669.90, $6,669.90, $6,669.90 to Equitable
Bld. (memo: for Rent Suite #152);

      iv.  $5,100, $3,650, $8,740 to Evernet Corp (memo:
refund Dormitory).  These checks were
deposited into BofA account number ******2605
in the name of Evernet Corp, dba Wilshire
Regency Hotel; and

      v.   $3,348.75, $3,348.75, $3,348.75, $3,348.75 to

25

Behzad Zaman (memo: payroll).

m.    Between March 8, 2006 and July 25, 2007, approximately $1,003,084.56 was deposited into BofA acct. no. *****1069 from external sources and approximately $774,977.70 was debited.   On April 22, 2008, agents seized the $68,908.70 from this account pursuant to a federal seizure warrant.

n.    Between March 8, 2006 and July 25, 2007, there was only one transaction in BofA acct. no. ******2201.   On April 6, 2007, $100,000 was transferred from BofA Acct. No. *****1069 into this account.   Only $5,880.07 was deposited into BofA acct. no. *****2201 from external sources and no funds were withdrawn.   On April 22, 2008, agents seized  $92,599.06 from this account.

**BANK OF AMERICA ACCOUNT NUMBER ******3132**

o.    BofA acct. no. ******3132 was opened on April 4, 1991, and is held in the name Bahman Zaman.   Between June 30, 2006 and July 6, 2007, there were 23 deposits in amounts ranging from $3,758.20 to $38,638.00, for a total of $244,123.64.   All of these deposits consisted of checks made payable to "Ben Zaman" and appear to have been for tuition.   On April 22, 2008, agents seized $66,612.78 from this account pursuant to a federal seizure warrant.

p.    Between June 29, 2006 and May 25, 2007, there were 6 checks written on the account in amounts ranging from $14,000.00 to $80,000.00, for a total of $254,000.00.   Two $50,000 checks were made payable to "WAMU" for Loan 0762895423.   Two $30,000 checks were made payable to Zaman Plaza LLC for a loan and deposited into a California Bank and Trust account

26

1  number ******6461 held in the name of Zaman Plaza LLC.

2              **CALIFORNIA BANK AND TRUST ACCOUNT NUMBER ******6461**

3              q.   As set forth above, at least $60,000 from BofA

4  acct. no. ******3132, which contained fraud proceeds, were paid

5  into California Bank and Trust acct. no. ******6461 in the name

6  of Zaman Plaza LLC.   Zaman and Behrouz Zaman own Zaman Plaza LLC.

7  On April 21, 2008, agents seized defendant $1,651.73 in U.S.

8  currency from the California Bank and Trust account pursuant to a

9  federal seizure warrant.

10             **BANK OF AMERICA ACCOUNT NUMBER ******9091**

11             r.   BofA acct. no. ******9091 was opened on January 2,

12 1992 and held in the names of Jinette M. Zaman and Behrouz Zaman.

13 Between June 7, 2006 and July 18, 2007, 26 deposits in amounts

14 ranging from $5,000 to $20,000 were made into the account, for a

15 total of $281,000.   These deposits were made in the form of

16 large, even-dollar amount checks.   One of the checks in the

17 amount of $15,000, was from California Bank and Trust acct. no.

18 ******6461 in the name of Zaman Plaza, LLC which, as stated

19 above, received student visa fraud proceeds.   On April 22, 2008,

20 agents seized $26,510.35 from this account pursuant to a federal

21 seizure warrant.

22             **FIRST BANK ACCOUNT NUMBER ******1837**

23             s.   Among documents seized from Zaman's vehicle were

24 records regarding First Bank Account No. ******7299 in the name

25 of Jila Zaman.   A folder was identified by a First Bank business

26 card which was stapled to it.   Among the items in the folder was

27 a deposit book with carbon receipts for First Bank Account No.

28

27

EXHIBIT E
Page 225

1  xxx7299/Jila Zaman.   The following are four (4) examples of

2  entries:

3                    (1) 11-23-01
                     Check 90-4182    $12,192.05
4                    Check 90-4182    $990.00
                     Total            $13,182.05

5

6                    (2) 2-8-02
                     Check

7

8                    (3) 11-26-02
                     Check 882-715 $500
                     Check 882-714 $500
9                    Check 882-713 $500
                     Check 698-482 $100
10                   Check 228-006 $100
                     Check 228-007 $100
11                   Check 604-680 $100
                     Check 604-678 $100
12                   Check 604-679 $100
                     Check 604-677 $100
13                   Check 604-676 $100
                     Check 604-681 $100
14                   Check 031-851 $100
                     Check 031-854 $100
15                   Check 031-853 $100
                     Check 031-852 $100
16                   Check 510-405 $100
                     Check 228-005 $100
17                   Check 228-008 $100
                     Check 909-475 $100
18                   Check 909-479 $100
                     Check 909-478 $100
19                   Check 909-477 $100
                     Check 909-476 $100
20                   Check 564-263 $100
                     Check 564-264 $100
21                   Check 564-262 $100
                     Check 8000.0011 $100
22                   Total            $4000

23                   (4) 2-8-02
                     Check 11-49-7   $386,482.34
24                   Total           $386,482.34

25          t.   Thirty-three such receipt carbons were found in

26  this book with similar entries totaling approximately

27  $679,052.39.   The majority of the deposits were similar to the

28

28

1  second example with numerous sequentially-ordered "check

2  numbers."  Based on an examination of other accounts into which

3  "Concord" funds have been deposited, the sequentially-ordered

4  numbers in the "check" column appear to be money order numbers.

5  The government alleges that First Bank acct. no. ******7299

6  received proceeds from the student visa fraud scheme.

7          u.    Additional documents found in Zaman's vehicle

8  showed that on March 28, 2008, First Bank acct. no. ******7299

9  was closed and $12,803.62 was transferred from the account to

10  First Bank account no. ******1837 in the name of Jila Zaman.  On

11  April 21, 2008 agents seized $14,308.95 from First Bank acct. no.

12  ******1837 pursuant to a federal seizure warrant.

13                      **FIRST CAUSE OF ACTION**

14      54.  Based on the above, plaintiff alleges that the

15  defendants are subject to forfeiture pursuant to 18 U.S.C. §

16  981(a)(1)(C) on the ground that they constitute or were derived

17  from proceeds traceable to violations of 18 U.S.C. § 1546(a)

18  (fraud and misuse of visas), a specified unlawful activity under

19  18 U.S.C. §§ 1956(a)(7)(A) and 1961(1).

20                     **SECOND CAUSE OF ACTION**

21      55.  Based on the above, plaintiff alleges that the

22  defendants are subject to forfeiture pursuant to 18 U.S.C. §

23  981(a)(1)(C) on the ground that they constitute or were derived

24  from proceeds traceable to violations of 18 U.S.C. §§ 1341 (mail

25  fraud) and 1343 (wire fraud), specified unlawful activities under

26  18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).

27  / / /

28

                                   29

1

### THIRD CAUSE OF ACTION

2    56.   Based on the above, plaintiff alleges that the

3    defendants are subject to forfeiture pursuant to 18 U.S.C. §

4    981(a)(1)(A) on the ground that they were property involved in

5    transactions or attempted transactions in violation of 18 U.S.C.

6    § 1956(a), or are traceable to such property.

7

### FOURTH CAUSE OF ACTION

8    57.   Based on the above, plaintiff alleges that the

9    defendants are subject to forfeiture pursuant to 18 U.S.C. §

10   981(a)(1)(A) on the ground that they were property involved in

11   transactions or attempted transactions in violation of 18 U.S.C.

12   § 1956(a)(1)(B)(i), or are traceable to such property.

13

### FIFTH CAUSE OF ACTION

14   58.   Based on the above, plaintiff alleges that the

15   defendants are subject to forfeiture pursuant to 18 U.S.C. §

16   981(a)(1)(A) on the ground that they were property involved in

17   transactions or attempted transactions in violation of 18 U.S.C.

18   § 1957, or are traceable to such property.

19   WHEREFORE, the United States prays that:

20        a.   due process issue to enforce the forfeiture of the

21   defendants;

22        b.   due notice be given to all interested parties to

23   appear and show cause why forfeiture should be not be

24   decreed;

25        c.   that this court decree forfeiture of the

26   defendants to the United States of America for disposition

27   according to law; and,

28

EXHIBIT E
Page 228

1          d.    for such other and further relief as this court

2     may deem just and proper, together with the costs and

3     disbursements of this action.

4  DATED: September 16, 2008        THOMAS P. O'BRIEN
                                    United States Attorney
5                                   CHRISTINE C. EWELL
                                    Assistant United States Attorney
6                                   Chief, Criminal Division
                                    STEVEN R. WELK
7                                   Assistant United States Attorney
                                    Chief, Asset Forfeiture Section
8

9                                   _____
                                    MICHELE C. MARCHAND
10                                  Assistant United States Attorney

11                                  Attorneys for Plaintiff
                                    United States of America
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                31

<u>VERIFICATION</u>

I, Kara S. Careaga, hereby declare that:

1.    I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement.  I am the case agent for the civil forfeiture action entitled <u>United States v. $61,098.00 in Money Orders, et al.</u>

2.    I have read the above Complaint for Forfeiture and know its contents.  It is based upon my own personal knowledge and reports provided to me by other agents.

3.    Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 15, 2008 in Los Angeles, California.


_____
KARA S. CAREAGA

32

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Florence-Marie Cooper and the assigned discovery Magistrate Judge is Carla Woehrle.

The case number on all documents filed with the Court should read as follows:

## CV08- 6066 FMC (CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | $61,098.00 IN MONEY ORDERS; $12,850 IN TRAVELERS CHECKS; $17,741.00 IN U.S. CURRENCY; $208,220.00 IN U.S. CURRENCY; $1,031,900.00 IN U.S. CURRENCY; $404,600.01 IN BANK FUNDS |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| THOMAS P. O'BRIEN, U.S. Attorney,  MICHELE C. MARCHAND, AUSA United States Attorney's Office, California Bar No.  93390 312 N. Spring St., 14th Floor, Los Angeles, CA 90012   (213) 894-2727 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. § 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☑ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:    Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|

CV 08-06066

EXHIBIT E
Page 232

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s):  CR 08-427(A)-DSF

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　 ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　 ☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　 ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑　Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐　Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
　　**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Michele C. Marchand_　　Date  9/16/08

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

EXHIBIT E
Page 233

# **Exhibit F**

1  STEPHANIE YONEKURA
   Acting United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   STEVEN R. WELK
4  Assistant United States Attorney
   Chief, Asset Forfeiture Section
5  JOHN J. KUCERA, CSB 274184
   Assistant United States Attorney
6  Asset Forfeiture Section
7      Federal Courthouse, 14th Floor
8      312 North Spring Street
       Los Angeles, California 90012
9      Telephone:  (213) 894-3391
       Facsimile:  (213) 894-7177
10     E-mail:  John.Kucera@usdoj.gov

11
   Attorneys for Plaintiff
12 UNITED STATES OF AMERICA

13

14              UNITED STATES DISTRICT COURT

15         FOR THE CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17 UNITED STATES OF AMERICA,   ) No. **CV14-9114** ₿₂₀ SH+
                               )
18          Plaintiff,         )
                               )     VERIFIED COMPLAINT FOR
19            v.               )           FORFEITURE
                               )
20 $985,000.00 IN ESCROW FUNDS,)  18 U.S.C. § 981(a)(1)(A)
                               )
21                             )          [I.C.E.]
           Defendant.          )
22                             )
                               )
23 ─────────────────────────── )

24

25     Plaintiff United States of America brings this action against

26 defendant $985,000.00 in escrow funds, and alleges as follows:

27 //

28 //

─────────────────────────────────────────────────────────
              VERIFIED COMPLAINT FOR FORFEITURE          page 1

JURISDICTION AND VENUE

1.   The government brings this <u>in rem</u> forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A).

2.   This court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

3.   Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

PERSONS AND ENTITIES

4.   Plaintiff in this action is the United States of America.

5.   Defendant is $985,000.00 in Bank Funds (the "defendant funds") derived from the proceeds from the sale of Real Property located in Tarzana, California (the "subject property"), which proceeds had been held in escrow account number xx-4000.[1]

6.   The interests of a retail store in Los Angeles, California (the "store") and/or the store's owner/operator (the "owner") may be adversely affected by these proceedings.

7.   On March 21, 2014, prior to the sale of the subject property, the owner and the government entered into a settlement agreement.  The settlement agreement provided that the owner permit and authorize the United States to record a lien against the subject property in the amount of $1,000,000.00.  On June 9, 2014, in Instrument Number xxx-4938, the United States recorded a deed of trust with assignment of rents against the subject

---

[1]   Pursuant to Local Rule 5.2-1, full account numbers have been omitted from this Complaint.

1  property, which secures a debt in favor of United States of

2  America in the principal amount of $1,000,000.00.

3      8.   The defendant funds are in the custody of the Treasury

4  Department, where it shall remain subject to the jurisdiction of

5  the Court during the pendency of this action.

6                      BASIS FOR FORFEITURE

7      9.   Beginning in or about early 2012, the Los Angeles Police

8  Department ("LAPD") started investigating the owner and the store

9  based on suspicion of the owner's use of the store to fence stolen

10  merchandise.   Cooperating sources and undercover operations

11  revealed that the owner directed associates to conduct

12  robberies/burglaries targeting high-end merchandise, at times even

13  providing co-conspirators with residential addresses to

14  rob/burglarize.   The owner would then re-sell the illicit

15  merchandise at the store, oftentimes after altering the more

16  unique merchandise in an attempt to thwart law enforcement

17  detection.   The store conducted business almost exclusively in

18  cash.

19     10.   Beginning in or about mid-2013, Homeland Security

20  Investigations ("HSI") began participating in the investigation of

21  the store and the owner.   Around this time, an HSI Special Agent

22  ("SA") learned that in or around late 2009, the owner was arrested

23  for "Receiving Stolen Property," in violation of California Penal

24  Code ("CAPC") Section 496(A), a misdemeanor for which the owner

25  was convicted and received two years of summary probation.   This

26  arrest was the result of multiple undercover LAPD operations where

27  officers posed as individuals selling merchandise that they

28  represented as stolen.

1    11.   Beginning in or about early 2012, and continuing for an

2    intermittent period prior to the inception of the HSI

3    investigation, LAPD officers conducted surveillance of the owner

4    and the store, revealing a suspicious pattern of unusual activity.

5    LAPD officers frequently observed individuals meet the owner at

6    the store to conduct transactions inside the retail space.   On

7    several occasions the owner and these individuals, some of whom

8    were later identified as documented gang members or associates,

9    would meet at the store, go inside, shut the doors, and thereafter

10   conduct meetings.   Sometimes the owner would leave the window

11   blinds open, allowing LAPD officers to observe the meetings, but

12   occasionally, the window blinds would be drawn, the reinforced

13   security door closed, and an armed security guard would sit inside

14   the store.   This kind of activity during normal business hours is

15   suspicious given that the store is a retail space normally open

16   for public entry.

17   12.   Following this surveillance, and around the same time

18   that HSI began participating in the investigation in mid-2013,

19   LAPD officers interviewed an individual following that

20   individual's arrest on burglary charges.   That individual became a

21   confidential informant ("CI") who agreed to cooperate with law

22   enforcement in its investigation of the store and the owner.   The

23   CI explained to law enforcement officers how the CI had previously

24   met the owner at the store and there sold stolen merchandise to

25   the owner, who knew the merchandise was stolen.   The CI explained

26   that the owner would sometimes provide the CI with the addresses

27   of residences, which the owner identified as containing high-end

28   merchandise for the CI and associates to steal and bring to the

1  owner, who would then pay the CI and thereafter sell from the

2  store.   The CI explained that s/he was aware of several other

3  individuals with whom the owner would engage in this same type of

4  criminal activity.

5      13.   In addition to providing information relating to the

6  owner and the store, the CI also introduced to the owner an HSI SA

7  who operates in an undercover capacity ("UCA").   As part of the

8  undercover operation, on multiple occasions, sometimes at the

9  store and sometimes in other locations, the UCA sold several items

10  to the owner.   On one of the last such occasions, the UCA met the

11  owner at the store where the UCA sold merchandise to the owner

12  that the UCA represented as the proceeds of a violent robbery that

13  had taken place in a state other than California.   The UCA and the

14  owner negotiated, eventually settled on a price for the

15  merchandise, and the owner explained how the owner would have to

16  alter the merchandise in order avoid detection by law enforcement

17  prior to the owner reselling the merchandise.

18      14.   The owner derived his only source of income from the

19  sales generated from his illicit operation of the store.   Further,

20  the owner used funds generated from the operation of the store to

21  purchase and maintain the subject property.

22      15.   The defendant funds were delivered to the United States

23  Attorney's office pursuant to a settlement agreement between the

24  owner and the government.

25                      CLAIM FOR RELIEF

26      16.   Plaintiff incorporates the allegations of paragraphs

27  1-15 above as though fully set forth herein.

28

---

VERIFIED COMPLAINT FOR FORFEITURE                    page 5

1      17.   Based on the above, plaintiff alleges that the
2   defendant currency constitutes property involved in multiple
3   transactions or attempted transactions in violation of 18 U.S.C.
4   § 1956 (money laundering), or property involved in or traceable
5   to such property, with the specified unlawful activity being a
6   violation listed in 18 U.S.C. § 1956(c)(7).  The defendant
7   currency is therefore subject to forfeiture pursuant to 18
8   U.S.C. § 981(a)(1)(A).
9      WHEREFORE, plaintiff United States of America prays that:
10     (a)   due process issue to enforce the forfeiture of the
11  defendant funds;
12     (b)   due notice be given to all interested parties to
13  appear and show cause why forfeiture should not be decreed;
14     (c)   this Court decree forfeiture of the defendant funds to
15  the United States of America for disposition according to law;
16  and
17     (d)   for such other and further relief as this Court may
18  deem just and proper, together with the costs and disbursements
19  of this action.
20
21
22
23
24
25
26
27
28

VERIFIED COMPLAINT FOR FORFEITURE                    page 6

1

2    Dated:   November 25, 2014          STEPHANIE YONEKURA
                                         Acting United States Attorney
3                                        ROBERT E. DUGDALE
                                         Assistant United States Attorney
4                                        Chief, Criminal Division
                                         STEVEN R. WELK
5                                        Assistant United States Attorney
                                         Chief, Asset Forfeiture Section
6

7

8                                        By:

9                                        _____
                                         John J. Kucera
10                                       Assistant United States Attorney
                                         Attorneys for Plaintiff,
11                                       UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT FOR FORFEITURE                    page 7

EXHIBIT F
Page 241

VERIFICATION

I, Reed W. Rosenberg, declare:

1.   I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.

2.   I have read the foregoing Complaint for Forfeiture and am familiar with its contents.

3.   The information contained therein has been furnished from official government sources and, based on information and belief, the allegations contained in the Complaint for Forfeiture are true and correct.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed November 25, 2014 in Los Angeles County, California.

Reed W. Rosenberg
Special Agent, DHS-HSI

VERIFIED COMPLAINT FOR FORFEITURE (VERIFICATION)                    page 8

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| UNITED STATES OF AMERICA | $985,000.00 IN ESCROW FUNDS |

| (b) County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant   Los Angeles |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |

| (c) Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. | (c) Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. |
|---|---|
| STEPHANIE YONEKURA, Acting United States Attorney JENNIFER M. RESNIK, Assistant United States Attorney 312 North Spring Street, 14th Floor, Los Angeles, CA 90012 Telephone: (213) 894-6595   E-mail: Jennifer.Resnik@usdoj.gov | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

| | |
|---|---|
| ☒ 1. U.S. Government Plaintiff | ☐ 3. Federal Question (U.S. Government Not a Party) |
| ☐ 2. U.S. Government Defendant | ☐ 4. Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1. Original Proceeding | ☐ 2. Removed from State Court | ☐ 3. Remanded from Appellate Court | ☐ 4. Reinstated or Reopened | ☐ 5. Transferred from Another District (Specify) | ☐ 6. Multi-District Litigation |

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No       ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. §§ 981(a)(1)(A)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influ-enced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Com-modities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☒ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | | |
|---|---|---|---|
| CV-71 (06/14) | | CIVIL COVER SHEET | Page 1 of 3 |

CV14-9114

EXHIBIT F
Page 243

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes   ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.?  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.  ☒ NO. Continue to Question B.2. |
|---|---|---|
| ☒ Yes   ☐ No | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.  ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | | |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.  ☒ NO. Continue to Question C.2. |
|---|---|---|
| ☐ Yes   ☒ No | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.  ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | | |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| D.1. Is there at least one answer in Column A? | D.2. Is there at least one answer in Column B? |
|---|---|
| ☐ Yes   ☒ No | ☐ Yes   ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION.  Enter "Southern" in response to Question E, below, and continue from there.  If "no," go to question D2 to the right. ➡ | If "yes," your case will initially be assigned to the EASTERN DIVISION.  Enter "Eastern" in response to Question E, below.  If "no," your case will be assigned to the WESTERN DIVISION. Enter "Western" in response to Question E, below.  ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | WESTERN |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes   ☒ No |

CV-71 (06/14)      CIVIL COVER SHEET      Page 2 of 3

EXHIBIT F
Page 244

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any cases previously filed in this court?  ☐ NO   ☒ YES

If yes, list case number(s):  CV 14-3343-DMG (Ex)

Civil cases are related when they:

☒ A. Arise from the same or closely related transactions, happening, or event;

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Check all boxes that apply. That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____   DATE: November 25, 2014

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

EXHIBIT F
Page 245

# **Exhibit G**

ENGLISH TRANSLATION

# <u>PRESS RELEASE</u>

## IN RELATION TO THE INVESTIGATION PAPERS RETURNED BY MACC ON SRC INTERNATIONAL AND "RM2.6 BILLION"

I have thoroughly perused all the witness statements and the documents in the investigation papers as well as the response given by MACC on my queries for clarification in relation to the investigation paper on the alleged RM2.6 billion and the two investigation papers in relation to SRC International which were returned to me by the Malaysian Anti-Corruption Commission (MACC).

A.   <u>"2.6 BILLION"</u>

1.   With regards to the investigation paper on the alleged "RM2.6 billion" which was transferred into the personal account of YAB PM, **I am satisfied** that based on the evidence from witnesses and supporting documents submitted to me by the MACC show that the sum of USD681 million (RM2.08 billion) transferred into the personal account of YAB PM between 22.03.2013 and 10.04.2013 is a personal donation to YAB PM from the Saudi royal family which was given to him without any consideration.

2.   MACC in their investigation personally met and recorded statements from witnesses including the donor which confirm that the donation was given to YAB PM personally.

3.   **I am satisfied** that there is no evidence to show that the donation was a form of gratification given corruptly. Evidence obtained from the investigation does not show that the donation was given as an inducement or reward for doing or forbearing to do anything in relation to his capacity as a Prime Minister.

1

**ENGLISH TRANSLATION**

4.      Furthermore, in August 2013, a sum of USD620 million (RM2.03 billion) was returned by YAB PM to the Saudi royal family because the sum was not utilized.

5.      Based on the evidence from witnesses and supporting documents submitted, I am satisfied that no criminal offence has been committed in relation to the said RM2.08 billion donation.

6.      On the same matter, **I am satisfied** that as no criminal offence has been committed, there is no necessity for Malaysia to make a request for a mutual legal assistance  to any foreign States for the purpose of completing the criminal investigation  by the MACC in relation to the said RM2.08 billion donation.

**B.      SRC INTERNATIONAL**

7.      With regards to the two investigation papers on SRC International, I am satisfied that no criminal offence has been committed based on the following reasons:

7.1      <u>Under the MACC Act 2009</u>

    a.      There are no evidence to show that YAB PM has abused his position during the Cabinet Meeting which approved the government guarantee on the RM4 billion loan to SRC International from *Kumpulan Wang Persaraan (Diperbadankan)* (KWAP);

2

ENGLISH TRANSLATION

b.    Evidence also show that the loan approval process by KWAP and the loan guarantee approval by the Cabinet were properly done;

c.    There are no evidence to show that YAB PM had solicited or was promised any gratification from any party either before, during or after the Cabinet decision was made;

d.    The evidence as a whole does not disclose any conflict of interest on the part of YAB PM; and

e.    MACC itself admitted that based on their investigation, there are no evidence from the witnesses that could show that YAB PM had committed any act of corrupt practice.

7.2    Under the Penal Code

a.    There are no evidence to show that YAB PM had any knowledge and/or was informed that monies had been transferred into his personal accounts from the account of SRC International;

b.    There are no evidence to show that YAB PM had given any approval for the transfer of monies from the account of SRC International into his personal accounts; and

c.    Evidence show that at all material times, YAB PM was of the belief that all payments which were made by him were made from the donation received from the Saudi royal family which was earlier transferred to his personal accounts.

3

ENGLISH TRANSLATION

8.      Based on the facts and evidence as a whole, **I, as the Public Prosecutor,** am satisfied that no criminal offence has been committed by YAB PM in relation to the three investigation papers. I will return the relevant investigation papers to MACC today **with the instruction to close the three investigation papers (NFA/KUS).**

**TAN SRI DATO' SRI HAJI MOHAMED APANDI BIN HAJI ALI**

Attorney General of Malaysia

26 January 2016

4